# EXHIBIT "C"

# Lawrence S. Borow, M.D., P.C.

Obstetrics, Gynecology, Colposcopy

146 Montgomery Avenue, Suite 200
Bala Cynwyd, PA 19004
(610) 668-1170
Fax: (610) 668-7922
Email: Larryborow@comcast.net

March 3, 2024

Thomas F. Sacchetta Esq.
Sacchetta and Baldino Tial lawyers
308 E. 2nd St.
Media PA 19063

Re: Bethany Ditzler, DOB ▓▓▓▓▓▓▓▓

Dear Mr. Sacchetta:

Since the production of my expert report of December 29, 2023, I have received numerous documents expressing medical opinions and life care plans concerning Bethany Ditzler. These records include the following:

Expert report of Robert Dein, M.D., Obstetrician Gynecologist.
Expert report of Dr. Robert Gherman, M.D., Obstetrician and Gynecologist
Expert report of Jay Goldberg, M.D., Obstetrician Gynecologist
Expert report of Joseph Ouzounian, M.D., Obstetrician Gynecologist
Expert report of Walter Molofsky, M.D., Pediatric Neurologist
Expert report of Dr. Scott Kozin, M.D., Pediatric Orthopedic Surgeon
Expert report of Dr Joshua Abzug, M.D., Orthopedic Surgeon
Life care plan for Bethany Ditzler from R.N. Valerie Parisi
Lifecare plan for Bethany Ditzler from Forensic Resolutions Inc.

1

Life care plan for Bethany Ditzler from Jennifer Cantor, MD, Empiric Planners Lifecare

After reviewing the expert reports of the above physicians, I find it necessary to respond to several of the opinions expressed with which I disagree and/or were critical of opinions I expressed in my report.

All opinions expressed in my report were to a reasonable degree of medical certainty and reflected the factual information available from the medical records that I reviewed; the deposition testimony of both Dr. Hall-Ndlovu and Dr. Blecher; as well as the sworn deposition testimony of Bethany's mother, father and aunt who attended and witnessed the delivery of Bethany on ▮▮▮▮▮▮.

Upon review of my expert report, I misstated the height of Bethany Ditzler's mother Cami Furjanic as 5'10" tall when in fact the medical record says that she was 5'0" tall. At 240 pounds on admission this gave her a BMI of 47 which is morbidly obese, a recognized risk factor for fetal macrosomia/large for gestational age fetus at increased risk for both shoulder dystocia with or without a brachial plexus injury as well increased need for cesarean section delivery.

I disagree with the general opinion of all of the OB/GYN defense experts that prenatal risk factors for shoulder dystocia are of little or no value in the management of the patient's labor and delivery since they will not in every case predict which patient will develop a shoulder dystocia. In this case, Cami Furjamica, was a morbidly obese woman at term who last delivered 6 lbs. 15 oz. male child 12 years prior to this labor. Bethany was 35% larger by birthweight than her brother. Bethany was both large for gestational age fetus, being closer to the 95th percentile for weight, and macrosomic. An obstetrical ultrasound was planned for the clinic visit the day before admission but not performed due to apparent staffing problems. The obstetrical plan in place was for medical induction for a suspected large for gestational age fetus and routinely an ultrasound is required for an estimated fetal weight prior to the initiation of that medical induction.

It is my opinion that had that ultrasound study been performed by a Registered Diagnostic Ultrasound Technologist that the estimated fetal weight would have been 4300 g- plus or -10% (Chauhan 2005). Van Der Looven (2019) in a study of

2

29 million live births reported that the most prevalent, significant risk factors for neonatal brachial plexus injury were shoulder dystocia (OR 115) and fetal macrosomia (OR 9.75). With the multiple risk factors present at the time of admission to labor and delivery it is my opinion, to a reasonable degree of medical certainty, that a careful and informed discussion should have been made with Cami Furjanic providing her with information that was known at the time concerning multiple risk factors that she had for having a delivery complicated by a shoulder dystocia and/or the need in labor for cesarean section. The maternal input as to how her labor was to be managed was as important in 2001 as is in 2024. No mother wants to put her unborn fetus at significant risk of harm without adequate informed consent. Again, Van Der Looven (2019) as well as multiple publications from ACOG reported that cesarean section appears as a protective factor from a neonatal brachial plexus palsy with an OR= 0.3.

Dr. Gherman (1998) in an article entitled Shoulder Dystocia stated that "shoulder dystocia is strongly correlated with the triad of fetal macrosomia, maternal diabetes, and maternal obesity. Macrosomia is arbitrarily defined as a birth weight of more than 4000 g or an estimated fetal weight of more than 90th percentile for the probable gestational age. Repeated studies have shown that infants weighing more than 4000 g or at a statistically increased risk for Shoulder Dystocia. Specifically weights between 4000 and 4500 gm have a 7 to 10% chance of shoulder dystocia. "It goes on to note that in the presence of fetal macrosomia an infant will have a large abdominal or chest circumference that is larger than the fetal head." Several studies have used obstetrical ultrasound to predict fetal macrosomia with an abdominal circumference greater than 35 cm or more. It will predict 93% of macrosomia fetuses Jazayeri 1999) Bethany had a chest circumference of 36 cm consistent with this finding and putting her at further risk of a shoulder dystocia.

It is also my opinion, to a reasonable degree of medical certainty that the majority of brachial plexus injuries are associated with a shoulder dystocia event. It is generally accepted that there may be in utero events or factors which may lead to the neonatal brachial plexus injury such as fetal malposition, viral infections, uterine fibroids or other structural abnormalities of the uterus or even the natural forces of labor. In a well-designed study by Gurewitch (2006) titled "Risk factors for brachial plexus injury with and without shoulder dystocia it was reported that non-shoulder dystocia brachial plexus injury is uncommon and was found in

3

infants of average weight, having a cord pH less than 7.10 and commonly exhibit a trend towards posterior shoulder involvement. They report that this is likely a distinct mechanism from fetuses born with a shoulder dystocia associated brachial plexus injury. Nearly all non-shoulder dystocia brachial plexus injuries were temporary, whereas more than 90% of permanent brachial plexus injuries were associated with a shoulder dystocia (OR 17). A shoulder dystocia related brachial plexus injury correlated positively with fetal macrosomia (OR 6.97), negatively with fetal acidosis and positively with anterior shoulder involvement.

As to the comment made by the defense experts that brachial plexus injuries have been reported frequently to have been associated with a cesarean delivery, Alexander (2006) performed a prospective cohort study of all cesarean deliveries conducted at 13 University centers between January 1, 1999, to December 31, 2000. They reported nine brachial plexus injuries out of 37,110 Cesarean section deliveries for an incidence of 0.2 per 1000. This data certainly suggests that not only is Cesarean section protective against a brachial plexus injury, but a brachial plexus injury is extremely rare and may well and been a consequence of obstetrical maneuvers attempted prior to the C-section or at the time of elevating the anterior shoulder when the fetal head is deeply impacted in the pelvis after prolonged labor.

Comments concerning the expert report of Dr. Robert Dein: I disagree with Dr. Dein as to whether there was an uncomplicated delivery in 1989 since there does not appear to be prenatal records that we were able to review. He is also incorrect that the mother's BMI was 35 when in fact she was morbidly obese with a BMI of 47. The estimated fetal weight of approximately 8 pounds at the time of admission appears to have been done by the family practice fellow Dr. Blecher on the Obstetrical service one month after his family practice residency training. I agree with Dr. Dein that this patient had an uncomplicated first and second stage of labor with an epidural and that she likely spontaneously delivered the fetal head. This is strong evidence that the fetal shoulder at no time "were hung up" on the sacral promontory and had no delay in descent through the bony pelvis. He ignores the presence of a "turtle sign" described by those at the delivery, an event consistent with a shoulder dystocia. He also agrees based upon the family depositions that the delivery was initially begun by Dr. Blecher who was both undertrained, under supervised and had only been in this training program for one month. Dr. Blecher could not accomplish the delivery and the attending Dr.

4

Hall had to be called to the bedside after some uncertain time. There are no delivery notes explaining what he did to try to facilitate this delivery other than downward traction on the fetal head as described by the family members in attendance at the delivery. It is likely as has been demonstrated in previous articles that family practice physicians pull harder and with more force and rapidly than trained obstetricians putting any baby at increased risk for brachial plexus injury in the presence of a shoulder dystocia (Deering 2011). I disagree with Dr. Dein's opinion about the value of risk factors of predicting fetal macrosomia in this case as well as when to discuss with a patient and have her involved in her own care as to the benefits of a trial of labor versus a prophylactic cesarean section. I continued to disagree with him as in the need for an attending to be present at this delivery at all times when Dr. Blecher attempted the delivery. Dr. Hall had a duty and obligation to be there and supervised this trainee on the service for only one month. Had she been there the entire time she should have supervised his efforts, and in the presence of a shoulder dystocia event, immediately initiated an organized plan of care to minimize the chance of harm to the baby. There is no record of any maneuvers done in this case short of an episiotomy performed only when Dr. Hall presented to the patient. As to his theory of in utero brachial plexus injury in response to the forces of labor. I am unable to find a single article regarding a shoulder dystocia or brachial plexus injury that was either prevented or predicted based upon this theory commonly purported by the obstetricians who offer reports in this case. It is well accepted that forceful downward traction applied to the head after the fetal third rotation represents an important risk factor for obstetric brachial plexus palsy vaginal deliveries in the cephalic presentation (Mollberg 2007). It is shown by Allen (2007) that by itself, shoulder dystocia does not pose additional risks of brachial plexus stretch over routine deliveries. No EMG studies were done in this case, so it is impossible to assert that this was an in-utero injury without scientific evidence. Finally, because there is no evidence of fetal hypoxia or fetal acidemia present in the medical record is highly unlikely that any "constellation of forces" were acting independently on this fetus during the labor and delivery process in a negative manner.

Comments concerning the expert report of Dr. Robert Gherman: I have addressed Dr. Gherman's comments concerning the need to discuss a trial of labor versus a C-section based upon the multiple risk factors that were known here in my introduction. I also addressed the fact that in the absence of a detailed operative

5

delivery note by either the attending Dr. Hall or by the family practice resident Dr. Blecher we must rely upon the sworn testimony of the family members who were there along with Cami Furjanic as to what the events were that occurred at the time of this delivery. In my opinion, their description of the delivery process is consistent with a shoulder dystocia event having occurred and attempt to deliver the baby using downward traction sufficient to cause permanent brachial plexus injury to the baby. The family does not recall the application of either the McRoberts maneuver or suprapubic pressure being applied or the patient being told to stop pushing. This is all consistent with an initial delivery attempt when an undertrained, under supervised family practice resident prior to the summoning of this attendant physician Dr. Hall to the bedside. In an unsupervised situation, an inexperienced operator in addition to downward forceful traction on the fetal head is likely to perform twisting an extension of the fetal head. The certainly should be avoided during labor and delivery and is listed by Sandmire (2008) as a contributing factor to the labor forces and a cause of a brachial plexus injury. Finally, I disagree with Dr. Gehrman's conclusion that deposition testimony by the family present at the time of this delivery should not be depended upon when judging the standard of care provided by Dr. Hall and Dr. Blecher. There is no stronger evidence in this case than the deposition testimony of those at the delivery, especially in the absence of any medical records.

Comments concerning the expert report of Dr. Jay Goldberg: it is well-known that shoulder dystocia events have been reported to be underdiagnosed and underreported. With potentially a disagreement on the definition of shoulder dystocia, failure to recognize a shoulder dystocia event or a frank attempt to avoid reporting a medical incident I do agree that a shoulder dystocia event was not documented in this case. However, in the nursery evaluation of baby Bethany Ditzler Dr. Lippe, a consultant orthopedist, does note "apparently large shoulders" This would be consistent with both a 9 ½ pound baby and a poorly reported shoulder dystocia event. This terminology has been used in literature to try to minimize the presence of shoulder dystocia having occurred. I agree with Dr. Goldberg that a C-section was not mandated in this case but rather maternal involvement in the decision for trial of labor with the recognized risk factors certainly should have occurred to comply with the standard of care. I disagree with Dr. Goldberg strongly about the validity of his opinion concerning a family practice fellow in his first month of training being qualified to safely perform this or any delivery without an attending supervising in the delivery room throughout

6

the entire delivery. I disagree with the 9% incidence of brachial plexus injuries occurring at the time of Cesarean sections as reported in an article cited by Dr. Goldberg. Alexander (2006) refutes this clearly. Again, I disagree with Dr. Goldberg's dependence upon the theory of endogenous forces of labor causing the brachial plexus injury in this case because of the lack of scientific evidence surrounding this theory offered because it lacks any ability to predict or prevent a shoulder dystocia event and newborn harm. Ultimately Dr. Hall needed to be present during his delivery to provided expertise and guidance and prevented a permanent brachial plexus injury to this child from the hands of an untrained physician who had never seen a shoulder dystocia emergency before!

Comments concerning the expert report of Dr. Joseph Ouzounian: Several of Dr. Ouzounian's comments of already been addressed in the prior comment sections. I clearly stated why I disagree with the fact that more likely than not excessive downward traction with or without twisting and extension of the fetal head occurred in this case. The sworn deposition of those present at the time of the delivery, and absent any other medical records to invalidate their testimony, strongly suggests that excessive traction likely off axis was performed by Dr. Blecher prior to the appearance of Dr. Hall, his attending physician. Additionally, I disagree with the theory offered that this was an in-utero injury resulting from fetal malposition and impaction posteriorly of the baby's shoulders on the sacral promontory. In the previously cited article by Gurewitch (2006) a transient injury certainly may be associated with the non-shoulder dystocia brachial plexus injury in a smaller baby, with a low pH and involving the posterior shoulder. None of these factors were present in this case making his theory invalid.

Comments concerning the expert report of Dr. Walter Molofsky: Dr. Molofsky is a Pediatric Neurologist who examined Bethany Ditzler. He is of the opinion that brachial plexus injuries are the result of net vector forces acting on the brachial plexus during labor resulting in stretch of the brachial plexus. He believes that contribution by the obstetrician can be minimal to nonexistent even with permanent injury. I strongly disagree with this opinion based upon my testimony throughout this report. He does not understand the concept of a prophylactic cesarean section markedly reducing the risk of a shoulder dystocia and brachial plexus injury occurring. He does not understand that the implementation of training programs throughout the Western World has significantly decreased the incidence of brachial plexus injuries through early recognition of a shoulder

7

dystocia event early initiation of maneuvers to relieve that shoulder dystocia event and the dictum of avoiding downward traction with twisting the head or extending the fetal head. He does not accept the concept that risk factors should help obstetricians in their management of patients at risk of a shoulder dystocia event. Lastly, he has no understanding of the concept of an underreported underrecognized shoulder dystocia event that does not obviate the presence of the shoulder dystocia event having occurred. He does "not accept any questionable testimony given by lay people" regarding the routine use of traction in the delivery that they personally witness and for which there are no medical records to better explain the events of the injury that occurred here.

I did review the reports of the two Orthopedists and noted that Dr. Scott Kozin noted in his September 1, 2004, office visit with Bethany that" mom had some trouble delivering her. She was told immediately that Bethany had a brachial plexus injury". The remainder of the two orthopedic reports are completely consistent with my understanding of the findings, her prognosis, and her limitations at present.

It is my opinion that neither a senior OB/GYN resident in training nor a family practice fellow in training should have been given the primary responsibility to attempt this delivery without the full-time presence of their supervising obstetrician. If Dr. Hall-Ndlovu, the supervising obstetrician of the residents and family practice fellows in the morning of August 17, 2001, permitted either of these physicians in training to attempt delivery of Ms. Furjanic's fetus without her direct supervision it would be a breach of the standard of care putting both mother and baby at increased risk of harm. If instead Dr. Hall-Ndlovu was present for the entire time of this delivery, she then breached the standard of care by permitting her trainees or by her own direct care by applying excessive downward traction on the fetal head, applying off axial forces to relieve the should dystocia, performing excessive rotation of the fetal head or any combination of the above maneuvers causing a permanent brachial plexus injury to baby Bethany Ditzler.

It is my opinion that Lee Blecher, who was a resident also breached the standard of care. He regularly attended to Baby Bethany. His attempt to deliver the Baby was a breach. The pulling of the baby and bracing his feet on the bed are a breach of the standard of care. Furthermore, his attempt to deliver given circumstances without attending physician present was a breach of the standard of care.

The Defendant hospitals breached the standard of care by failing to oversee the defendant Doctors patient care and they breached the standard of care by failing to formulate, adopt and enforce rules and policies to ensure quality care to patient Baby Bethany as set forth herein, including allow a family practice resident to attempt delivery without supervision.

All of my opinions are held to a reasonable degree of medical certainty. All breached that I have set forth herein were a direct cause of harm and increased risk of harm to Bethany Ditzler.

Thank you for the opportunity to respond to these recently received expert reports. I reserve the right to review any other reports or medical records that are received and to issue an updated supplementary report if any of my opinions of changed.

Very truly yours,

*Lawrence S. Borow, MD.*

Lawrence S Borow MD

References:

> 1. Chauhan SP, Hendrix NW, et al: a review of sonographic estimate of fetal weight: vagaries of accuracy. The Journal of Maternal Fetal and Neonatal Medicine 2005; 18 (4):11-220
> 2.
> 2. Van Der Looven R et al: risk factors for neonatal plexus palsy: a systemic review and meta-analysis. Developmental Medicine and Child Neurology 2020; 62 673- 681
> 3. Ghermann RB, Goodwin TM. Shoulder dystocia. The Female Patient 1998 23 April 79-90;
> 4. Jazayeri A et al. macrosomia prediction using ultrasound fetal abdominal circumference 35 cm or more. Obstet Gynecol 1999; 93:523 526
> 5. Gurewitch ED et al. risk factors for brachial plexus injury with and without shoulder dystocia. AJOG;2006;194: 486-492

9

000048

6. Alexander JM et al. fetal injury associated with a cesarean delivery. Obstet Gynecol 2006; 108:885 -890

7. Deering SH et al. evaluation of force applied during deliveries complicated by shoulder dystocia using simulation. AJOG 2011; 204:234-239

8. Mollberg M et al. Obstetric brachial plexus palsy: a prospective study on risk factors related to manual assistance during the second stage of labor. Acta obstetric et gynecologic 2007; 86:198 – 204

9. Allen RH et al. comparing mechanical fetal response during the sentence, crowning, and restitution among deliveries with and without shoulder dystocia AJOG 2007; 196:539-544

10. Sandmire H et al. Newborn brachial plexus injuries: the twisting an extension of the fetal head as contributing causes. Journal of obstetrics and gynecology, 2008; 28 (2): 170-172 I

10