# EXHIBIT "O"

State of Ohio,        )
County of Lorain.  ) SS:


                IN THE COURT OF COMMON PLEAS

     ████████ **COOK, et al.,**            )
                                          )
                Plaintiffs,      )
                                          )
vs.                                       ) No. **12CV175644**
                                          ) C/A: n/a
**EMH REGIONAL HEALTHCARE**               )
**SYSTEM, et al.,**                       )
                                          )
                Defendants.      )

                        * * *

     A COMPLETE TRANSCRIPT OF LAWRENCE S. BOROW, M.D.,

TESTIMONY IN THE PROCEEDINGS HAD IN THE ABOVE-ENTITLED

MATTER ON WEDNESDAY, MAY 30, 2018, BEFORE THE HONORABLE

D. CHRIS COOK, PRESIDING JUDGE OF SAID COURT.

                        * * *


APPEARANCES:

Appearing on behalf of the Plaintiffs:

     Pamela Pantages, Esq.
     Jeffrey Heller, Esq.

Appearing on behalf of the Defendants Corie L. Kovach,
M.D. and Erie Shore Women's Health, Inc.:

     Jeanne Mullin, Esq.

Appearing on behalf of the Defendant EMH Regional
Healthcare System:

     Michael Murphy\, Esq.

1              **WEDNESDAY, MAY 30, 2018, 1:09 P.M.**

2              THE COURT:  Attorney Pantages, on behalf of

3      the Plaintiff, are you prepared to call your first

4      witness?

5              MS. PANTAGES:  We are, Your Honor.

6              THE COURT:  Very well.

7              MS. PANTAGES:  Plaintiffs call Dr. Lawrence

8      Borow.

9              THE COURT:  Come on up, Doc.  Ms. Leeza will

10     swear you in.

11     **LAWRENCE S. BOROW, M.D.,** after being first duly sworn,

12     as hereinafter certified, was examined and testified as

13     follows:

14             MS. PANTAGES:  Good afternoon, everybody.

15                             * * *

16        **DIRECT EXAMINATION OF LAWRENCE S. BOROW, M.D.**

17     **BY MS. PANTAGES:**

18     Q    Good afternoon, Dr. Borow.

19     A    Good afternoon, Ms. Pantages.

20     Q    Will you please introduce yourself to the jury?

21     A    My name is Lawrence Stephen Borow, B-O-R-O-W, M.D.

22      I'm an obstetrician/gynecologist.

23     Q    And where are you from, Dr. Borow?

24     A    I live and practice in a town called Bala Cynwyd,

25     Pennsylvania, but it's a suburb of Philadelphia.

1    Q     And how long have you been practicing obstetrics

2    and gynecology?

3    A     I've been in the private practice for 44 years.

4    Q     And approximately how many babies do you think

5    you've delivered over the course of your career?

6    A     Over 6,000.

7    Q     And how many shoulder dystocias do you think

8    you've had?

9    A     Between 2 and 300 shoulder dystocias.

10   Q     And in 6,000 deliveries, 2 to 300 shoulder

11   dystocias, have you ever had a permanent brachial

12   plexus injury in a child like ███████?

13   A     I have not.

14   Q     Can you tell the jury a little bit about what you

15   had to do -- well, before I start down that path, are

16   you actively licensed to -- licensed to practice

17   medicine?

18   A     Yes.

19   Q     And where are you actively licensed to practice?

20   A     In Pennsylvania.

21   Q     And are you also board certified by the American

22   Board of Obstetrics and Gynecology?

23   A     Yes.

24   Q     And you're actively licensed in Pennsylvania?

25   A     Yes.

1    Q    And what do you have to do to maintain your active

2    license in obstetrics and gynecology?

3    A    The primary thing you have to do is to maintain

4    your continuing medical education and be willing to pay

5    the licensing fees, of course, and be a good citizen.

6    All of the above.  But the continuing medical education

7    requirement actually meets the hospital requirement and

8    the departmental requirement.  So that's what I do.

9    And I have to do that every two years on a recurring

10   cycle, so I've done it 22 times already where I've

11   recertified through the state and through my own

12   department and the hospital.

13   Q    And does that procedure that you go through for

14   licensing and for your hospital privileges and that

15   type of thing, does that require you to stay current

16   with the literature, the science, the research in

17   obstetrics and gynecology?

18   A    Absolutely.

19   Q    Either by reading literature or attending courses?

20   A    It actually involves -- there's components for

21   both.  Because you do have to do lecture classes,

22   lecture studies, so it can't all be voluntary home

23   reading journals.  So they specify three or four

24   different divisions of how you can earn the credit, but

25   you have to have a certain minimum in each one.  For

1   example, patient safety we have to have, like I said,

2   12 to 15 hours of patient safety in the 100 or 200

3   hours that you have to accumulate.

4   Q    And relative to the coursework and the study that

5   you've done to keep your current -- your license

6   current and your active privileges current, can you

7   give us some examples of some other type of courses

8   that you have attended within the last year or so?

9   A    Past year or so, I've attended courses in surgical

10  safety, so that's safety in the operating room; how to

11  prevent fires, which sounds impossible, but it occurs

12  more frequently than people like.  I've taken course on

13  that.  I've taken courses on -- a lot of courses on

14  using our new computer system.  That's been a busy

15  thing, all of those systems.  I've taken courses in

16  high-risk obstetrics, fetal monitoring, obstetrical and

17  gynecologic topics of all types.

18              THE COURT:  Counsel, hold on a second.  I

19  need to see you real quick.

20         (Sidebar discussion took place as follows:)

21              THE COURT:  We didn't give them notebooks.

22              MS. PANTAGES:  Oh, oh, right.

23              THE COURT:  So why don't we get that on.

24              MS. PANTAGES:  Oh, sorry.  Thank you.

25              THE COURT:  We agreed to do that, I think.

1           MS. PANTAGES:  Yes, yes.

2           THE COURT:  Do it before we get too far down.

3           MS. PANTAGES:  Thank you.

4               (Sidebar discussion ended.)

5           THE COURT:  Micki, off the record.

6               (Discussion held off the record.)

7           THE COURT:  Let the record reflect that we

8   have now provided the jurors with notepads and pencils,

9   so that, again, those who wish may take notes.  And,

10  again, I remind you, please, even if you're taking

11  notes, do your best as well to stay up with the

12  testimony.  So thank you very much.

13          MS. PANTAGES:  Thank you.  Thank you, Your

14  Honor.  Thank you, Leeza.

15  **BY MS. PANTAGES:**

16  Q    And, Dr. Borow, since our jury has their notepads

17  now, can you spell your last name, please, Dr. Borow?

18  A    B-O-R-O-W.

19  Q    Thank you.

20  A    You're welcome.

21  Q    All right.  So we were talking a little bit about

22  your credentials.  You are licensed to practice

23  medicine in the state of Pennsylvania.  And do you

24  spend at least 75 percent of your professional time in

25  the active clinical practice of obstetrics and

1    gynecology?

2    A    I do.

3    Q    Great.  And we mentioned that you were board

4    certified.  Our jury has not -- hasn't had a witness

5    yet.  You are our first witness.  So board

6    certification is a term that hasn't been said in this

7    courtroom yet.  Could you describe what board

8    certification is, what you have to do to be board

9    certified and what it means?

10   A    Board certification means that you can present

11   yourself to the public as someone who has undergone an

12   approved training program that resulted in you taking

13   examinations, peer review examinations, usually by a

14   board, American Board of Obstetricians and

15   Gynecologists.  Usually you travel there someplace,

16   Washington or Chicago.  And you sit for an exam.

17   There's a three-part -- you take basically two parts in

18   training during your four-year residency program, which

19   is what I did.  And then you go into practice.  And

20   after two years you submit a case list, all of the

21   cases you've done, all of the deliveries you've done,

22   surgeries you've done, so they see you're actually

23   working and you have experience.  And then you go and

24   defend your cases and you get quizzed on a multitude of

25   academic subjects on a one-to-one basis, usually three

1    board examiners and you.

2        And if you pass that, you then are told that you

3    now are board certified, and you get a certificate that

4    you can hang on the wall that shows that you are and

5    have achieved board certification.  And it takes a --

6    an approved residency, passing the examinations,

7    submitting all of these materials, and then sitting for

8    the exam.

9    Q    Thank you.

10   A    You're welcome.

11   Q    And how long have you been board certified?  How

12   many years?

13   A    Since 1976.

14   Q    All right.  So walk us through if you would,

15   Dr. Borow, undergraduate school, medical school, and

16   residency, what you had to do education and

17   training-wise to become an actively licensed, board

18   certified obstetrician/gynecologist.

19   A    Four years of undergraduate school.  I went to

20   Franklin and Marshall College in Lancaster,

21   Pennsylvania.  I went to the Temple University School

22   of Medicine.  I started in 1966.  I finished in 1970.

23   And in 1970 I started an internship of residency in

24   obstetrics and gynecology at the Pennsylvania Hospital

25   in Philadelphia, part of the University of

9

1   Pennsylvania.  I completed my residency in 1974.  Went

2   into private practice.  I was in the military in the

3   Reserves for nine years during part of that, and then

4   in private practice.  And became board certified two

5   years after I started to practice.

6   Q    And have you on occasion, also, Dr. Borow, over

7   the course of your career, taught at medical schools

8   teaching obstetric residents how to safely care for

9   pregnant women and safely deliver babies?

10  A    Yes.

11  Q    Can you tell us about that a little, please?

12  A    Well as a resident, part of your duties as chief

13  resident is to teach the medical students and younger

14  residents.  Our medical students were from the

15  University of Pennsylvania.

16       When I went into practice, I was in a hospital

17  associated with Jefferson University School of

18  Medicine, which is also in Philadelphia.  And for the

19  past 40-some years, I've been teaching medical students

20  from Jefferson, as well as our own residents at my own

21  primary hospital called the Lankenau Medical Center.

22  And that's where my primary clinical responsibilities

23  are.

24  Q    And have you also, over the course of your career,

25  either taught obstetric labor and delivery nurses,

1   supervised them, managed them over the course of your

2   career?

3   A    Yes.

4   Q    And can you tell us about that too, please?

5   A    I think, over the 6,000 deliveries or so, there

6   always were obstetrical labor and delivery nurses

7   involved.  Every patient is a teaching case,

8   essentially because each case is a team effort, or

9   should be a team effort between the doctors and nurses

10   and anesthesia and pediatrics, because that's how we

11   treat patients.  It's patient care.  So there's always

12   teaching involved, there's always looking at fetal

13   monitors, talking about situations, blood pressure and

14   blood sugars and conditions of moms and babies along

15   the way.  So I've done both clinical teaching, hands-on

16   in labor and delivery, but I've done lectures and other

17   educational contacts with nurses on a regular basis.

18   Q    And have you had any role at the hospitals that

19   you've had privileges at over the years in assisting

20   with protocols or safety drills or that type of

21   training or developing safety parameters for your

22   hospital?

23   A    All of the above.

24   Q    Okay.  Can you tell us about that, please?

25   A    I've been on numerous committees.  I've been on

1    the OB/Gyn safety committee.  I'm on the transfusion

2    committee now, which represents 130 or 140 different

3    OB -- obstetricians and gynecologists who are in our

4    healthcare system, looking at use of blood, which for

5    OB/Gyns is very important.

6        I've been on the tumor board.  I've been on the

7    patient quality care committee.  I've been on the risk

8    management committee, and actually was involved with

9    starting our program.  This is now almost 14 years ago

10   where we developed a shoulder dystocia -- that's a word

11   we're going to talk about a little later -- shoulder

12   dystocia drill program for all of the residents,

13   nurses.  All of the nurses in OB/Gyn and all of the

14   physicians had to go through a program so we all spoke

15   the same language.  There was a safety purpose for it

16   to reduce the risk of having injuries, and so that

17   everybody was on the same team how to manage a shoulder

18   dystocia event.  Like a CPR event, I mean, people have

19   to know what their role is.  And we developed that

20   program in 2004, I think.

21   Q    And have you also published and researched, given

22   presentations, that type of thing as well, over your

23   career?

24   A    I have.

25   Q    Tell us about that, please.

```
 1   A    I started in 1996.  I edited a textbook on

 2   laparoscopy and hysteroscopy, published numerous

 3   articles on both obstetrical and gynecologic topics in

 4   the areas that I have interest in.  I've taught about

 5   20 courses on high-risk obstetrical and gynecologic

 6   topics, but primarily gynecologic topics in terms of

 7   courses.

 8   Q    Dr. Scott Kozin is an expert witness in this case.

 9   You know Dr. Kozin?

10   A    I've met Dr. Kozin.

11   Q    And has Dr. Kozin referred you patients over the

12   years?

13   A    Yes.

14   Q    Thank you.

15            MS. PANTAGES:  May I approach the witness?

16            THE COURT:  You may.

17                         *  *  *

18       (Plaintiffs' Exhibit No. 1 was marked.)

19                         *  *  *

20   Q    Doctor, I'm handing you Plaintiffs' Exhibit No. 1.

21   Can you identify that for us, please?

22   A    This is a -- my curriculum vitae through, looks

23   like, April 2018.

24   Q    So it's reasonably current?

25   A    Yes.
```

1    Q    And basically that sets forth all of the things we

2    just talked about right now?

3    A    It does.

4    Q    All right.  Can you tell us a little bit about

5    your current active practice?

6    A    Sure.  I have an active practice in obstetrics and

7    gynecology.  I have office hours essentially Monday

8    through Fridays.  Monday, Tuesday, and Wednesday I see

9    regularly scheduled patients, both obstetrical and

10   gynecologic patients.  Thursday I usually to go the OR.

11   And Fridays I do continuing medical education to the

12   business of the practice, and sometimes we'll do this

13   medical/legal-type function.  And that case might read

14   pretty busy, being on call essentially every night and

15   every weekend for my own patients, where I may have to

16   go to the emergency room, see patients in the hospital,

17   make rounds on patients who are in the hospital.  So

18   it's a pretty busy week.

19   Q    You're still in full-time active practice?

20   A    Yes.

21   Q    Are you still delivering babies?

22   A    Not in 2018.

23   Q    Tell us about that.

24   A    I haven't delivered any babies for a little over

25   10 years.  I still see six to eight new OB patients per

 1   month in the office, take them through to about 20

 2   weeks.  Nowadays it's a very complicated first half of

 3   the pregnancy, because of genetic testing and all types

 4   of advanced diagnostic tools we have.  Now, patients

 5   try to get the best possible baby, so to speak.  But

 6   after 20 weeks, the patients transfer to one or two

 7   other practices in the hospital, people who have

 8   actually been my partners in the past.  And they

 9   usually take care of those women and deliver their

10   babies for me.

11   Q    And what led to the decision, your decision to

12   stop delivering babies?

13   A    I'd done 6,000 deliveries.  I hadn't lost a mom or

14   a baby.  And I promised my wife at a certain point I

15   would stop, get some nights and weekends back.  I held

16   on for a couple years past that, but stopped.

17   Q    Has the manner in which mothers delivered babies

18   changed from 2007 to the present time?

19   A    No.

20   Q    Has the standard of care that applies to an

21   obstetrician or a labor and delivery nurse changed --

22   managing a patient like Mrs. Cook, has that changed at

23   all since 2007?

24   A    No.

25   Q    The fact the jury heard during defense opening

1   statement that was pointed out that you haven't

2   delivered babies in 10 years, does that affect your

3   competency or your ability to review this case and give

4   qualified obstetric opinions?

5   A    I do not believe it does at all.  Because I'm as

6   current as you can be in terms of conferences,

7   literature, being aware, I mean, what happens in a

8   hospital setting, because I'm in and out of the

9   hospital all of the time, and going to events and

10  programs all about obstetrics and gynecology, plus

11  continuing education courses.

12  Q    So are you familiar with the standard of care that

13  applies in this case?

14  A    Yes.

15  Q    All right.  Have you and I worked together before?

16  A    Yes.

17  Q    Approximately how many times -- we're both going

18  to gave our age away a little bit here.  How many times

19  have you and I worked together in the past 25 years?

20  A    I think I've probably looked at probably 15 or 16

21  cases together over that time period.

22  Q    All right.  And have you turned down some of those

23  cases?

24  A    I have.

25  Q    Thank you.

```
 1          And the reason why you turned them down was
 2    because you told me --
 3              MS. MULLIN:  Objection, Your Honor.
 4              THE COURT:  As to form?
 5              MS. MULLIN:  Leading.
 6              THE COURT:  Sustained.  Rephrase.
 7    Q    And when a lawyer like myself sends you a case to
 8    review and you turned it down, what's the primary
 9    reason for your turning it down?
10    A    Well, there's usually two reasons.  One reason is
11    that I may review the case, and whether there was
12    injury done or not, I did not believe that it was an
13    injury that rose to the level of breach of the standard
14    of care, a violation of the standard of care.  Or I'm
15    the wrong expert.  In other words, I may read the case
16    and say, "Well, you need a general surgeon, or you need
17    an anesthesiologist, or you need an urologist, but it's
18    not an OB/Gyn case, and I only testify about OB/Gyn
19    issues."
20    Q    And you have no hesitation sending whoever sent
21    you a case, whether it's a Plaintiff's lawyer or a
22    defense lawyer, that there's no merit to the case?
23    A    Right.  I believe they respect that.
24    Q    All right.
25              MS. PANTAGES:  May approach the witness?
```

```
 1              THE COURT:  You may.

 2                          *  *  *

 3        (Plaintiffs' Exhibit No. 3, 4, and 5 were marked.)

 4                          *  *  *

 5   Q    Doctor, I'm going to hand you what we've marked as

 6   Plaintiffs' Exhibit 3, 4, and 5.  And for the record

 7   I'm going represent to you that these are exhibits that

 8   include the prenatal care records, the EMH labor and

 9   delivery records for Mrs. Cook, the electronic fetal

10   monitoring tracings, the EMH nursery records for

11   ███████, and the Cleveland Clinic, Cincinnati

12   Children's Hospital, various care providers, and some

13   other materials that we've marked as Plaintiffs'

14   Exhibits 3, 4, and 5.  I'm going to ask you to take a

15   look at those, if you would, please.

16   A    Okay.  I took a look.

17   Q    And are those duplicates of the materials that I

18   have sent you over the last couple of years in order to

19   get your opinions on this case?

20   A    They are.

21   Q    All right.  And did I also send you, over the

22   course of the last couple of years, depositions of fact

23   witnesses that occurred in this case, Mr. and

24   Mrs. Cook, some of the EMH nurses, Dr. Kovach, and the

25   grandmothers that were present in the delivery room?
```

```
 1   Have you seen all of those depositions?

 2   A    I've seen all of those.

 3   Q    All right.  And you've read all of those?

 4   A    Yes.

 5   Q    And did I also send you expert reports over the

 6   last couple of years, expert reports from Plaintiffs'

 7   experts, Dr. Adler, Dr. Durgin, and Veh?  Did I send

 8   you Plaintiffs' expert reports, in addition to yours?

 9   A    Nurse Daniels.

10   Q    Oh, Nurse Daniels.  Thank you, I apologize.

11   A    All right.

12   Q    Yes.

13   A    Right.  She's a nursing expert, Nurse Daniels.

14   Yes, I've read those.

15   Q    All right.  And I also sent you defense expert

16   reports, Dr. Kozin, Dr. Ouzounian, Nurse McGrath, and

17   there might be a couple that I'm forgetting.  But I

18   sent you defense expert reports over the years?

19   A    There were a few you didn't add, but the answer is

20   yes.

21   Q    Yes.  And you've read everything that I've sent

22   you?

23   A    I did.

24        MS. PANTAGES:  All right.  And if I could

25   approach again, Your Honor?
```

```
 1              THE COURT:  You may.

 2                         *  *  *

 3         (Plaintiffs' Exhibit No. 2 was marked.)

 4                         *  *  *

 5    Q    I'm going to hand you what we've marked as

 6    Plaintiffs' Exhibit No. 2.  And can you tell the jury

 7    what Exhibit No. 2 is?

 8    A    No. 2 is my expert report, which I authored in

 9    November of 2013.

10    Q    All right.  May I have that one back?

11    A    Of course.

12    Q    You have a copy of this?

13    A    I do.

14    Q    All right.  And you wrote your expert report after

15    having reviewed some of the materials that we talked

16    about.  For example, you did not have the defense

17    expert reports yet when you wrote this, right?

18    A    Right?

19    Q    Those came later, so kind of a work in progress,

20    right?

21    A    Work in progress.

22    Q    Are those, those materials that we've discussed,

23    are those the types of materials that lawyers like me

24    representing an injured child like ███████ would send

25    to you to obtain your opinion on whether there were
```

1    standard of care violations in a case that led to the

2    child's injury?

3    A    Yes.

4    Q    And that's the typical methodology of how this

5    process works, correct?

6    A    Yes.

7    Q    Okay.  So we're going to be talking about some of

8    your opinion -- we're going to be talking about the

9    bulk of your opinions in this case, Dr. Borow.  And I'm

10   going to ask you, if I don't ask you in each individual

11   question, if you have opinions that you're going to

12   state in front of the jury, if you would do so only to

13   a reasonable degree of medical probability, all right?

14   A    Yes.

15   Q    All right.  I'll try to remember to do it all of

16   the time, but I might not do it.

17        So I want to run through quickly some words that

18   we used in opening statements that I would like you to

19   explain to the jury, okay?

20   A    Okay.

21   Q    And just brief definitions of these, and we're

22   going to expand on these as we go through your

23   testimony this afternoon, all right?

24   A    Sure.

25   Q    So "standard of care," the jury has already heard

1    about standard of care.  Are obstetric residents taught

2    about the standard of care in their training?

3    A    Yes.

4    Q    Can you tell the jury what the standard of care

5    means to a obstetrician and why it's important?

6    A    Well, both in residency and in practice, standard

7    of care, basically, is your primary element of patient

8    safety, which is what's reasonable for

9    obstetrician/gynecologists with the same or similar

10   training expected to do or not do under same or similar

11   circumstances.  So it means you try and do the safest

12   thing for the patient with the best potential outcome,

13   and it's reasonable.

14   Q    And what's the ultimate goal underlying any

15   particular standard of care?

16   A    Safety.

17   Q    All right.

18   A    Patient safety.

19   Q    Patient safety, number one, right?

20   A    Yes.

21   Q    Okay.  We've talked about what's a fact in this

22   case.  A situation in this case is Dr. Kovach was a

23   weekend on-call obstetrician.  In your practice, have

24   you, over the course of your career, have you been --

25   have you had occasion to be a weekend on-call

1   obstetrician?

2   A    I was just trying to think how many times I've

3   done that.

4   Q    All right.

5   A    Hundreds and hundreds of times I've been on call

6   for the weekend, yes.

7   Q    All right.  So can you tell for the jury, please,

8   what that means and what the job of a weekend on-call

9   obstetrician is at a hospital like EMH?

10  A    Your job as a weekend on-call physician -- and

11  normally, again, every group has their own dynamic.

12  But usually you cover from Friday afternoon until

13  Monday morning for your own practice.  You may cover

14  for a second group, as did Dr. Kovach in this case.

15  You're responsible for the patients who are in the

16  hospital.  You're responsible for labor and delivery.

17  You're responsible for patients who come into the ER

18  from your group or the other group.  You're responsible

19  to make rounds, if there's patients in the hospital,

20  and you're responsible to see, care for, attend.

21  That's why we say you're an attending, attend to the

22  patients that are in the hospital.  You take telephone

23  calls.  We call in prescriptions and prescription

24  renewals.  And we try to solve problems on the phone if

25  we can for gynecological or obstetrical patients who

1    are not in the hospital setting.  That's it.  You're

2    busy.  You're very busy when you're on call.

3    Q    And under what circumstances is the on-call doctor

4    in the hospital?

5    A    Depends on if someone's in labor, you have to make

6    a determination of when to come in.  And that's all

7    based on the situational awareness.  What's the -- what

8    is the reason that the mom's there?  Is she 30 weeks

9    and she's in preterm labor, or was she full term, which

10   might let you come in a little bit later.  Does mom

11   have medical problems?  Do you need to come in sooner?

12   Do you know this patient?  Have you examined the

13   patient?  Is she getting Pitocin?  Is she in pain?  Is

14   she bleeding?  Multiple varieties of things that happen

15   with patients that doctors have to recognize and look

16   at a situation as a whole.  And that's when you come in

17   to the hospital to see patients.

18   Q    And that's what you call situational awareness?

19   A    Sure.  And, of course, when patients are in active

20   labor, then you are more likely to have to come in.

21   Certainly when patients are completely dilated, since

22   we don't know how quickly someone -- 10 centimeters and

23   ready to push, completely dilated.  When we get to that

24   point, we don't know how quickly, we can't predict how

25   quickly someone will deliver.  So normally, if you're

```
1    not there, the nurses will let you know, and you should
2    be on your way in promptly, because someone can push
3    and have a problem with bleeding or umbilical cord or
4    fetal monitor strip that develops a problem, or a baby
5    could deliver.
6    Q    Right, or a baby can deliver.
7    A    So you try to come in in a timely fashion.
8    Q    So you talked about those things.
9         What is the term "attending"?  Have you been an
10   attending obstetrician before?
11   A    Yes.
12   Q    Thousands of times?
13   A    Thousands of times, I think, since I've gone into
14   practice.  You then can use the word you're an
15   attending physician.  Because when you're a resident,
16   you're supervised.  When you go into practice, so
17   that's since 1974, I've been an attending physician to
18   the patients I care for.
19   Q    And that means it's your job to take care of that
20   patient?
21   A    Yeah, sure.
22   Q    What's a "house obstetrician"?
23   A    That's different.  So a house obstetrician is
24   usually someone who is not necessarily from your group
25   or any group.  That may be somebody who is a full-time
```

1    hospital employee, part-time hospital employee, usually

2    paid for by the hospital to cover emergencies, to

3    cover -- to help with C-sections, for example, or

4    surgery in the OR, if a patient has to go to the OR

5    during a weekend time or during a 24-hour period.  So

6    their job is sort of a special job.  They cover

7    emergencies and calamities and other types of issues

8    that are outside of the normal care that you as the

9    attending would give your patients.  But that's

10   somebody usually who is "in-house," usually on 24-hour

11   shifts.

12   Q    And does someone have to ask the house OB to go

13   see a patient?  Is that usually how it works?

14   A    Sure.

15   Q    Okay.

16   A    For special things.  Or, or I was on my way in to

17   do a C-section for some reason, I could notify the

18   house physician and ask he or she to attend to the

19   patient for the 15 or 20 minutes until I got there, and

20   get anesthesia, the OR ready, and nurses and everybody

21   else who you need to have together.  So the house

22   physician could help you with that.  Particularly if

23   they're going scrub in on the C-section with you.

24   Q    Okay.  "Bedside labor nurse," briefly what is that

25   or "obstetric nurse"?  We've been calling them --

1    A    Obstetrical nurse is basically the nurse who is

2    assigned the patient.  And it may be one-on-one or one

3    nurse to two patients.  And she's the person who takes

4    notes and pays attention and manages and cares for the

5    patient per doctor's orders and within the normal

6    parameters that nurses are allowed to take care of

7    patients.

8    Q    And are there limitations on what a bedside nurse

9    can do?

10   A    Of course, right.

11   Q    Okay.  What are "physician orders"?

12   A    Physician orders are usually documented records,

13   either electronically or handwritten, that tell the

14   staff, which is normally the nursing staff or the

15   pharmacy, for example, what the physician wants.  And

16   that's an order.

17   Q    And those can be -- how are those -- how do

18   doctors issue their orders, hospital orders, to the

19   nurses?

20   A    Normally you put them into the computer, or you

21   would tell a nurse, and that's a verbal order.  And

22   then it has to be signed within a certain time period,

23   12 or 24 hours.  You could do it on the telephone, and

24   that's a verbal order, but that's something you need to

25   sign as soon as you come into the hospital, so that it

 1  doesn't get lost in the order file.

 2  Q    Okay.  "Hospital protocols," what are we talking

 3  about when we talk about hospital protocols?

 4  A    There are all kinds of protocols within the

 5  hospital.  They're directed toward patient safety.  And

 6  they're guidelines for physicians and nurses to use to

 7  deliver safe and efficient, effective care for

 8  patients.

 9  Q    The jury heard a little bit in open statement

10  about prenatal care in this case.  What is "prenatal

11  care" and what's the purpose of it?

12  A    So prenatal care is the care that you get from the

13  time that your pregnancy is diagnosed, and you come to

14  the office and get an evaluation, physical exam, and

15  blood testing, and the time that you come to the

16  hospital to have the baby.  So you may come in and

17  still go home, go back to prenatal care.  But usually

18  patients come in, if you're uncomplicated, and you come

19  in, and now you're going to be in the hospital and

20  you're going to have the baby.

21  Q    Is one of the goals of prenatal care to assess

22  risks for a safe delivery?

23  A    Absolutely.

24  Q    All right.  So we're going to talk about some of

25  those a little bit that the jury is going to hear about

```
 1   in this case.  During prenatal care, what is the
 2   significance of -- or at any point in time during a
 3   pregnancy, what is the significance of maternal
 4   obesity, high body mass index, or excessive weight gain
 5   during a pregnancy?
 6   A    Both of these are serious risk factors in
 7   obstetrics and gynecology for both hypertension, risks
 8   for diabetes in pregnancy, other types of associated
 9   diseases.  But particularly anesthesia risks, risks
10   that as moms who either are heavyset before they get
11   pregnant and then go into the pregnancy and gain
12   weight, moms have an increased risk for dysfunctional
13   labor, meaning the labor pattern isn't the same as
14   women who are not obese.  And they have a significantly
15   increased risk for cesarean sections, both because of
16   dysfunctional labor, abnormal labor patterns, and
17   progress, as well as the fact that bigger moms
18   frequently make bigger babies.  And bigger babies can
19   only fit through a certain size pelvis.  And if mom
20   already is a -- has a high body mass index, and she
21   gains an excessive amount of weight -- an excessive
22   amount of weight sort of predicated on what your body
23   mass index was when you got pregnant, whereas a thin
24   gal may be told to gain 25 or 35 pounds, someone who's
25   heavy set to begin with may be told to keep her weight
```

1    to 15 pounds, seven kilograms.  If she starts off with

2    a body mass index of more than 30 -- Mrs. Cook, for

3    example, her body mass index was over 35 when she got

4    pregnant.  It went to 43.  So she was morbidly obese.

5    And just by our definition.  And she's somebody who you

6    want to be very careful, if she gains even 25 or

7    30 pounds.  It doesn't sounds like a lot, but it's a

8    lot relative to where she was.  So increased risk for

9    bigger babies.  And that's what you want to worry

10   about.

11        The most obvious thing that can affect the baby is

12   a big baby who can't get delivered safely, because the

13   baby's too big.

14   Q    And are there metabolic changes during pregnancy

15   in some woman that result in a larger weight gain than

16   other people?

17   A    Well, the one that you would immediately think

18   would be gestational diabetes.

19   Q    Right.

20   A    All right.  So if somebody has -- develops

21   diabetes in pregnancy, because it's mediated by the

22   chemicals in pregnancy, that can make the babies even

23   larger, because the baby's being overfed.  Because

24   mom's blood sugars are always -- not always, but may be

25   running higher, and the baby says, "Thank you for

1  feeding me five times a day," and gets bigger and

2  bigger.  And, again, you get a difficult delivery or an

3  increased risk for shoulder dystocia.

4  Q    All right.  When an obstetrician talks about

5  "pelvic adequacy," what does that mean?

6  A    So you learn in residency training how to evaluate

7  the size and shape of a woman's bony pelvis, not the

8  outside, but the bony part.  And the pelvis is --

9  there's, basically, four different types of pelvis

10 shapes.  You learn those, and you learn the features of

11 those when you examine moms.  Usually at the first

12 prenatal visit you'll write a note, usually a checkoff

13 box as to the shape of the pelvis.  There is usually a

14 space that says, is this pelvis adequate or not.

15 Adequate usually depends on how big was your last baby.

16     When you are having a patient like Mrs. Cook, who

17 came in and is having her first baby, we don't know how

18 big a baby she can bring down.  So the answer is, I

19 don't know if it's adequate until I exam her physically

20 and get an estimated fetal weight for the baby.  Then

21 you can make a determination.  Two elements, how big is

22 the baby?  How big is the pelvis?  And then you can

23 make an assessment of adequacy.

24 Q    And that was my next point.  Estimated fetal

25 weight, how do you estimate fetal weight?  And when

000421

```
 1   you're talking about a fetus, we're just talking about
 2   a baby who has not come out in the world yet, right?
 3   A    We call it a fetus if it's still in the uterus.
 4   Q    All right.  So what are the ways that an
 5   obstetrician measures estimated fetal weight?
 6   A    There's three ways.  One of the ways is called
 7   Leopold's maneuver.  And that's where we put our hands
 8   on mom's belly.  And we examine moms, and we feel where
 9   the head is, where the butt is, and feel around on the
10   baby.  And you can even get an estimated fetal weight.
11   Hopefully after doing it for a while, you should be
12   pretty accurate.
13        Number two, ultrasound.  So obstetrical ultrasound
14   can be done, and that is a pretty reliable means.  In
15   good hands, meaning the hands of somebody who's a
16   certified registered ultrasound technologist, you can
17   be within 5 to 10 percent of birth weight, the actual
18   birth weight.
19        The third way is to ask mom, "How big is this baby
20   compared to your last baby?"  But if you haven't had a
21   baby before, they can't really answer that question.
22   Q    In terms of the ultrasound, what's the
23   significance of the computer's measurement of the
24   fetus' head circumference and abdominal circumference?
25   A    Well, if you're worried, for example, that a --
```

1  you have a mom that's a big mom, or has gained a lot of

2  weight or was obese to begin with and got even heavier,

3  you worry about these big babies.  So you look at the

4  measurements on the ultrasound and you see the hat

5  size, the circumference of the baby's head.  And then

6  you would look at the belt size, the abdominal

7  circumference.  And if there's a difference between the

8  size of the head, and the abdominal circumference is a

9  few centimeters bigger, you already know that this

10  potentially is going to be a baby that's more

11  triangular in shape, rather than sort of cylindrical.

12  Normally the head is the bigger measurement, and the

13  shoulders and abdomen are less.

14      In the case, an ultrasound was done two days

15  before Mrs. Cook came to the hospital, and it showed

16  that the abdominal circumference was 2 centimeters,

17  2-and-a-half centimeters bigger than the head

18  circumference.

19      Again, yellow flag, something to be aware of, just

20  so you know you have a mom, a heavyset mom, that gained

21  weight, risk factors for shoulder dystocia and

22  difficult deliveries.

23  Q    Did Dr. Kovach know about that ultrasound?

24  A    No, she didn't.

25  Q    Did Dr. Kovach do a Leopold's maneuver for

```
1    estimated fetal weight, not knowing about that
2    ultrasound?
3    A    No, she never assessed the fetal weight.
4    Q    All right.  You mentioned a couple of these.
5    We're talking about how -- the language that
6    obstetricians use.  When an obstetrician says risk for
7    difficult vaginal delivery, what is the significance of
8    that?
9    A    A risk for difficult vaginal delivery is a -- is a
10   term that actually should be used with doctors, nurses,
11   and with the rest of the team.  And that is if there
12   are risk factors, that there may be difficulty both
13   with labor and/or delivery.  You should be sharing that
14   with the team.  The nurses should know what to look
15   for.  You should know what to look for.  You should be
16   frequently examining the patient and evaluating how
17   she's making progress in labor.  Is the cervix
18   dilating, is, eventually, the baby starting to move
19   down, and is the baby tolerating the labor process by
20   showing changes on the fetal monitor that are not
21   reassuring, or is the baby looking healthy and fine?
22   Q    And do obstetricians have the same concern or
23   surveillance or assessment, along with the team, about
24   mothers who appear to be at risk for a cesarean
25   delivery or mothers who appear to be at risk of
```

1  shoulder dystocia?  Is that part of a obstetrician's

2  job?

3  A    In the labor process, it's an intimate part of an

4  obstetrician's job, yes.

5  Q    Okay.  We're going to talk about these in more

6  detail in just a minute, but just let's -- Pitocin, and

7  talk about routine Pitocin, and talk about high-dose

8  Pitocin just briefly.

9  A    Pitocin is a medicine that is used in labor and

10 delivery to either augment, which means support or

11 supplement, labor and contractions that may be present

12 already, but they're spread out or aren't very strong

13 or aren't very frequent.  Okay.  So we can give

14 Pitocin, some through using an IV pump, so you can just

15 turn it on and off.  With a bag it's -- you administer

16 it by adjusting the rate.  So the rate is fixed.  And

17 you only get so much by each increment.  And Pitocin in

18 and of itself is very helpful.  Okay.

19     There are routines that are used.  It's pretty

20 well recognized.  The average patient who gets Pitocin,

21 at least in the United States, in the articles that

22 I've read and things, gets between 6 and 8 units of

23 Pitocin.  When people get above 20 units, as in this

24 hospital protocol, above 20 you have to get approval

25 from the doctor to go beyond 20 units.  And the reason

```
 1   is it increases the risk that the contractions may be
 2   too long, the contractions could be too strong, could
 3   be too frequent, and you can theoretically even rupture
 4   the uterus, actually pull the uterus apart with too
 5   forceful contractions, if the baby, particularly, isn't
 6   moving in the birth canal, moving down.
 7        So Pitocin can be a lethal medicine.  And it
 8   carries basically a black box warning.  Everybody be
 9   very careful with Pitocin.  But we do use it,
10   judicially, and if it's used properly, it can be very
11   effective.
12   Q    All right.  And then talk to the jury, please,
13   about active phase of labor, what that means when we
14   "active phase"?
15   A    Sure.  So patients who come in the hospital and be
16   in the early stages of labor, make slow progress,
17   particularly first baby -- and it may take a while
18   until moms go on the active phases.  About 4
19   centimeters is a good point for active stage to begin.
20   And in the active stage patients will make more rapid
21   change in their cervix.  So they may go from 1 to 4,
22   and it may take six or eight or 10 hours.  And then
23   from 4 to up to 9-and-a-half centimeters or
24   9 centimeters, that may occur at a rate of about a
25   centimeter to a centimeter-and-a-half an hour.  So over
```

1  three or four or five hours you can rapidly change your

2  cervix.  And then you have the next part where you go

3  completely dilated, and that usually takes a little

4  while, and then moms can start to push.  And that's the

5  second stage of labor, but that's all part of the

6  active labor process.

7  Q    All right.  And then when we talk -- when an

8  obstetrician talks about a "protraction disorder," what

9  does that mean?

10  A    Protraction disorder means, usually that there's

11  been -- in labor, and that's in the active phase of

12  labor, so that's under 10 centimeters before mom's

13  completely dilated.  We say a protraction disorder is

14  you haven't changed your cervix in an hour, and you

15  haven't -- in two hours you haven't changed at all, and

16  that's called an arrest.  So you have to make a

17  decision what's happening.  Is this a problem with the

18  size of the baby, is it the size of the pelvis, or the

19  contractions aren't strong enough, or all three?  So a

20  contraction disorder is no change over an hour, and

21  arrests are two hours.

22  Q    And you reminded me of something that I forgot to

23  put on the list.  Can you please talk to the jury about

24  what obstetricians learn in their training about the

25  three Ps?

1  A    The three Ps are -- principle, is the fourth P, I

2  guess -- that obstetrician/gynecologists are supposed

3  to have in mind at all times.  So there's three

4  elements that we're always worried about, concerned

5  about, and evaluating.  How big is the passenger?  What

6  position is the passenger?  Is it breach, butt first,

7  head down, one or the other?  Is the baby facing up?

8  Is the baby facing down?  Multiple variables.  And

9  what's the size of the baby?  So passenger first.

10      Number two, passage.  How big is the bony pelvis?

11 Is it shaped so that it's favorable for an average baby

12 to come through in the right position, or is the pelvis

13 contracted, a long skinny pelvis, or flat pelvis from

14 front to back, which may be more difficult for the

15 baby's head to negotiate.  So passage.

16      And propulsion, meaning the forces of labor.  Are

17 the contractions adequate?  Are they long enough?  Are

18 they strong enough?  So there's variables for each one

19 of the Ps.  But that's what you're always examining or

20 evaluating when you go and you sit at bedside.  You

21 examine the patient.  That's what you're looking for.

22 What's the baby doing?  Is the baby coming through this

23 birth canal?  And are the forces adequate to get the

24 babe through safely?

25 Q    And you mentioned earlier, Dr. Borow, that the EMH

1   Pitocin protocol requires a doctor's order to go above

2   20 milliunits per minute.  And does the standard of

3   care require an assessment of the three Ps before the

4   doctor signs off on that order?

5   A    In the EMH document, it does not.  But reasonable

6   obstetricians, under same or similar circumstances,

7   would be doing the three Ps from their very first exam

8   when they meet the patient.  To do that, you continue

9   to do that basically every time you examine the

10  patient, evaluating them.  That's the baby, the pelvis,

11  and the progress of labor by propulsive forces.

12  Q    And is that a relative question when you're giving

13  high-dose Pitocin, why do we need high-dose Pitocin?

14  A    It's very relevant, particularly in a patient who

15  we've already established is at a higher than normal

16  risk for dysfunctional labor because of her body

17  weight.  I mean, it's just -- we just know that as a

18  fact.  So the answer would be yes.

19  Q    All right.

20  A    Even more relevant.

21  Q    And you already mentioned the second stage of

22  labor.  We're going to talk about the last thing on

23  here, this electronic fetal monitor in just a second.

24  But we have an animation of a normal delivery that I

25  would like you to narrate for the jury, so that they

000429

1  understand the delivery process that we're going to be

2  talking about now.

3  A    So here's mom.  Here's her bony pelvis.  And the

4  arrow obviously points to her uterus.  This looks like

5  a mom who's full term.  And there's a baby that's head

6  down.  Thank you.  Can I do it on this?  No.

7  Q    I don't know.

8  A    Here's a baby who's head down.  The baby has

9  amniotic fluid around it.  The placenta is in the

10 posterior.  Let me just see if I can do this.

11 Umbilical cord and this is the pubis, coccyx.  I think

12 all of these things are just pointed out to us.  And

13 now we're going to see that the uterus has contracted

14 the baby.  And that was pretty quick delivery of that

15 baby.  Look how that baby slid out.

16     Can we go back?  That was perfect.  We'd all like

17 to have that.  That would be just great.  If we can

18 just go back to maybe the middle part of it, and I can

19 just -- so everybody -- and that's fine.  Wherever you

20 are is good.  Sure.

21     And I'm going to not point this at anybody.  I

22 don't know if you can see the red light.  Let's just go

23 real slowly, so I may want you to stop just for a

24 second.  So now we're fine.  The uterus is going to

25 contract in one second.  Get ready.  The uterus is

```
 1   going to contract.  And why don't you just go a little
 2   bit.  Stop for a second.  So in this particular case,
 3   we can see that this baby's shoulder is rotated.  The
 4   baby's starting to come out.  The head is coming out
 5   facing the floor.  That's fine.  Shoulder's rotated to
 6   the side, and it's gotten underneath the symphysis
 7   pubis.  And now we can go ahead and finish.  And the
 8   baby's out.
 9       It's hard to see and imagine on this, but there's
10   basically seven different movements that the baby goes
11   through between the time that the baby's head enters
12   the birth canal, does internal rotation, and the chin
13   comes down, and then the chin goes back up, and it
14   rotates some more, and the head comes out.  There's
15   seven steps that, actually, we as OB/Gyn doctors have
16   to be aware of as the baby comes down.  But that's a
17   pretty normal looking delivery.
18   Q    So let's do the shoulder dystocia, so the jury can
19   see --
20   A    Okay.
21   Q    -- what a shoulder dystocia looks like.
22   A    So here's our mom again.  Her bony pelvis and her
23   uterus.  Baby, looks like our same baby from before.
24   And that's the umbilical cord.  Let's stop for a
25   second.
```

```
1         So the umbilical cord, I didn't mention this

2    before.  And I'll be careful with the red light.  The

3    umbilical cord, as you can see, is a little bit tangled

4    up inside the baby.  The amniotic fluid -- it looks

5    like it's still present -- in this case provides a

6    buffer for the umbilical cord.  The umbilical cord is

7    the connection between the baby and the placenta.  And

8    the placenta is the interface between the pregnancy, so

9    to speak, and the mom.

10        And the umbilical cord, in the presence of

11   ruptured membranes, if the water bag breaks -- it's the

12   same thing as if you have a bathtub.  And the water's

13   running out of the bathtub, you don't have any water

14   around you, there's no protection.  So your elbows and

15   your back and everything touch the side of the bathtub.

16        Well, the baby's going to be potentially

17   compressed in the uterus, as is the umbilical cord.

18   And without fluid around the umbilical cord, we can get

19   what's called cord compression, umbilical cord

20   compression.  And I'll call it just cord compression.

21   But then cord compression shows up as changes on the

22   fetal monitor.  And that's how you got it, because

23   there's not any water left, because mom has ruptured

24   membranes.  Water bag is broken.  Cord's not protected.

25        But the cord can, as in this case, you can see the
```

```
 1    cord can be interposed between the baby's legs or in
 2    between the arms or between the baby and the bony
 3    pelvis.  So you can get cord compression.  And that
 4    can, over a long time period, produce potential changes
 5    to the baby, decreased oxygenation to the baby, and be
 6    dangerous, over hours of change, not over just one or
 7    two minutes.
 8        Okay.  You can go ahead. Back on?  Thank you.
 9    So now we see this baby's moving down.  We expect the
10    shoulder to come out, but in this case -- all right.
11    Let's stop.  In this case, where the other baby was
12    very rapidly able to advance out the birth canal --
13    here's my little red dot.  Let's see if we can get that
14    again.
15    Q    I have a pointer, Dr. Borow, if you want it.
16    A    Yeah.  I'm sorry.
17    Q    You want it?  You got it?
18    A    Yeah.  Here we go.  The symphysis pubis, which is
19    the front of the mom's bony pelvis, this anterior
20    shoulder -- this is the anterior shoulder, and there's
21    a posterior shoulder, of course.  Anterior shoulder, in
22    this case, this is the baby's right anterior shoulder,
23    gets caught behind the symphysis pubis.  So instead of
24    -- instead of rapidly coming down, the shoulders rotate
25    to an oblique angle, 45 degrees to one side or the
```

1   other.  The shoulders instead get caught in an

2   anterior/posterior, 12:00 o'clock and 6:00 o'clock,

3   position, and the shoulders can't advance.  And the

4   more mom pushes, the more the shoulder gets impacted,

5   and it's harder to get this baby delivered.  And that's

6   called shoulder dystocia.  Shoulders are caught

7   behind -- one of the shoulders are, the anterior

8   shoulder, is caught behind the symphysis pubis, and

9   that's shoulder dystocia.

10       Now, let's go and see what happens.  In this case,

11  the posterior shoulder, which we don't believe was the

12  issue here -- the anterior shoulder, yes, is caught.

13  And now we see hopefully skilled hands trying to get

14  the shoulder delivered.  Pulling down will not get the

15  shoulder delivered that way.  And you can cause damage

16  to the nerves of the baby's neck, the nerves of the

17  brachial plexus that enervate our shoulder, elbow,

18  lower arm and hand.  And that shows shoulder dystocia,

19  with the shoulder being impinged and caught behind the

20  symphysis pubis and maneuvers have to be made, other

21  than traction, to try to get this baby delivered.

22  Q    And what is the risk of traction, Dr. Borow?

23  A    Traction can cause stretching, tearing, or

24  actually rupture, pulling the nerves out of the spinal

25  cord.  It's all avulsion.  Most of the time it is a

1    stretch injury.  They're like rubber bands.  That can

2    only be stretched so far and they can tear.  And if

3    they tear, they may not be able to mobilize the muscles

4    of the upper arm, shoulder, lower arm, and the hand.

5    Q    Are obstetricians taught in their training and

6    reminded throughout their careers as obstetricians to

7    avoid either pulling or twisting on a baby's head when

8    the shoulder is still stuck?

9    A    Yes.

10   Q    And is that reported throughout the obstetric and

11   pediatric literature as the most common cause of a

12   permanent brachial plexus injury in a child?

13   A    For over a hundred years that's what has been

14   reported.

15   Q    Doctor, I want you to address a statement that was

16   made in the defense's opening statement today that a

17   permanent -- well, let me back up just one second.

18   Just for the purpose of my next question or so, do you

19   have an understanding as to the type of brachial plexus

20   injury ▮▮▮▮▮▮▮▮    has?

21   A    Yes.

22   Q    What is your understanding as to the type of

23   brachial plexus injury she has?

24   A    Well, my understanding is, number one, she has a

25   permanent brachial plexus injury.  So that means it

```
 1   wasn't something that occurred and then healed on its

 2   own and went away.  Number one.

 3       Number two, there's five nerves that are involved

 4   in a brachial plexus, excluding C-4.  So cervical

 5   nerves 5, 6, 7, 8, and T-1.  She has a C-5, 6, and 7

 6   injury.  So she has an injury that involves three

 7   nerves of the brachial plexus.

 8   Q    And I will represent to you for the purpose of my

 9   next question that her orthopedic surgeon is going to

10   testify in this case that C-5, C-6, and C-7 are likely

11   torn in some way.  Assume that for the purpose of my

12   question.  I also want you to assume for the purpose of

13   my question that during opening statement the jury was

14   told by defense counsel that that type of injury can

15   occur in a normal, healthy baby like ███████, without

16   a doctor ever touching the baby.  Assume that is what

17   the jury heard.

18       In a normal healthy fetus, like ██████████ do you

19   agree with that statement that a baby can have three

20   nerves torn in their brachial plexus, two nerves torn

21   in the brachial plexus, without a doctor ever touching

22   the baby?

23   A    No.

24   Q    Has that ever been reported anywhere in the

25   medical literature in a reliable, authoritative
```

1  article, case study, anywhere that a baby can have two

2  or three nerve injuries in the absence of a doctor not

3  touching the head?

4  A    No.

5  Q    Okay.  So let's now talk about electronic fetal

6  monitoring a little bit, and we're going to talk

7  specifically about this case.

8  A    Sure.

9  Q    I want you, when we're talking about these, to

10  talk about baseline, variability, accelerations, and

11  decelerations, okay?

12  A    Sure.

13        MS. PANTAGES:  And if we could, Jen, go to

14  166, please.

15        And, Your Honor, if it would be easier, is it

16  okay if Dr. Borow gets down off the witness stand to

17  talk about specific things on the screen?

18        THE COURT:  Any objection?

19        MR. MURPHY:  No.

20        MS. MULLIN:  No objection.

21        THE COURT:  Then that's fine.

22        MS. PANTAGES:  Thank you.

23  Q    All right.  So if you could identify, Dr. Borow,

24  this is -- this is Jennifer Cook's electronic fetal

25  monitoring tracing, correct?

```
1    A    Yes, it is.

2    Q    And approximately what time is this?

3    A    This is at 4:10 --

4    Q    All right.

5    A    -- in the morning.

6    Q    And I have a pointer for you.

7    A    You want me to --

8    Q    Yes.

9    A    -- come down there, too?

10   Q    Yes, please.

11        THE COURT:  Counsel, what exhibit is this?

12        MS. PANTAGES:  This is -- this is exhibit --

13   A    You have Bates stamps on this, too.

14        MS. PANTAGES:  Can you go by the Bates stamp,

15   Your Honor?

16        THE COURT:  Well --

17        MS. PANTAGES:  They're on the upper

18   right-hand corner.

19        THE COURT:  Oh, yes.

20        MS. PANTAGES:  122.  I'm sorry, 166.  I

21   misspoke, 166.

22        THE COURT:  166?

23        MS. PANTAGES:  Yes.

24        THE COURT:  Okay.  Thank you.

25   Q    Okay.  So this is -- this is the beginning pretty
```

1  much of the labor process for ████████, right?

2  A    Yes.

3  Q    And do you have an opinion that you hold to a

4  reasonable degree of medical probability whether or not

5  this is a normal reassuring fetal monitor tracing?

6  A    This is a normal reassuring fetal monitoring

7  tracing.  This is an example I picked because it's

8  before Pitocin was started.  So this is where we have

9  sort of our baseline strip.  And that's what you do.

10  Mom comes in, we put them on the monitor, watch for an

11  hour or two, make sure you know what's on the monitor.

12  Mom is very early in labor.  You can tell because

13  she -- this is the contractions, this is the fetal

14  heart rate.  And you can tell she's having a couple

15  spontaneous contractions on her own every couple of

16  minutes.  So she's in early labor.  Her cervix is only

17  1 or 2 centimeters dilated at that point.

18      And we can establish a baseline.  Her baseline is

19  about 140.  She has spontaneous acceleration, looks

20  like here and here.  And she doesn't have any

21  significant decelerations in her variability.  That's

22  the sort of second by second, how does the fetal

23  monitor go up and down.  Because it's really a series

24  of pinpoints.  And when we look at the monitors,

25  they're really, like, little pinpoints that are all

```
 1   lined together like a cardiogram.  And you can see that

 2   her variability here is just sort of average

 3   variability.

 4        So that's fine.  The baby looked fine at 4:10 in

 5   the morning.

 6   Q    All right.  So let's go to 2:15.

 7             MS. MULLIN:  Your Honor, may we approach for

 8   a minute?

 9             THE COURT:  Yep.

10        (Sidebar discussion took place as follows:)

11             MS. MULLIN:  Your Honor, this was not -- this

12   was not visible to me from my seat when the doctor was

13   on the stand.  It looks like he's reading from notes.

14   What is he reading from?

15             THE COURT:  Well, if he's -- okay.  Hold on a

16   second.  If he brought materials to the stand that he's

17   reading from, then he's going to keep them up there,

18   and you'll be able to cross-examine them, review them,

19   or see him on them.  If he took up notes with him,

20   other than exhibits -- now, obviously, if they're

21   exhibits, that's different.

22             MS. PANTAGES:  They're notes just of the time

23   periods that we were -- the page numbers that we're

24   pulling out.

25             THE COURT:  Okay.  Well, if he brought up
```

1    handwritten notes to augment his -- well, let me back

2    up.  My initial reaction would be if he brought up

3    handwritten notes that he's referring to, using, or

4    they're going to -- you can review them and you can

5    cross him on it.  Now, are you suggesting that you want

6    me -- are you suggesting anything further than that?

7             MS. MULLIN:  Well, I don't think it's proper.

8    I think it's asking me, you know, in a couple seconds I

9    have to get ready for a cross-examination, to review

10   notes.  We were not provided with additional notes from

11   this witness.

12            MS. PANTAGES:  Well, I'll take -- put them

13   away.  He can -- I have the page numbers that we're

14   going to address.  I can put them aside.

15            THE COURT:  That's fine then.  I -- if he

16   uses them, you're going to have access to them.  If you

17   prefer from the -- that this witness testify from

18   memory or the exhibits only, that will be the order.

19            MS. MULLIN:  Thank you.

20            THE COURT:  Okay.  So you can instruct him on

21   that.  Okay.

22            MS. PANTAGES:  Yeah.

23                 (Sidebar discussion ended.)

24   **BY MS. PANTAGES:**

25   Q    Okay.  So we were going to 2:15.

```
1    A    All right.  So now we're 2:15.  This is -- I think
2    this one -- let's see.  Oh, Page 215 of yours, right?
3    Q    Yes.
4    A    Hold on just one second.  So this is at --
5    sorry -- 11:00 o'clock.  Sorry.  From where I was
6    standing, I couldn't really tell.  11:00 o'clock,
7    Pitocin's been running at this point for a little
8    while.  It started around 4:30 in the morning.  Mom's
9    already got an epidural for pain relief.  She's just
10   gotten that a little while ago.
11        You can see the contractions are now easier to
12   see.  You can, actually, sort of count the
13   contractions.  This is a contraction that goes on
14   through a second contraction, so it's coupled with it.
15   So you can suddenly see that the baseline, even though
16   the baseline is pretty much the same, 130 to 140-ish,
17   we're starting to see when mom gets a contraction, that
18   there's deceleration in the heart rate.  Not in every
19   one.  At least in this one, two out of four.  So these
20   are called decelerations.  And those, that occur with a
21   contraction, begin and end with the contraction, are
22   called variable decelerations.  There's other types of
23   decelerations, and we'll talk about those in a minute.
24   So that just shows that after mom's been getting
25   Pitocin for a little while, we see a change in the
```

1    strip.  Okay.  And the nurses know about this, and the

2    nurses are aware of.

3        And do you have another strip?

4    Q    Yep.  We have now -- so that was at 11:00 a.m.,

5    correct?

6    A    Yes.  And the Pitocin's at 16.  She starts at 3

7    milliunits around 4:30, and it's up to 16 units at this

8    point.

9    Q    All right.  And so now, Dr. Borow, we're going to

10   go to Bates stamp 229.  And this is 13:03, which is

11   military time.

12   A    Right.  So it's 1:33.  Let's go to the next one.

13   So this looks like it's 13:00.  We can see that mom has

14   had -- this is the end of the contraction, one, two,

15   three contractions.  We can see that in this time

16   period.  We can see also that the nurses are describing

17   what's called variable decelerations.  And we talked

18   about that a minute ago, what's a variable

19   deceleration.

20       There's a contraction that begins, heart rate

21   comes down, and now we're taking a little longer to

22   come back up.  This is a variable with a sort of late

23   component.

24       There's another contraction, a little overshoot,

25   and then it comes back down to the baseline.  So our

1   baseline's still about the same, when you can see the

2   baseline on here.  But there's more decelerations,

3   there's more accelerations, sometimes with and after

4   contractions, and there's variable decelerations we can

5   see at 13:00.  That's just another pattern that's

6   different from when mom started when mom came in.

7       So go to the next one.

8   Q   Okay.  We're going to 254, it's the Bates stamp

9   number, and the time is 16:16.

10  A   So at this point we're still running Pitocin,

11  16:16.  Here's contractions.  One contraction, two

12  contractions.  This contraction has a little bit of

13  time in between.  Another big contraction, fourth

14  contraction on that.  On that we see how the baby's

15  doing.  This looks like it is a variable with a slight

16  late component.  This is what looks like a late

17  deceleration.  So here's the contraction that begins

18  and ends.  The deceleration is almost over, but the

19  deceleration in the heart rate takes almost two minutes

20  to get back up to normal, and then mom has another

21  contraction.  There's another little deceleration after

22  that.  So this is another pattern that's a late

23  deceleration.  Late, after the contraction begins and

24  ends.  So that's what that means.

25      And this can be associated with a variety of

1    things, from dangerous things, such as placental

2    abruption or a placenta just running out of steam, not

3    giving good perfusion to the baby, to a variety of

4    other things.  But mostly this is associated with

5    placental problems, whereas the previous variable

6    decelerations are cord compression.  That's what we

7    talked about earlier, not enough fluid around it, cord

8    gets compressed.

9         I think you have another one after this one.

10   Q    Yeah.  And this is -- Dr. Borow, so this one is at

11   4:16.  At that point in time --

12   A    Mom's 5 centimeters at this time.  She has to go

13   to 10 centimeters to get delivered.  She's only 5

14   centimeters, and she's having these variable and these

15   what look like late decelerations on the strip.

16   Q    All right.  So this is -- the Pitocin, at this

17   point in time, is now running at 24 milliunits?

18   A    Right.  Because we know after 16:00 -- 15:00 there

19   was a telephone call between Dr. Kovach and the nurses

20   about increasing above 20 milliunits to keep the labor

21   process strong and going.

22   Q    What concerns do you have, as an obstetrician,

23   when you're looking at a tracing like this, knowing

24   that you've been having continuous Pitocin for now 12

25   hours at 24 milliunits?  What concerns do you have?

1   A    Well, I have a lot of concern at 16:10, because

2   this mom has made, going from 4 centimeters to 5

3   centimeters, one centimeter progress over a four-hour

4   time period.  So by 16:00 you would expect her to be

5   further along in the process, and she hasn't really

6   changed her cervix.  And we know 4 is sort of the

7   beginning of active phase.  So she was close to

8   4 centimeters, if I remember, at 12:00 o'clock.

9        So we're now four hours later with -- we've had

10  very little progress, and we're seeing some changes on

11  the monitor that should be of concern.  A physician

12  should want to be there, exam the patient, evaluate the

13  patient, and make some decisions about the patient plan

14  of care.

15  Q    And what's the plan of care at this point in time?

16  A    Well, the care plan should be "What do we need to

17  do to get this baby safely delivered?"  And that's

18  going to be, "Can we sit on this monitor?  Do we do

19  intrauterine resuscitation," which the nurses were

20  doing off and on, change position, IV fluids, consider

21  turning down or turning off the Pitocin, letting the

22  mom rest a little while, amnio infusion, get fluid

23  inside the uterus, try to take the pressure off the

24  cord, and change the mom's position a lot.

25  Q    All right.

1   A     So those are the things that you can try to do to

2   make this better.  But we're still dealing -- four

3   hours after the cervix has changed very little.  With

4   adequate contractions, you can count these out and

5   count -- be like the -- there's a way we can do it,

6   Montevideo units.  We can measure, over a 10-minute

7   period, how strong the contractions really are, and see

8   that they're adequate.  And we're still getting

9   decelerations in the baby's heart rate.  So we're sort

10  of stuck at 5 centimeters, and we've been there, 4 to

11  5 centimeters, for four hours.  So you need a doctor to

12  come in to evaluate the patient.

13  Q     Let's go to Bates number 262.  And this is now at

14  17:40, which is 5:40 p.m., correct?

15  A     Yes.  So when we look at this, we see our four

16  contractions in there.  We see, again, basic baseline

17  about 150-ish, when you're not having some other

18  activity.  But you see the patient has a deceleration.

19  This is at 17:40.  Heart tones were okay.  Now we see

20  that with the contraction it starts, and it persists

21  after the contraction, so this is another late

22  deceleration, just sort of an isolated one, because

23  it's a prolonged deceleration, because it lasts over

24  two minutes.

25  Q     And when you see a deceleration in the baby's

1 heart rate, what does that mean?  What is going on with

2 the baby?  What is the baby telling us?

3 A    Well, you're getting less oxygen to the baby's

4 brain, and that's why the heart rate slows down.  And

5 baby's can tolerate this for a while, if they're not

6 severe.  But after a while, then that can be additive

7 and cause harm to the baby and cause, eventually,

8 what's called partial prolonged hypoxia.  It can cause

9 brain damage if it can't be corrected.

10 Q    So does a reasonable obstetrician, looking at the

11 total picture of this case, in terms of the amount of

12 Pitocin, the progress of labor, and the fetal heart

13 rate pattern, as it's evolved since 4:00 o'clock in the

14 morning -- what concerns do you have at this point?

15 A    Well, I would like to know why this patient hasn't

16 gotten herself delivered yet, and how are we going to

17 get her delivered, and is it safe to continue with

18 Pitocin at this rate driving the contractions?  Because

19 we know that the nurses at no point have turned the

20 Pitocin either down or off since they've started, but

21 we're still seeing these episodes where we have

22 prolonged decelerations, which are two minutes or

23 longer.

24 Q    The one that you pointed to at the end of the

25 tracing, how deep does that go?  What does the baby's

1    heart rate go down to and how long does it last?

2    A    If the baseline is about 150, we can see it goes

3    down just about to -- like between 90 and 100.  And

4    this whole contract -- whole deceleration lasted about

5    two minutes.

6    Q    And where is it in relation to the contraction?

7    A    Well, the contraction begins and ends, and we

8    still have the heart tones down, so that's the

9    definition of a late deceleration.

10   Q    And is that concerning?

11   A    Yes.

12   Q    Okay.

13   A    It's always concerning, because according to the

14   hospital protocol, if they continue they have to turn

15   the Pitocin off and notify the doctor.  So if the

16   doctor is there, the doctor will turn the Pitocin down,

17   examine the patient, or turn the Pitocin off if the

18   doctor sees it.

19   Q    And was there any doctor here evaluating this?

20   A    Not at this time, no.

21   Q    Okay.  Let's go to 265 Bates stamp.  And this is

22   18:05.  This is 6:05 p.m.

23   A    Pitocin's still running.  The mom is at this

24   point -- I can't read my numbers up here --

25   7-and-a-half centimeters, so she's still far from

1    delivering.  Baby's still at about zero station, so

2    baby's moving down a little bit in the birth canal.

3    Four contractions in this 8-and-a-half minute window.

4         We see that variability is still okay, but we see

5    she's having some variable decelerations.  This

6    contraction begins and ends.  And as this contraction

7    is ending, we see the heart rate is starting to drop,

8    and we go through a one, two, two-and-a-half minute

9    deceleration right through another contraction.

10        So, again, we're seeing that there's -- the baby

11   is on the fetal monitor telling us or showing us that

12   it's not tolerating this labor process with the Pitocin

13   where it is at 7-and-a-half centimeters.  And you need

14   nursing, a physician intervention here to protect the

15   baby.

16        This ends.  And then she goes ahead and gets

17   another variable deceleration after that.  So, again,

18   you need a physician at bedside to examine the patient,

19   do the three Ps, how big is the pelvis, how big is the

20   baby, is the baby's position normal or not, and try to

21   make the decision, how long you can tolerate this type

22   of pattern?  If you are assuming that the baby has

23   adequate oxygenation, how long can you tolerate it?  If

24   you don't think it's adequate, then you may tolerate it

25   less and have to move to a cesarean delivery.

```
 1              MS. PANTAGES:  If we could go back to

 2    Page 2 -- Bates, yeah, 263.  And, Jen, if you could pop

 3    out the first annotation up at the top, please.

 4    Q    Who is doing the annotations on this fetal

 5    monitor, Dr. Borow?

 6    A    All right.  Well, again, the time is 17:41, so

 7    that's 5:41 in the afternoon.  The doctor hasn't been

 8    there yet.  Patient's been there since 2:40 in the

 9    morning.  Pitocin's been running since 4:30.  Epidural

10    at 10:00 o'clock.  We're now 5:40 in the afternoon.  No

11    attending obstetrician has been there to examine the

12    patient, assess the size of the pelvis, adequacy of the

13    pelvis, assess the size of the baby, see this fetal

14    monitor strip one-on-one, examine the strip herself.

15    Okay.  The annotation says, "Plan of care discussed

16    with patient and family at that time," signed Dawn

17    Lopez.

18    Q    And if -- you read the family's depositions in

19    this case?

20    A    Yes.

21    Q    And did you see in the family's deposition that

22    they recall conversations with nurses late afternoon

23    about the fact that a -- this baby might need to be

24    delivered by cesarean?

25    A    If mom didn't continue to make good progress or
```

1   get completely dilated soon, cesarean section was

2   discussed with this nurse, correct.

3   Q    Any indication that it was discussed with any

4   doctor?

5   A    Not by this note, that's for sure.

6   Q    Okay.  So if we could then go to just a couple

7   more, and then we'll be done with the tracings.  283.

8   And, Dr. Borow, this is at 20:36.  So this is at

9   8:36 p.m.  All right.  What's -- is --

10  A    So --

11  Q    Do you see a progression?

12  A    We see a change.  So we're at 20:30, so that's at

13  8:30.  So Mom has gone completely dilated at 19:30,

14  about an hour before.  About a half an hour later, the

15  nurse calls the doctor, who hasn't been in yet, and

16  says to the doctor, "Your patient's completely

17  dilated."

18       The doctor says, "You can push."  The doctor

19  doesn't come in, but she says you can push, even though

20  she recognizes that sometimes moms can deliver very

21  quickly once they start to push.

22       And now we see here's four contractions.  And you

23  now can read fetal monitor strips because you can see

24  that the tops look different.  They're flat.  That

25  means mom's pushing.  That's how we read it, because it

1  goes to the top, and the little pointer can't go any

2  higher, so you get this sort of straight across

3  pattern.  So mom's having contractions and Mom's

4  pushing.  And we see that every time mom pushes, you

5  see a little acceleration in the heart rate here up to

6  180 beats per minute.  Normal is 160, as high as 160.

7      So now the baby's heart rate's going up to 180

8  with these pushing experiences, and then we're seeing a

9  drop in the fetal heart rate after the contraction, so

10  this is a late deceleration, late deceleration, late

11  deceleration, late deceleration.  So in this one panel

12  over eight or nine minutes, we're seeing that starting

13  at -- it actually started at 20:20 and it runs for a

14  half an hour -- every time mom pushes we see those late

15  decelerations.  So it's a repetitive pattern of late

16  decelerations.

17      You should have concerns about fetal health,

18  hypoxia, adequate oxygenation, blood supply to the

19  baby.  So this is more about the baby's brain, not the

20  baby's extremities, arms and shoulders and things.

21  Just as is it safe to be here doing this, Pitocin

22  running, the Pitocin was not turned off, nor was the

23  Pitocin turned down by the nurses, even though the

24  hospital protocol says, late decelerations you have to

25  turn down or turn off and do your maneuvers and call

1    the doctor.  So we don't have any evidence that any of

2    those things were done.  But these are all, in my

3    opinion, late decelerations.

4    Q    And at this point are they repetitive late

5    decelerations?

6    A    Well, repetitive by definition is 50 percent or

7    more, and over a time period.  But it's over a half an

8    hour in this case, so the answer is yes.

9    Q    Okay.  And I want you to assume for the purpose of

10   my question, Dr. Borow, that the nurse's flowcharts at

11   this point in time, 8:36, reflect, in response to this

12   tracing, the nurse put oxygen on, charted late

13   decelerations, and 10 minutes after putting the oxygen

14   on, increased the Pitocin.  Can you comment on that,

15   please?

16   A    Breach of the standard of care, because the late

17   decelerations haven't gone away and haven't been

18   corrected.

19   Q    All right.  So I want you to go to 285.  And this

20   is now at 20:53.

21        MS. PANTAGES:  And, Jen, if you can pop out

22   the annotations up on the top.

23   Q    All right.  Dr. Borow, Annotation No. 3, there's a

24   comment.  Could you read that comment, please?

25   A    "Reviewed -- RN reviewed the fetal monitor strips.

64

```
 1    Comments fetus A, late decelerations resolved after
 2    oxygen administration."
 3    Q    And you've reviewed this tracing.  In the
 4    immediate period after the oxygen was first put on,
 5    were the -- did the late decelerations go away?
 6    A    In the immediate period, yes.
 7              MS. PANTAGES:  Okay.  Jen, could you go to
 8    20 -- 292?
 9    Q    So this note was timed a couple minutes before
10    9:00 o'clock?
11    A    Right.
12    Q    And now we're going to go to nine minutes after
13    9:00 o'clock.  And did the late decelerations come
14    back, Dr. Borow?
15    A    So this one actually is timed at 21:50.  All
16    right.  It's 21:50.  I think we were at 20:50 before.
17    Q    You're right.  I'm sorry.
18    A    So this is an hour ahead.
19              MS. PANTAGES:  If you could go to 287, Jen.
20    Q    Okay.  This is 21:09, 9:09.  Did the late
21    decelerations come back shortly after 9:00 p.m.?
22    A    Well, we see what looks like at least variable
23    deceleration here.  Contraction, contraction,
24    contraction.  Here's the baseline going 150-ish.  And
25    then you see contraction, and you have this long
```

65

```
 1   deceleration, so the answer is, yes, it did come back.

 2   Q    And then where we were before, 292.

 3   A    292 is going to be about 45 minutes later or 40

 4   minutes later.

 5   Q    Again, the late decelerations returned?

 6   A    Right.

 7   Q    Correct?

 8   A    They did.

 9   Q    And was the Pitocin running at 30 milliunits per

10   minute at this point in time?

11   A    Right.  And the doctor's not there, and the nurses

12   had just spoken to the doctor and said, "You should

13   come in."

14   Q    Did she do that?

15   A    The doctor come in?

16   Q    Did the nurse call the doctor and tell her to come

17   in?

18   A    21:49, yes.

19   Q    Um --

20   A    And that's the first time that the nurse,

21   according to the records, asked the doctor to come in.

22   Q    For delivery?

23   A    Yes.

24   Q    Did she call her to come in for the late

25   decelerations?
```

1   A    No.

2   Q    All right.  Done talking about the fetal monitor

3   tracings?

4   A    Yes.

5   Q    Okay.  If you want to take your seat again.

6        In the interests of time, Dr. Borow, I'm not going

7   to project the EMH protocols, but I want you -- have

8   you read the EMH protocols that have to do with Pitocin

9   induction and also the protocol about fetal distress?

10  A    Yes.

11  Q    Did you read those?

12  A    I have.

13  Q    Can you tell the jury what the protocols, the EMH

14  protocols, on Pitocin induction or augmentation of

15  labor and fetal distress say that a nurse is required

16  to do?

17  A    This nurses are required to do at least

18  resuscitative efforts, which is change position, IV

19  fluids, give the patients oxygen, turn the Pitocin down

20  and/or off, notify the physician.

21  Q    All right.

22  A    So --

23  Q    So can you just summarize in a nutshell what

24  happened that we -- we've been talking about the fetal

25  monitor tracings.  We took them kind of page by page.

1   Put those fetal monitor tracings in context with the

2   vaginal exams that we've been talking about and that

3   you've been referencing, the progress in labor, and the

4   Pitocin dosage in a first-time mom.  Can you tell the

5   jury what happened over the course of the time, and

6   then I'm going to ask you about standard of care

7   violations?  Okay?

8   A    Sure.  Basically what happened is that the Pitocin

9   continued to be increased over the time period, from

10  4:30 in the morning up until 15:00, 3:00 in the

11  afternoon, when the phone call had to be made to

12  increase beyond 20 milliunits.  They continued to go up

13  to 30 milliunits.  You increase by 2 milliunits every

14  hour or so, whatever it is, to continue to have the

15  labor process.

16      The Pitocin was given, despite the fact that there

17  were recurrent, variable decelerations, which are cord

18  compression issues.  We're not surprised.  There's

19  ruptured membranes.  But we have to be concerned about

20  the baby not getting enough oxygen.

21      And then those changes on the monitor became more

22  of what we call late decelerations, which are

23  consistent with uteroplacental problems.  The

24  placenta's not profusing the baby well enough, getting

25  enough oxygen.

68

```
 1       And we're seeing those longer, deeper

 2   decelerations and those prolonged decelerations.  So

 3   you have both depth, going deeper and deeper, and

 4   you're going longer and longer.  And the longer you do

 5   that, it's like holding your breath.  How long can you

 6   hold your breath from time to time to time?  Eventually

 7   you're not getting enough oxygen.  And we're worried

 8   about that.  And that's part of then where are you in

 9   the labor process.  And we know this mom doesn't go

10   completely dilated until 19:30, which is 7:30 at night.

11   But she doesn't deliver for three hours.

12       After she goes completely dilated, she's busy

13   pushing away.  She has a nice-sized baby, and mom's an

14   obese, morbidly obese, mom at this time.  You're

15   worried about the fit.  And she's having monitor

16   changes.  And there's no doctor there to monitor.  And

17   the nurse aren't asking the doctor.  Based upon what

18   they're seeing and how they're reading the strips, even

19   though they described them as late decelerations,

20   they're not turning down the Pitocin, and they're not

21   asking the doctor to come in and see and examine and

22   evaluate the patient.

23   Q    All right.  So let's now talk about your opinions

24   regarding the standard of care as it relates to the

25   nurses and Dr. Kovach.  Okay?
```

1        Okay.  As it relates to their interpretation of

2   the fetal monitor tracings, do you have an opinion as

3   to whether or not -- do you have an opinion that you

4   hold to a reasonable degree of medical probability as

5   to whether or not the EMH nurses met the standard of

6   care.  First, do you have an opinion?

7   A     Nurses only, not the doctor, right?

8   Q     Right.  Regarding --

9   A     I just want to make sure.  Just the nurses.

10  Q     Regarding the interpretation of the monitor.

11  We'll talk about Dr. Kovach in a moment.

12  A     Okay.  So the answer is, yes, I have an opinion.

13  Q     And what is your opinion regarding whether the

14  nurses, the EMH nurses, met the standard of care in

15  their interpretations of the fetal monitor tracings?

16  A     I believe the nurses in general under read the

17  strips, and then when they recognized late

18  decelerations, did not respond in an appropriate

19  fashion.

20  Q     All right.  So if we were to put in a sentence how

21  the EMH nurses violated the standard of care relative

22  to the tracings --

23  A     Improper interpretation of the fetal monitor

24  strips.

25  Q     From when to when, Dr. Borow?

```
1    A    Well, in terms of -- variable decelerations

2    started on the strips as early as 11:00 in the morning.

3    And they can be benign.  You can have variable

4    decelerations, because it's cord compression.  Mom has

5    ruptured membranes.  If you change position and they go

6    away, and they come back when you change position, they

7    may be benign.  They may not be of consequence.  If

8    they're repetitive and they're deep and they're longer,

9    then they can be of consequence, and that can be

10   associated with the decreased oxygenation.

11       So really that occurs, even though it starts at

12   11:00 in the morning, it's not until about 16:16 in the

13   afternoon when we start to see a greater frequency of

14   the variable decelerations.  That's about the time that

15   it would be.

16   Q    And by what point in time should the nurses have

17   called the fetal monitor tracings persistently

18   non-reassuring and have met the standard of care?

19   A    Well, I think that certainly occurs more after

20   about 18:10, 18:15, in that range.

21   Q    Okay.

22   A    So a little bit later.

23   Q    So from about 18:00 you're talking about 6 --

24   approximately 6:00 p.m.?

25   A    6:00 p.m. on.
```

1   Q     Until delivery?

2   A     Right up to and through the delivery.  Because

3   we're seeing both variables and lates and episodes --

4   multiple episodes of prolonged decelerations.

5   Q     Okay.  So there are points in time throughout the

6   day that you believe that the nurses were under reading

7   what was going on, is that what I heard you say before?

8   A     I do.  But I don't believe that during the time

9   that they were under reading it, that it would

10  ultimately prove to be harmful to the baby.  It's just

11  we don't know that until the baby comes out.

12  Q     Right.

13  A     So we have to work under the assumption that what

14  we're seeing is something that you need to correct.

15  You can't sit on it.  You have to do something, change

16  the position, IV fluids or oxygen, and/or decrease or

17  turn off the Pitocin.

18  Q     And is it your opinion that from 6:00 p.m. on the

19  tracings were persistently reassuring, such that it

20  required some kind of reaction from the nurse to meet

21  the standard of care?

22  A     You said "reassuring."  I think you mean

23  non-reassuring.

24  Q     Let me say it again.  I'm sorry.

25        From 6:00 p.m. on, approximately 6:00 p.m. is when

000462

1    the tracings were persistently non-reassuring?

2    A    Yes.

3    Q    Okay.  So let's now talk about -- do you have an

4    opinion that you hold to a reasonable degree of medical

5    probability whether or not the EMH nurses deviated from

6    standards of care with respect to their communication

7    with Dr. Kovach?

8    A    I do.

9    Q    And what's your opinion?

10   A    I have an opinion they did breach the standard of

11   care.

12   Q    In what way?

13   A    Well, communication has two components.  First

14   component is you have to communicate in an accurate

15   fashion what you're seeing.  I mean, I'm seeing late

16   decelerations, I'm seeing repetitive variable

17   decelerations.  They're getting longer and worse,

18   meaning they're longer and deeper, more frequent

19   decelerations.  So you have to stay to the person who

20   you're calling or talking to, "This is what I'm

21   seeing."

22       And then you have a second component.  The second

23   component is, "What do you want to do about it," which

24   is "I want you to come in and look at the strip.  I

25   want you to come in and examine the patient.  I want

1    you to come and confirm what I'm seeing is okay, and we

2    can continue what we're doing with the Pitocin running,

3    or we need to reevaluate a plan of care."

4        So there's two components.  And I believe there

5    was inadequate communication both of what was being

6    seen and interpreted by the nurses, and it's the

7    variety of nurses, and failure to say to Dr. Kovach,

8    you know, "Come on in, give us a hand, look at the

9    strips, examine the mom, and help us get a plan of care

10   here."

11   Q    Violated the standard of care in accuracy of what

12   they reported and in meeting the goal of getting her to

13   the hospital?

14   A    The doctor to the hospital in a timely fashion.

15   Q    Okay.

16   A    Right.  Next one?

17   Q    Okay.  And do you have an opinion relative to the

18   nurse's preparation for this delivery, whether or not

19   they met the standard of care?

20   A    I have one before that.

21   Q    Oh, sorry.  Go ahead.

22   A    That's only that the Pitocin -- running the

23   Pitocin in the presence of repetitive variable

24   decelerations and late decelerations, when obviously

25   that is counterintuitive and dangerous for both mom and

1    baby.

2    Q    And that's what we've been calling persistently

3    non-reassuring?

4    A    Yes.

5    Q    Okay.  All right.

6    A    Yep.  One more.

7    Q    One more.  Okay.  What's the fourth one?

8    A    The fourth one is there is no -- there is no sense

9    of awareness, by the nursing staff for sure, certainly

10   by the doctor, because she hasn't been there for 19

11   hours.  She hasn't been there.  From the time mom came

12   in, until basically four or five minutes before the

13   delivery, she hasn't been there.  No awareness this

14   mom's at increased risk for shoulder dystocia, based

15   upon her obesity, based upon her weight gain, based

16   upon the ultrasound that we had seen before, two days

17   earlier, that she wasn't aware of, based upon the fact

18   that this is the first baby, and we don't know how big

19   a baby mom can fit through this pelvis.  Therefore, she

20   had risk factors that everyone should have been aware

21   of.

22        And if you have risk factors, one of the things

23   that we teach in shoulder dystocia drills, and they do

24   them apparently -- I don't know when they started.  But

25   they do do them at EMH.  What you do is you have to

1    announce a shoulder dystocia, but you have your staff

2    there prepared, ready to go.  So I always wrote up on

3    the board, you know, "be prepared for shoulder

4    dystocia" if I thought that was the case.  And that way

5    you know that you have -- if there's any other

6    obstetricians around, Dr. Fernando, nursery,

7    anesthesia, some more nurses -- not parents, not

8    grandparents if you can help it -- some skilled people

9    who have done the maneuvers that have to be done,

10   should be there at delivery.  If you don't need them,

11   you send them away.  Everybody smiles and you are

12   smart.  If you need them, everybody smiles and says you

13   were smart.  It's a win/win.  You just have to be

14   prepared.  And then you have the best chance of using

15   the maneuvers and getting the baby delivered safely in

16   a quick and efficient fashion.

17   Q    So what your fourth --

18   A    Be prepared.

19   Q    Lack of preparation?

20   A    Lack of preparation for a potential difficult

21   delivery.  And in this case the difficult delivery

22   would have been a shoulder dystocia.

23   Q    Okay.  Are those all of the standard of care

24   violations that you've identified in your review of the

25   conduct of the nurses?

1    A    I believe we have.

2    Q    I want to ask you just one last question relative

3    to the nurses.  Counsel for EMH told the jury in

4    opening statement that the electronic fetal monitor

5    tracings in this case were never non-reassuring,

6    hundred percent of the time they were reassuring.  Do

7    you agree with that statement?

8    A    I do not.

9    Q    And we went through the pages that you identified?

10   A    Yes.

11   Q    And were there -- we don't have time to go through

12   all of those hours.  Were there other pages with

13   similarly non-reassuring fetal heart patterns that we

14   did not project up there?

15   A    Yes.

16   Q    Okay.  So let's go to Dr. Kovach now, all right?

17   A    Sure.

18   Q    Do you have an opinion that you hold to a

19   reasonable degree of medical probability as to whether

20   or not Dr. Kovach deviated from standards of care?

21   A    Yes.

22   Q    Okay.  What is the first deviation of standards of

23   care by Dr. Kovach that you identify?

24   A    The first deviation would be that she managed this

25   patient from home, and that it was a patient who was

1   unknown to her.  She was covering the other practice.

2   She had never seen the patient, met the patient,

3   examined her, evaluated the patient over a 19-hour time

4   period.

5   Q    Okay.  All right.  What's the second?

6   A    That she had more than ample opportunity to come

7   in and examine the patient at various times, lunch

8   time, when the Pitocin has already been running for

9   eight hours and she hasn't seen the patient yet; later

10  in the afternoon, based upon some conversations with

11  the nurses; and then certainly when she went completely

12  dilated, which was at 19:30, 7:30 at night, because we

13  all agree, she has said it in her deposition, and I

14  agree with her, those -- cannot tell how fast the

15  people are going to go in the second stage.  They may

16  go quickly, and you have to be on your way in, or you

17  should be there when mom's pushing.

18  Q    So what's your second standard of care?

19  A    That she failed to come in in a timely fashion and

20  examine, evaluate, assess plan of care.

21  Q    In response to specific events?

22  A    In general because of the patient being there and

23  getting Pitocin, first, and then in response to events.

24  Q    And how many patients does -- and I'm talking

25  about specific to the Cook family.  How many patients

1    does Dr. Kovach actually have relative to this mom and

2    this baby?

3    A    I hope everybody understands there's two patients,

4    of course, mom and baby.  Right.

5    Q    Okay.  Anymore standard of care violations by Dr.

6    Kovach?

7    A    Number three, I think she was unprepared for the

8    shoulder dystocia event which ensued, and that's

9    largely because she arrived at the hospital essentially

10   five or six minutes before the baby's head delivered.

11   Q    Okay.  We're going to talk about the shoulder

12   dystocia in a second.  But do you have any opinion

13   regarding Dr. Kovach relative to a cesarean delivery,

14   since we heard the family talk about it at some point

15   in time throughout the course of the day?

16   A    I do.

17   Q    And what's your opinion?

18   A    My opinion is based upon review of the situation,

19   the patient, the baby, the labor progress, the

20   contractions, the risk factors for a difficult

21   delivery, especially if we had to do an emergency

22   cesarean section, I believe that at 21:35 or 37, based

23   on some -- so that's at 9:30 at night, 21:37, that

24   C-section was indicated, Pitocin should have been

25   discontinued, everybody on the team got together, that

1    means anesthesia, pediatrics, probably Dr. Fernando,

2    who is the in-house doctor, and the Pitocin turned off,

3    patient prepared for cesarean section for maternal and

4    fetal benefit.

5    Q    And did you say by -- by what time?

6    A    21:37, I believe.  And then doctor's not there,

7    so, of course, she has to come in.  And there was a

8    prolonged deceleration at that time.  I think we looked

9    at it on the strips.

10   Q    By 21:37 is 9:37?

11   A    The decision should have been made, right, to come

12   in.

13             MS. MULLIN:  I missed the last part, the

14   decision should have been made to come in?

15             THE WITNESS:  No, the decision should have

16   been made to discontinue the Pitocin, to get Dr. Kovach

17   to labor and delivery, if she's not there already, and

18   to proceed with a cesarean section.

19   Q    All right.  So anymore standard of care

20   violations?

21   A    Yes.

22   Q    Okay.

23   A    Only one more.

24   Q    One more?

25   A    Yes.  And I believe that Dr. Kovach, during the

```
 1   actual shoulder dystocia relief, used excessive
 2   traction, twisting, turning of the fetal head, and that
 3   that caused damage to the baby's muscles.  Baby had
 4   what's called torticollis.  The muscles are torn in the
 5   neck muscles, torn.  Baby had a fractured clavicle,
 6   bone in our shoulder, fractured clavicle, football
 7   injuries, skating and football.  And that the baby had
 8   a permanent brachial plexus injury.  So the baby had a
 9   bone injury, a nerve injury, and a muscle injury.
10       Mom had trauma as well from the delivery of this
11   nice-sized baby, and she had muscles torn in her
12   vaginal and rectal area called a third-degree tear that
13   was repaired.
14   Q    All right.  So, specifically, do you have an
15   opinion that you hold to a reasonable probability,
16   Dr. Borow, whether the standard of care violations that
17   you've identified by the EMH nurses were a proximate
18   cause of ████████'s difficult birth, fractured
19   clavicle, torticollis, and brachial plexus injury; do
20   you have an opinion?
21   A    Yes.
22   Q    Tell us how -- in what respect the nurse's conduct
23   was a proximate cause of ████████'s injury?
24   A    Well, it's my opinion that had the nurses properly
25   identified the changes on the fetal monitor strip, as
```

1  we've gone over, notified the doctor and asked the

2  doctor or suggested to the doctor or requested the

3  doctor to come in, that the patient would have been

4  examined, evaluated, assessed, and then more likely

5  than not cesarean section would have been performed for

6  the maternal and fetal benefit.  They would have

7  realized -- Dr. Kovach would have realized there were

8  progress and labor problems, there were electronic

9  fetal monitor problems, there were descent in the

10 pelvis problems with mom pushing, there were

11 intolerance to some labor in the second stage when

12 mom's pushing problems.

13     There were numerous issues there that the nurses

14 should have addressed, told the doctor about, and had

15 the doctor come in and assessed the patient.  Had that

16 been done, in my opinion, cesarean section was

17 indicated no later than 21:37.  Get the baby out in the

18 next half an hour.  By 22:00 the baby is delivered, and

19 we have a good baby and a good mom.

20 Q     Do you have an opinion, that you hold to a

21 reasonable degree of medical probability, whether all

22 of the injuries that ███████ sustained would have been

23 avoided if a cesarean had been done at the point in

24 time in which you say the standard of care required it

25 to be done?

1  A    I have an opinion.

2  Q    What's your opinion?

3  A    My opinion is it would have been exquisitely rare

4  for a baby to have a brachial plexus injury that was

5  permanent after a cesarean section.  This was looked at

6  in the past, and the incidence is minute in cesarean

7  section.  So C-sections are considered to be

8  protective, a way to prevent a brachial plexus injury.

9  Q    And while it's true that nurses can't order

10 cesarean deliveries, have you, over the course of your

11 time, your career, had nurses call you and let you know

12 that, between what the mother's progress and labor

13 looked like, and what the changes on the fetal heart

14 rate were doing, and the amount of Pitocin that was

15 being administered, that a nurse wanted you to come in

16 and do a C-section?  Have you had those conversations

17 before?

18 A    Many times.  But usually I'm there in the doctor's

19 lounge in the building, and I can walk over in 30

20 seconds or a minute, make an assessment, or call it or

21 not call it.

22 Q    Okay.  I also want you to assume for the purpose

23 of my question, Dr. Borow, that defense counsel told

24 the jury in opening statement that retrospectively

25 doing some Monday morning quarterbacking here, Dr.

```
 1   Kovach believes that she wouldn't have done anything

 2   different, even had the nurses not violated the

 3   standard of care.  Assume we're going to hear some

 4   Monday morning quarterbacking from Dr. Kovach.  Does

 5   that change your opinion about the nurses being a

 6   proximate cause of ██████████'s injury?

 7   A    No, it doesn't change my opinion as to the cause

 8   of the injury for either side, nurses or Dr. Kovach.

 9   And certainly in this case, we have to do this in a

10   prospective fashion.  That's how I review the cases.

11   That's how doctor's learn.  I think how most of us

12   learn prospectively.  Tell us what you're going to do

13   next.  What are you going to do next?  What's the

14   consequence of it?

15       And to say, "Well, I didn't section her, and I

16   wouldn't have sectioned her.  But even though I

17   wouldn't have sectioned her, I know if I did section

18   her, she wouldn't have had this brachial plexus injury,

19   had I sectioned her."  That's not the way that doctors

20   do things prospectively.  We have to do it in a normal,

21   proper sequence.  And then you have to be responsible

22   for the consequences of being or not being there, and

23   making a judgment there, at the time with the patient,

24   examining the patient and looking at the strip.  So you

25   can't look back and say, "Well, I wouldn't have
```

1   sectioned her," no.

2   Q    Can an obstetrician be exercising her personal

3   best judgment and still be below the standard of care?

4   A    Of course.

5   Q    Do you have an opinion, Dr. Borow, that you hold

6   to a reasonable degree of medical probability, whether

7   or not the standard of care violations that you've

8   identified by Dr. Kovach were a proximate cause of

9   ███████'s broken clavicle, torticollis, and permanent

10  brachial plexus injury?  First, do you have an opinion?

11  A    Yes.

12  Q    And what's your opinion?

13  A    My opinion is that Dr. Kovach directly contributed

14  to the injury to this baby, both by the delay of coming

15  and evaluating this mom, and going to a C-section in a

16  timely fashion; and also by having a traumatic

17  delivery, at the time of trying to relieve the shoulder

18  dystocia, for which she really was unprepared because

19  she had just walked in the door.  Basically changed her

20  clothes, came in, and baby's delivering, and there's

21  this obstetrical emergency in front of her without

22  adequate staffing and preparation.  That that increases

23  the risk that you will not get your maneuvers done

24  successfully and properly, and that increases the risk

25  that there will be harm, because the doctor will use

1    more force to try to overcome the resistance of the

2    baby that's stuck.

3         Instead of rotating the baby and doing other types

4    of maneuvers, doctors tend to pull harder when there's

5    resistance.  And I believe in this case, not only did

6    the pulling harder damage the nerves of the brachial

7    plexus, but she likely broke the clavicle at the same

8    time, broke the clavicle, and that's how the baby got

9    delivered.  The clavicle broke and the shoulder then

10   rolls in.  And it's a maneuver that no one's probably

11   ever done, but that's the way you can get more room.

12   And in breaking the clavicle, that's how the delivery

13   got affected, and that's with pulling down with

14   excessive force.

15   Q    In terms of timing, do you believe more likely

16   than not that the brachial plexus injury and the broken

17   clavicle occurred at approximately the same time?

18   A    Within a minute or two of the shoulder dystocia

19   relief, yes.

20   Q    Same question with respect to the muscle, the

21   traumatic muscle injury.  Do you think that the muscle

22   injury that led to the torticollis that was in the

23   new -- identified in the baby's records, that the

24   muscle damage occurred close in time to the broken

25   clavicle and the brachial plexus injury?

1   A    Yes.

2   Q    And geographically, where are all of those things

3   located, Dr. Borow?

4   A    Well, they're all located in the same general

5   area.  It's the nerves in the neck and the muscles in

6   the neck, which overlie those nerves, and the clavicle

7   where the nerves run underneath the clavicle.  So it's

8   all anatomically in the same area.

9   Q    All right.  Did Dr. Kovach have multiple

10  opportunities to prevent this difficult vaginal birth

11  from occurring?

12  A    In my opinion, of course, by coming in sooner,

13  evaluating the patient, and potentially doing a

14  cesarean section.  And certainly being prepared and

15  having enough folks there, staff there to help her do

16  it successfully in a mom who weighed 260 pounds, who

17  has an epidural, who can't hold her own legs up, and

18  there's two grand moms, one nurse, doctor trying to get

19  this 8-and-a-half pound, almost 8-and-a-half pound baby

20  delivered.

21  Q    And, Dr. Borow, has that been studied extensively

22  and recorded in the medical literature that doctors

23  increase the amount of traction they use when they're

24  confronted with a shoulder dystocia, whether

25  unexpectedly or expectedly?

1   A    The answer is yes.

2   Q    And is that why there's so much time spent in

3   institutions like your hospital, at EMH, and other

4   places to train people to have appropriate staff and to

5   respond by doing something other than having their

6   hands on the baby's head?

7   A    Well, the answer is yes to that question.  In

8   addition to that, we also do simulation with models

9   where you can measure how much force you are using.

10  Because most people don't realize they use more force

11  than they think they're using.  And confronted with a

12  shoulder dystocia, doctors tend to pull harder rather

13  that give up and move to other maneuvers that don't put

14  a stretch on the brachial plexus.

15          MS. PANTAGES:  May I approach the witness,

16  Your Honor?

17          THE COURT:  You may.  Counsel, how much more

18  do you have?

19          MS. PANTAGES:  I'm wrapping up.  Yeah.

20  Q    Just a couple more questions and I'm done,

21  Dr. Borow.  I want to ask you about some medical

22  literature.  There is an article that's out of *Clinical*

23  *Obstetrics and Gynecology*, Volume 50, No. 3, from

24  September of 20, 2007, written by Robert Allen, Ph.D.,

25  called "On the Mechanical Aspects of Shoulder Dystocia

```
 1   and Birth Injury."

 2            MS. MULLIN:  Objection, Your Honor.

 3            MR. MURPHY:  Objection.

 4            MS. MULLIN:  May we approach?

 5            THE COURT:  Well, I don't think we need to

 6   approach.  The objection is sustained.  If you want to

 7   rephrase the question, you may.

 8            MS. MULLIN:  I think the basis of the

 9   objection is also a little bit differently than that.

10   May we approach briefly?

11            THE COURT:  Are you folks doing okay for a

12   few more minutes?  All right.

13        (Sidebar discussion took place as follows:)

14            THE COURT:  If you want -- if you want to ask

15   him if he knows the document, you can.  If he doesn't

16   recognize it, you can refresh his recollection of it.

17   But you've got to ask him first if he's familiar with

18   it, not just show him and read it to him.

19            MS. PANTAGES:  No, I'm just reading him the

20   title.  And then I'm going to ask him, have you read

21   this?

22            THE COURT:  Okay.  What's your objection?

23            MS. MULLIN:  He testified in his deposition

24   he had not reviewed literature, isn't planning on

25   citing literature, isn't talking about literature in
```

```
 1    the course of this case.  If he is going to, if he

 2    decides to, he will let us know so that we can prepare

 3    an adequate cross-examination on the literature.

 4              THE COURT:  Has that literature been provided

 5    to you or was it made part of the doctor's report?

 6              MS. MULLIN:  No.

 7              MS. PANTAGES:  No, no.  This is completely

 8    different.  I'm not going to ask him about these.  I'm

 9    merely establishing these as learned treatises.  That's

10    it.  And I do --

11              THE COURT:  But if he didn't -- if he didn't

12    reference them in his report or his depositions, if he

13    didn't talk about them, why are they relevant?

14              MS. PANTAGES:  No, I do this in every case.

15    Every case.

16              THE COURT:  Well, that doesn't make it right.

17              MS. PANTAGES:  It's -- it's -- okay.

18              THE COURT:  What do you want to ask him?

19              MS. PANTAGES:  Are you familiar with this,

20    have you read this, and is this reliable.

21              MS. MULLIN:  Because she wants to then use

22    it --

23              MS. PANTAGES:  Sure.

24              MS. MULLIN:  -- with our experts who don't

25    think this is reliable.
```

1          THE COURT:  Didn't we have -- didn't we go

2     through this a little bit?

3          MS. PANTAGES:  Yeah.

4          MS. MULLIN:  The particular expert was asked

5     at his deposition, "Are you going to cite to, rely on,

6     reference in my way any literature?"

7          THE COURT:  Okay.  Okay.  So his opinion

8     isn't based on that?

9          MS. PANTAGES:  Right.

10         THE COURT:  Okay.  But you -- so you just

11    want to ask him in general are you familiar with it?

12         MS. PANTAGES:  Yes.

13         THE COURT:  You can do that, but you're not

14    going to ask him if he then based his opinions on it.

15         MS. PANTAGES:  No, no, I'm not.

16         THE COURT:  So why is that a problem?

17         MS. MULLIN:  She wants to say, "Is this

18    reliable," so that when Dr. --

19         THE COURT:  But what does -- why is it

20    relevant if he didn't base his opinion on -- how is it

21    relevant if it's reliable on not?

22         MS. PANTAGES:  Because I can then use it

23    to -- there are two different types of -- there is two

24    uses for literature in a medical malpractice trial.

25    One is I relied upon this article in formulating an

1  opinion.  Here's what it is, here is why I relied upon

2  it.

3             THE COURT:  Okay.  And that's not applicable

4  here.

5             MS. PANTAGES:  Not applicable here.

6             THE COURT:  Okay.

7             MS. PANTAGES:  We have a duty to disclose

8  that information.

9             THE COURT:  Agreed.

10            MS. PANTAGES:  There is another type of

11  literature that can be used that is for the purposes of

12  cross-examination.  That is not discoverable.  That is

13  totally attorney work product.

14            THE COURT:  Agreed.  But this isn't

15  cross-examination.

16            MS. PANTAGES:  Right, right.  But I am

17  entitled to ask him on direct examination, "Are you

18  familiar with this article?"  That's all I'm asking

19  him.  And, "Is it a reliable article?"  And he's

20  allowed to answer that question.  There's no reason why

21  I can't ask him those questions.

22            THE COURT:  How about relevance?  If he

23  didn't use it to rely on his opinions, then why is some

24  article in this field relevant to this case?

25            MS. PANTAGES:  Because the learned treatise

 1  rule says that's how I -- that's how I establish.  It

 2  doesn't say that the expert -- in the learned treatise

 3  rule --

 4          THE COURT:  I'm not --

 5          MS. PANTAGES:  The only thing the learned

 6  treatise rule is says that somebody, somewhere along

 7  the line said they're familiar with it and they

 8  recognize it as reliable.  That's the only threshold.

 9  That's the correct -- what they're saying is flat out

10  wrong, and they know it's wrong, because they've

11  seen -- they've seen us do it.  This is how it's done

12  to establish something under the learned treatise rule.

13  There is no rule that says that an expert has to

14  identify learned treatises in his expert report.

15  That's -- that's --

16          THE COURT:  But doesn't relevance also always

17  apply in the introduction of evidence?  Isn't the fact

18  that a document that he didn't use or consider -- how

19  is it relevant to his opinion in this case?  Doesn't

20  relevance have --

21          MS. PANTAGES:  But this is another topic of

22  discussion.  This is -- I'm allowed to do this this

23  way, Your Honor.  This is how you establish -- this is

24  one of the -- this is one of the allowable means of --

25  I've been doing this for 27 years, and I've never not

 1   been allowed to do this.  And I'm being -- I'm an

 2   officer of the court.  I'm being straight with you.  No

 3   one has ever said, "You cannot do this."  I am allowed

 4   to ask him simply, "Are you familiar with --" I did

 5   it -- I did it as Char Daniel's deposition.  At the end

 6   of her deposition she identified some learned treatises

 7   for me.  Dr. Mehlman identified some learned treatises.

 8   It doesn't have to be connected to their ultimate

 9   opinions in the case for it to be an allowable part of

10   examination.

11            THE COURT:  Go ahead.

12            MS. MULLIN:  Well, Your Honor, my -- the

13   basis for my objection, one, is the foundation that you

14   picked up on.  Number two is the fact that this expert

15   is not using, relying on, referencing these documents

16   to support his opinions.  He's going to give some

17   blanket statement that these are authoritative in some

18   sort -- in some way are reliable so that Pam can use

19   them to cross-examine --

20            THE COURT:  Hold on.  Let her finish.  Go

21   ahead.  Say this again.

22            MS. MULLIN:  So that Pam can use them -- she

23   wants to do this with this witness, so she can use

24   those articles later to cross-examine other experts,

25   who also haven't reviewed or relied on this work.

94

1          MS. PANTAGES:  She has reviewed them.  But

2     here's the thing, is that they know what I'm saying is

3     true.  These lawyers have tried so many cases, and

4     every case -- in every case that I know, every single

5     Plaintiff's lawyer does this.  And they are standing

6     here in front of you and telling you that this is

7     improper when they know that it is totally proper.

8          THE COURT:  So if I understand this

9     correctly, you want to have him identify a learned

10    treatise that he didn't rely on, and he will recognize

11    he's aware of it, and he's going to say he believes

12    it's a valid treatise in this area?

13         MS. PANTAGES:  That's it.

14         THE COURT:  And then when their expert

15    testifies, you want to cross their expert as to why he

16    or she agrees or disagrees that it's a valid treatise

17    or not?

18         MS. PANTAGES:  No, no.  I'm not even going to

19    do that with them.  I don't have to do that with them.

20         MR. MURPHY:  Well, what are you going to do

21    with it?

22         THE COURT:  Then what's the point then?

23         MR. MURPHY:  Yeah.

24         MS. PANTAGES:  They're going to -- you've

25    already heard things in opening statement --

1           THE COURT:  That aren't evidence, by the way.

2           MS. PANTAGES:  Right.

3           THE COURT:  That wasn't objected to, by the

4      way.

5           MS. PANTAGES:  I'm allowed to -- right,

6      because I believe the people should do their opening

7      statement.  I don't bother lawyer's opening statement

8      unless it's pretty egregious.  But that's the kind of

9      law I practice.  But I also don't do false stuff like

10     this, which is making me a little upset.

11          MS. MULLIN:  Wait, wait, wait.  That is not

12     fair.

13          MR. MURPHY:  I don't understand how you want

14     to say that.

15          MS. PANTAGES:  This is how it happens all of

16     the time.  Plaintiff's lawyers show their experts

17     literature and say, "Have you read this?"  And they say

18     either, "Yes, I have," or, "No, I haven't."  If they

19     say no, they I haven't, then there's no further

20     questions.  If they say, "Oh, yeah, I've read that

21     article," then --

22          THE COURT:  I am not going to pretend to be a

23     highly seasoned trial judge in medical malpractice.

24     But I have also been involved in expert trials with

25     experts in many different fields for 22 years, and I

1   have never seen an expert cross-examined on a learned

2   treatise that that expert had nothing to do with the

3   particular case at bar.  Now, I'm not saying you're

4   wrong.  I want to know specifically what you're going

5   to do with it with their expert.  If I let you -- if I

6   let him testify he's aware of it, and that in his

7   opinion it has validity, what are you going to do with

8   it with them?

9           MS. PANTAGES:  If Dr. Ouzounian says --

10          MS. MULLIN:  It's not reliable.

11          MS. PANTAGES:  No.  It doesn't -- I've

12  already established it as reliable.

13          THE COURT:  From your expert.  So what are

14  you going to do with it from their expert?  What's the

15  point of this exercise?

16          MS. PANTAGES:  If Dr. Ouzounian makes a

17  statement about how brachial plexus injuries occur, or

18  that there's -- or that we've been doing the McRoberts

19  maneuver for years, and it hasn't changed anything --

20  and I've been in cases with Dr. Ouzounian, and

21  sometimes he says that, "No matter what we do, these

22  kids still get hurt."  There is literature that says

23  under --

24          THE COURT:  Okay.  And you'll ask him then

25  about that article?

1           MS. PANTAGES:  I'll say, "Here's this

2    article.  You know who that article is."

3           THE COURT:  Right.

4           MS. PANTAGES:  And then I'll ask him that

5    statement, you know, from the article and say, "Do you

6    agree or disagree with this?"

7           THE COURT:  And can't he then say why he

8    agrees or disagrees?

9           MS. MULLIN:  Sure.

10          MS. PANTAGES:  Yeah.

11          THE COURT:  Then what's the problem?

12          MS. MULLIN:  The prejudicial effect of this

13   is that this witness is going to use -- he's being used

14   as a pawn, essentially, to identify and verify the

15   reliability of a bunch of documents that he's not going

16   to testify about, and are then going to be paraded in

17   front of another expert that doesn't think that they're

18   reliable in any way and being cross-examined on that,

19   just because she's going to get from this expert that

20   he's deeming it reliable.

21          MS. PANTAGES:  The latest trial I was in, I

22   objected to the introduction of the ACOG bulletin, the

23   ACOG thing that was -- been the subject of some of our

24   pleadings.  And the trial judge in that case said -- I

25   said, "They can't talk about it in my case, because

 1  none of my people are going to identify it as reliable

 2  authorities."  And he asked defense counsel, "Well, is

 3  somebody going to do it in your case?  Are you going to

 4  ask the questions of this expert, 'Is this reliable?

 5  Are you familiar with this?  Is this reliable?'"  And

 6  they said yeah.

 7          So by virtue of the opposing counsel's

 8  statement in that case, even before their people took

 9  the stand, that they were going to follow the learned

10  treatise rule and establish it as reliable.

11          THE COURT:  I'd like to have this issue

12  briefed.  It would have saved us a lot of --

13          MS. PANTAGES:  I apologize.  I apologize,

14  Your Honor.

15          THE COURT:  A lot of --

16          MS. PANTAGES:  Like I said, I never had --

17          THE COURT:  Well, they didn't just object out

18  of the blue.  What is the rule?

19          MS. PANTAGES:  That's the rule.

20          THE COURT:  I mean, obviously the defense

21  counsel is objecting, so this isn't as crystal clear as

22  you're seeming to make it for me.

23          MS. PANTAGES:  I'm sorry.

24          THE COURT:  They wouldn't be standing up here

25  if they didn't have at least a rational basis for

```
 1   saying why there is an issue.  What is it, 17?
 2            MR. HELLER:  803.18.
 3            THE COURT:  Micki, can you hear me okay?
 4            COURT REPORTER:  Yes.
 5            THE COURT:  803.18.  Under the exception,
 6   statements contained in published treatises,
 7   periodicals, or pamphlets on a subject of history,
 8   medicine, or other science or art are admissible for
 9   their truth as an exception to the rule excluding
10   hearsay.  The treatise must be established as a
11   reliable authority to the extent that the statements
12   are called to the attention of an expert witness on
13   cross-examination, or relied upon by the expert in
14   direct examination.  The reliability may be established
15   by the testimony or admission of the witness or other
16   expert testimony or judicial notice.  Once the
17   authority is established as reliable, statements
18   contained in treatises and like, which are addressed on
19   direct or cross, may be considered as substantive
20   evidence.
21            Okay.  How do you get around this?  The
22   treatise must be -- the treatise must be established as
23   a reliable authority, to the extent that the statements
24   are called to the attention of an expert witness on
25   cross-examination, which you're not doing, or are
```

1    relied upon --

2              MS. PANTAGES:  Oh, but I am going to.  I am

3    going to.  Yeah.  This is --

4              THE COURT:  So you can introduce it with --

5    according to this, you can introduce it with their

6    witness.

7              MS. PANTAGES:  But it's to the extent called

8    to the attention of an expert witness upon

9    cross-examination, which is what I intend to do.  Or

10   relied upon by an expert witness --

11             THE COURT:  Right.

12             MS. PANTAGES:  -- which he did not rely upon

13   it.

14             THE COURT:  No, no, no.

15             MS. PANTAGES:  But you've got to keep --

16   you've got to read the whole.  Statements containing in

17   public -- blah, blah, blah, blah, blah -- established

18   as a reliable authority by the testimony or admission

19   of the witness or by other expert testimony or by

20   judicial notice.  All I need is expert testimony from a

21   qualified expert that is reliable.  That's all I need

22   to call -- it's kind of a circumvential {sic} thing,

23   but learned treatises can be used two ways:  To the

24   attention of an expert witness on cross, or relied upon

25   by an expert witness, which in direct examination,

```
 1    which he has not relied upon this.  But to establish

 2    this a learned treatise, they have to be by the

 3    admission of the witness or by other expert testimony,

 4    which is what I'm doing right now.  I'm getting other

 5    expert testimony that this is a reliable authority.

 6    That's it.  That's all I have to do, and I'm allowed to

 7    do that.

 8              MS. MULLIN:  This witness did not list it in

 9    his expert report.

10              MS. PANTAGES:  He doesn't have to.

11              MS. MULLIN:  He did not reference it in his

12    deposition.  He was asked whether he intends to talk

13    about literature that is reliable.  He said no.

14              MS. PANTAGES:  He doesn't have to.  I can ask

15    him questions on direct examination --

16              THE COURT:  The treatise must be established

17    as a reliable authority to the extent that the -- he's

18    not -- or relied upon.

19              MS. PANTAGES:  Well, the rule says what we

20    have to do.  If I'm going to call it to the attention

21    of an expert witness on a cross-examination, which was

22    what I intend to do.

23              THE COURT:  Here's what I'm going to rule.  I

24    have some concerns that this is not proper, and it's --

25    but at this point I'm erring on the side of
```

```
 1    admissibility.  I'll allow you to answer -- ask him

 2    questions to the extent if he's familiar with it, and

 3    if he has an opinion as to its validity, and that's it.

 4    And I'm going to give them a heck of a lot of free

 5    reign if this comes up on their witnesses on cross.

 6    Fair enough?

 7              MS. PANTAGES:  Yeah.  Absolutely.

 8              THE COURT:  All right.

 9              MR. MURPHY:  Thank you, Your Honor.

10              (Sidebar discussion ended.)

11              THE COURT:  Sorry for the delay.  I

12    appreciate your patience.  And I am promised we're very

13    close to our break.

14              MS. PANTAGES:  Yes.

15              THE COURT:  Go ahead.

16              MS. PANTAGES:  Thank you, Your Honor.

17    BY MS. PANTAGES:

18    Q    All right.  Dr. Borow, the title of this article

19    is "On the Mechanical Aspects of Shoulder Dystocia" by

20    Dr. Robert Allen, September of 2007, *Clinical*

21    *Obstetrics and Gynecology Journal*.  First, are you

22    familiar with this article?

23    A    Yes.

24    Q    Is it a reliable piece of literature?

25    A    Yes.
```

1   Q   This is from -- this is from the *American Journal*

2   *of Perinatology*, 2013, "A Multicenter Assessment of

3   1,177 Cases of Shoulder Dystocia, Lessons Learned,"

4   lead author, Suneet Chauhan.  Are you familiar with

5   this article?

6   A   I am.

7   Q   Is it a reliable article?

8   A   Yes.

9   Q   All right.  This is from the *Royal College of*

10   *Obstetricians and Gynecologists*, published in February

11   of 2015, lead author Crofts, C-R-O-F-T-S, the paper is

12   called "Prevention of Brachial Plexus Injury, 12 years

13   of Shoulder Dystocia Training, an Interrupted Time

14   Series Study."  Are you familiar with this study?

15   A   Yes.

16   Q   Is it a reliable study?

17   A   Yes.

18   Q   This is from the *American Journal of Obstetrics*

19   *and Gynecology*, February 2011, lead author, Amos

20   Grunebaum, G-R-U-N-E-B-A-U-M, article is called

21   "Effects of Comprehensive Obstetric Safety -- Patient

22   Safety Program on Compensation Payments and Sentinel

23   Events."  Is this -- are you familiar this article?

24   A   I am.

25   Q   Is it reliable?

104

```
1    A     It is.

2    Q     Thank you.

3          This is from Acta Obs -- how do you say this?

4    A     Obstetricia --

5    Q     -- et --

6    A     -- et Gynecologica.

7    Q     All right.  And this is from October 2006.  Lead

8    author, Margareta Mollberg, M-O-L-L-B-E-R-G, "Obstetric

9    Brachial Plexus Palsy, a Prospective Study on Risk

10   Factors Related to Manual Assistance During the Second

11   Stage of Labor."  Are you familiar with this paper?

12   A     I am.

13   Q     Is it reliable?

14   A     Yes.

15   Q     I think that's all I have, Doctor.

16         One more question.  Last question, was        's

17   permanent brachial plexus injury and all that has gone

18   with it, the therapies, the doctor's visits, the -- all

19   of the things that she's gone through, was it avoidable

20   and preventible had the EMH nurses and Dr. Kovach met

21   the standard of care?

22   A     In my opinion, yes.

23             MS. PANTAGES:  Thank you.  That's all I have.

24             THE COURT:  All right.  Doctor, hang on for

25   one second.
```

```
 1              Folks, we're going to take a break.  It is
 2    10 -- or 20 after.  We're going to take about 15, 20,
 3    probably about 20 minutes.  Now, it is my hope that we
 4    can finish this witness today, which means that there
 5    will be two more examinations of him, and possibly a
 6    second shorter redirect.  So on the break, I want you
 7    to talk to Elizabeth about anybody who might have a
 8    time period, because we're probably going to go a
 9    little longer than 4:30.  I won't make it super late,
10    but it might go to 5:00, 4:45, or something like that.
11    So if you have a commitment, a family member or
12    something, let me know that, and we'll work around it,
13    and I'll make it -- I won't put anybody out.  But to
14    the extent you all can, I would like to finish this
15    witness today, if we can do that.  All right?  So
16    we'll -- talk to her about that.  Let me know of your
17    availability to stay a little later.  I'll talk to the
18    lawyers and get a feel for how much they need.
19              And then remember while you're out of the
20    presence of the Court, do not begin to form opinions on
21    this case, do not discuss it among yourself or with
22    anybody else, and do not do anything to attempt to
23    research or look into any of the information that
24    you've heard today by way of testimony.  Thank you.
25         (Out of the presence and hearing of the jury.)
```

```
 1                THE COURT:  Okay.  Doctor, I'm instructing
 2  you not to discuss your testimony with anybody.
 3                THE WITNESS:  Thank you, sir.
 4                THE COURT:  Do you feel between your
 5  cross-examinations and a possible redirect that we can
 6  finish this witness today?
 7                MR. MURPHY:  Yes.
 8                THE COURT:  I really would like to try to do
 9  that.  I'm not going to cut you short at all.  If it
10  turns out that we have a problem with a juror, I'll let
11  you know that.  I got the sense that they're willing to
12  stay and try to finish Dr. Borow, so that's what I'd
13  like to try to do.  So let's try to start promptly in
14  about 20 minutes or so.
15                MS. MULLIN:  Great.  Thank you.
16                THE COURT:  Thank you.
17                (Recess from 3:21 p.m. to 3:45 p.m.)
18          (Out of the presence and hearing of the jury.)
19                THE COURT:  I was -- we're back on the
20  record.  The jury is not present.  I was troubled by my
21  inability to quickly analyze the 803.18 learned
22  treatise issue that consumed us for about five or eight
23  minutes off the record.  And I'm probably the 15th
24  smartest person in the room, and I think there's only
25  12 people in the room.  But I normally don't get thrown
```

1    for loops when it comes to evidence, and this one took

2    me by surprise.  I have not seen this one before.  So I

3    did a little quick research and reviewed the notes, the

4    staff notes to Evidence Rule 803.18, and as well as

5    the -- as well as a Supreme Court case directly on the

6    issue.  It's Moretz, et al., versus Muakkassa, probably

7    saying that wrong, M-U-A-K-K-A-S-S-A.  That's a 2013

8    Ohio Supreme Court case dealing directly with the

9    admissibility of learned treatises, and basically

10   reflects the change in the law -- or the change in the

11   learned treatise doctrine that occurred in 2006, which

12   liberalized the availability of counsel to introduce a

13   learned treatise through any expert.

14          The Court in Paragraph 54 noted, in 2006 Ohio

15   amended its hearsay rules by adopting Evidence

16   Rule 803.18.  This new exception to the hearsay rules

17   permits the admissibility of statements from learned

18   treatises during the testimony of expert witnesses.

19   Then cites rule, Paragraph 55 of the Evidence

20   Rule 803.18, replaced former Evidence Rule 706, which

21   permitted the limited use of learned treatises only for

22   impeachment purposes, and thus provided -- I'm sorry --

23   and thus prohibited their use during direct

24   examination.  And this -- the case goes on, and the

25   staff notes seem to indicate that the liberalization of

```
 1    this rule provides for the -- now it makes logical
 2    sense, because if I didn't allow that testimony to come
 3    in through Plaintiffs' witness, and Plaintiff attempted
 4    to cross-examine the Defendant's expert, and he denied
 5    any validity or denied the efficacy of those documents,
 6    then there would be no evidentiary value in discussing
 7    them, if they were otherwise learned treatises.
 8              So even though I have some reluctance, and
 9    I'm -- I didn't know the -- I was concerned about my
10    ruling on that issue, I think that there is support for
11    the proposition that Plaintiffs' admission of that
12    material was correct.  And I feel not great, but a
13    little better about it.  My number one rule is to be
14    the gatekeeper of evidence, and I don't want to fail at
15    that role.
16              Are we ready for cross-examination?
17              MS. MULLIN:  Yes, Your Honor.
18              THE COURT:  All right.
19        (Within the presence and hearing of the jury.)
20              THE COURT:  All right.  Thank you all.  Be
21    seated.  It's my understanding that Attorney Mullin
22    would like to inquire first.
23              MS. MULLIN:  Yes, Your Honor.  Thank you.
24              THE COURT:  All right.
25                           *  *  *
```

1       CROSS-EXAMINATION OF LAWRENCE S. BOROW, M.D.

2   BY MS. MULLIN:

3   Q    Good afternoon, Dr. Borow.

4   A    Good afternoon.

5   Q    Dr. Borow, I want to make sure the jury

6   understands the nature of what your practice is.  We

7   can agree that for the past decade plus you have not

8   delivered a baby?

9   A    Right.

10  Q    For the last decade plus, you have not managed a

11  labor, be it from home or in the hospital setting,

12  right?

13  A    I'm -- I think that's true.

14  Q    In the last decade plus, you have not done any

15  kind of official interpretation of fetal heart monitor

16  strips, except in the context of a lawsuit, true?

17  A    Continuing medical education, so, no, I wouldn't

18  say that is true.

19  Q    You have not -- when I say interpretation of a

20  fetal heart monitor strip, you are not currently

21  interpreting them where you can walk in a hospital,

22  interpret them, and have any privileges to deliver

23  babies today, true?

24  A    Sort of a compound question, but I think -- I

25  think I understand your question.  I don't go into

1    labor and delivery and look at these on a daily basis,

2    right.

3    Q    In terms of your involvement in litigation, you've

4    been doing this for how many years?

5    A    Beginning -- I think I started to looking at cases

6    about 30 years ago.

7    Q    30, 35 maybe?

8    A    35.

9    Q    And in the 35 years that you have been doing this

10   work, you have given depositions 99 percent of the time

11   only on behalf of plaintiffs; is that true?

12   A    Correct.

13   Q    And when you say that you are board certified in

14   OB/Gyn, that's still current today?

15   A    Yes.

16   Q    But then you told the jury that you spend more

17   than 75 percent of your professional time in the active

18   practice of obstetrics and gynecology.  Did you tell

19   them that?

20   A    Yes.

21   Q    We can agree that obstetrics and gynecology are

22   two different things?

23   A    Only to the extent that you are doing one type of

24   surgery or another.  But I am an

25   obstetrician/gynecologist --

```
1   Q     Sure.

2   A     -- and that's my board certification.

3   Q     Sure.  And I understand that.  I appreciate that.

4   My question, though, is different.

5   A     Sure.

6   Q     Obstetrics and gynecology are two different

7   things.  One involves a pregnant patient, labor

8   management and delivery, and one doesn't?

9   A     Right.

10  Q     When you talked about your current practice in

11  terms of obstetrics, you and I can agree that you spend

12  less than 20 percent of your time in the active

13  clinical practice of obstetrics, true?

14  A     Probably about 20 percent.

15  Q     Are you aware of any requirements in this state in

16  terms of what it takes to be an expert in a

17  medical/legal case like this, how much of your

18  professional time has to be devoted to obstetrics?

19            MS. PANTAGES:  Objection.

20            THE COURT:  What's the basis?  Do you want to

21  approach?

22            MS. PANTAGES:  Sure.

23        (Sidebar discussion took place as follows:)

24            THE COURT:  What's the basis?

25            MS. PANTAGES:  It's a legal question, number
```

```
1   one, and, number two, there's no challenge to his

2   competency.

3            MS. MULLIN:  There's about to be.  There's

4   about to be a challenge.

5            THE COURT:  My understanding is there is a

6   threshold level of -- that a doctor has to have to be

7   an expert.  I think it's 75 percent.

8            MS. MULLIN:  That's what he represented on

9   direct examination that he has, and that's why I'm

10  exploring.

11           THE COURT:  I'll give you a little bit, and

12  let's see where it goes.

13           MS. MULLIN:  All right.  Thank you.

14               (Sidebar discussion ended.)

15           THE COURT:  All right.  Doctor, do you recall

16  the last question or do you want it reread?

17           THE WITNESS:  Reread, please.

18                  (Record read.)

19  BY MS. MULLIN:

20  A    No.

21  Q    But just to be clear, you and I can agree that you

22  spend 20 percent or less of your time in the active

23  clinical practice of obstetrics, true?

24  A    I can't really spread it out the way you're asking

25  me to do it.  I take care of the patients.  I call
```

1  nights and weekends.  I mean, it's about 80 percent of

2  my time, I think is Gyn, 20 percent is OB.

3  Q    Then you answered my question.

4  A    Okay.

5  Q    As relates to obstetrics alone, zero percent of

6  your time today is devoted to the kind of obstetrics

7  that we're here about, and that is labor management and

8  delivery of patients, right?

9  A    To that extent of labor and deliveries, sure.

10  Q    In the 500-or-so cases that you have -- well,

11  forgive me.  We got distracted a little bit by the

12  sidebar.  Remind me, how many cases do you think you've

13  reviewed over the course of your work as an expert?

14  A    I think about 500.

15  Q    And you have testified 15 or 16 times for

16  Ms. Pantages?

17  A    No, not that I know of.  I've looked at, I think,

18  about 16 cases.

19  Q    How many times do you think you've testified for

20  her in a courtroom?

21  A    I don't know.  In a courtroom?

22  Q    Uh-huh.

23  A    A few times.  I just -- I don't know.

24  Q    The same models that she had out were present at

25  the other presentations in the courtroom that you have

1    been with her on, right?

2    A    Sure.  I mean, I can think of three or four times

3    that I've testified.

4    Q    Same video in brachial plexus injury cases?

5    A    I don't think so, because I've looked at -- I

6    mean, a long time ago when I first started to look at

7    cases, I don't think she had anything as sophisticated

8    as that.

9    Q    In terms of your work as an expert, what

10   percentage of your income do you think you derive from

11   your work as an expert?

12   A    It really varies from year to year.  It could be

13   20 percent, it could be 15 percent, it might be closer

14   to 30 percent.  It just depends year to year.

15   Q    For example, in the year that ████ Cook was

16   born in 2009, you have -- you earned that year from

17   expert work alone somewhere between 250,000 and

18   $275,000, true?

19   A    I'd have to go back and look at the source, but it

20   sounds familiar.

21   Q    Sure.

22   A    So...

23   Q    The source is your own testimony in a case that

24   you testified in Ohio called "Nist."

25   A    Sure.

1   Q    And you're --

2   A    Sounds reasonable if I've testified to it before.

3   Q    And in terms of what you're relying on for your

4   opinions here today, you indicated that you are not

5   relying on any medical literature, true?

6   A    None in particular, right.

7   Q    You were asked, if you were going to rely on any

8   medical literature that you thought was relevant to

9   these discussions, to let us know that, so we could

10  explore it before you took the stand, right?

11  A    Yes.

12  Q    And Ms. Pantages asked you about a number of

13  things literature-wise at the end of her direct

14  examination of you.  And let me just make clear, those

15  are not things that you reviewed and relied on in your

16  opinions in this case in any way, right?

17  A    They're articles I have read before, I was

18  familiar with, but they didn't apply directly to this

19  case.

20  Q    Are you a current member, Dr. Borow, of the

21  American College of Obstetrics and Gynecology?

22  A    No.

23  Q    How long have you not been a member of that

24  organization?

25  A    14 years.

1   Q     You do, though, read their literature?

2   A     Yes.

3   Q     For example, you're familiar with this book called

4   *The Neonatal Brachial Plexus Palsy*?

5   A     Yes.

6   Q     Put out by the American College of Obstetrics and

7   Gynecologists?

8   A     Yes.

9   Q     This is a compendium of information on brachial

10  plexus palsy, as it's titled?

11  A     Yes.

12  Q     Do you believe this is reliable and authoritative?

13  A     No.  The way you asked me the question, I do not.

14  Q     Then let me break it down.  Do you believe it's

15  reliable?

16  A     I don't believe that it is based upon, many of its

17  sections, on good scientific evidence.  So the answer

18  would have to be no.

19  Q     You don't believe it's reasonably reliable?

20  A     It depends.  What are you asking me?  What's the

21  question?

22  Q     Whether or not --

23          THE COURT:  Hold on.  Hold on.  Hold on.  One

24  at a time, please.  Reask the question.

25          MS. MULLIN:  Sure.

1    Q    I'm asking you whether or not this compendium, put

2    out by the American College of Obstetrics and

3    Gynecology -- what is that organization, by the way?

4    A    It's an educational organization.

5    Q    -- whether or not this compendium about neonatal

6    brachial plexus palsy is reasonably reliable?

7    A    My opinion, I don't believe it is.

8    Q    You're familiar with this document, you said.

9    You've read it, I assume?

10   A    I have.

11   Q    You know who Dr. Ouzounian is?

12   A    Yes.

13   Q    You have encountered his name and his work before,

14   I assume?

15   A    We've never met, but I know who he is.

16   Q    Dr. Ouzounian's name appears throughout this

17   compendium, doesn't it?

18   A    Yes.

19   Q    You have not authored any literature that you find

20   to be authoritative on the topics that we're here

21   discussing today, true?

22   A    I have not.

23   Q    Can we agree that the only accepted predictive

24   factor for a shoulder dystocia is a prior shoulder

25   dystocia?

1    A    Only predictive?

2    Q    Yes.

3    A    There are some people who wouldn't agree with

4    that.  I think there's multiple variables that people

5    have that significantly increase your risk, but I don't

6    think that there are -- I don't think that previous

7    shoulder dystocia in and of it itself rises to the

8    percent of 50 percent or more, so no, I wouldn't agree

9    with you.

10   Q    Previous shoulder dystocia would be the one risk

11   factor that would drive clinical decision making with a

12   future pregnancy, true?

13   A    No, brachial plexus injury would be one, difficult

14   deliveries would be two, patients who have had multiple

15   injuries to their babies would be three.  I can think

16   of a litany of reasons why one might say to a patient,

17   and counsel a patient about future risk of a shoulder

18   dystocia.

19   Q    Is it your testimony here to this jury, Dr. Borow,

20   that the multiple risk factors that you have identified

21   for this patient, an excessive BMI, weight gain during

22   her pregnancy, and the findings from the October 22nd,

23   2009 ultrasound, put her at increased risk for shoulder

24   dystocia?

25   A    First baby as well, the answer is yes.

```
 1   Q    What did Dr. Masri, her primary obstetrician who

 2   was managing her and who was aware of all of those

 3   things -- did he scheduled her for a C-section

 4   delivery?

 5   A    No.

 6   Q    Did he recognize her to be at high risk for

 7   shoulder dystocia, based on all of the information that

 8   he was aware of?

 9   A    The notes that I read, and, again, I read all of

10   the office records right up until two days before she

11   came to the hospital, you can't just -- the hospital

12   didn't have all of these records after June the 18th,

13   so the answer is, no, I didn't see any note about that.

14   Q    You read, I assume, Dr. Masri's own records,

15   didn't you?

16   A    Yes, of course.

17   Q    And, again, nothing in his records that documented

18   any concern that he had that this patient was at

19   increased risk for shoulder dystocia delivery?

20   A    Right.

21   Q    You said that you've delivered in your career

22   approximately 6,000 babies?

23   A    Yes.

24   Q    And I think I jotted this down, between 2 and 300

25   shoulder dystocias you've encountered?
```

1    A     Yes.

2    Q     That would be 4 to 5 percent of your deliveries

3    result in shoulder dystocia?

4    A     Right.

5    Q     That's higher than the national average, isn't it?

6    A     And, actually, it's pretty compatible with people

7    who you talk to who have a lot of experience with

8    shoulder dystocia, because most shoulder dystocias or

9    many shoulder dystocias go unrecognized or unreported

10   or undocumented or one of the above.  So the answer is

11   most people feel the shoulder dystocia rate is really

12   underreported.

13   Q   So in all of the deliveries that you did, 2 to 300

14   shoulder dystocias were not predictable or preventible,

15   they happened, right?

16   A     Well, they were patients who had C-sections in

17   order to prevent shoulder dystocia, so those people

18   were out of that group.

19   Q     Right.  That's why we're not --

20   A     The answer is, I never felt that it rose to the

21   level of 50 percent or more predictability, but it rose

22   to other levels, which we would discuss with the

23   patients.

24   Q    I don't know what you meant by that answer, so let

25   me try my question one more time.  We can agree that of

1    the 6,000 delivers, vaginal deliveries, that you

2    testified you have managed in your career --

3    A    Yes.

4    Q    -- 2 to 300 times the patient went on to have a

5    shoulder dystocia, true?

6    A    Correct.

7    Q    Meaning they were not predictable or preventible

8    in 2 to 300 times?

9    A    Because the others would have had C-sections as

10   the primary event, correct.

11   Q    All right.  Now, in terms of the management of

12   this particular shoulder dystocia, you were not at EMH

13   on October 24th, 2009, right?

14   A    No.

15   Q    We can agree that Dr. Kovach was there for this

16   delivery?

17   A    Correct.

18   Q    Dr. Kovach is the only one that can speak with any

19   authority in this courtroom in terms of how she managed

20   that shoulder dystocia, true?

21   A    Well, I don't think I can answer that question,

22   because I'm -- you're asking me a question about

23   authority.  The answer is she was there, and she can

24   tell what she recalls, if she remembers the delivery at

25   all.

```
 1   Q    She timely recognized a shoulder dystocia, we can

 2   agree on that?

 3   A    I think she did do that.

 4   Q    And then you mentioned, I think, that you read --

 5   had the opportunity to read the deposition of Jennifer

 6   Cook and Mark Cook, Patricia Cook, and I think

 7   Ms. Wolford, who is Jennifer's mother?

 8   A    I read all of those.

 9   Q    You read those last two recently, because those

10   were just -- those depositions were just taken, right?

11   A    Yes.

12   Q    And you and I can agree that there are

13   discrepancies between what the family remembers

14   happening in that labor and delivery room at the time

15   of delivery, true?

16   A    Between each one of the family members?

17   Q    Yes.

18   A    Yes.

19   Q    And that doesn't surprise you.  Oftentimes, I

20   would assume in your review of these cases, there are

21   discrepancies between what family remembers?

22   A    Most of the time it's reasonably consistent, but

23   there are details the family members do have different

24   recollections of, sure.

25   Q    In this case there aren't reasonable
```

1  inconsistencies, there are extreme inconsistencies,

2  aren't there?

3  A    I'm not sure I understand your question.

4  Q    Well, for example, you recall reading a long time

5  ago from Mr. and Mrs. Cook, they have some memory of

6  Dr. Kovach dismissing a nurse, and jumping up on the

7  bed with her knees on the bed, and applying suprapubic

8  pressure herself, leaving the perineum unattended.  Do

9  you remember that testimony?

10 A    I do.

11 Q    And you and I can agree that that is not testimony

12 that you accept as valid?

13 A    I was in the deposition, and I told you -- I said

14 in the deposition, when I was asked about this, that I

15 have once at least read that that actually happened in

16 a delivery.  Your resident came down and held the

17 baby's head, and the doctor went above, the attending

18 physician, and was able to relieve the shoulder

19 dystocia, and the resident delivered the baby.  So the

20 answer is, is it impossible?  No.  And I testified to

21 that.  The answer is is it likely?  It's pretty

22 unlikely.

23 Q    So you don't buy into that happening in this

24 delivery?

25 A    I have another version of it that I think more

```
 1   likely happened, right.

 2   Q    When you say in the circumstance that you

 3   reviewed, the resident was there to deliver the baby,

 4   that's a different scenario, right?  Because in this

 5   scenario, the claim is that Dr. Kovach left the

 6   perineum unattended, right?

 7   A    Correct.

 8   Q    And you don't find any credibility to a claim like

 9   that?

10   A    I don't believe I put that in my report either.

11   Q    You didn't.

12        And in terms of the testimony by the grandparents

13   that was taken more recently, they also deny that ever

14   happened, right?

15   A    The recollection was there was twisting and

16   pulling on the baby's head, but not that the doctor had

17   gotten up on the bed, that's correct.

18   Q    In fact, both grandparents acknowledge, one of

19   whom says she was standing behind Dr. Kovach the entire

20   time?

21   A    Yes.

22   Q    And the other mother, grandmother of ▮▮▮▮▮▮▮

23   testified that she was on -- when you're looking at the

24   bed, the right side of the bed holding onto Jennifer's

25   left leg, right?
```

```
 1   A    Yes.

 2   Q    You remember her saying that?

 3        And Patricia Cook, Mark's mom, who was behind Dr.

 4   Kovach, she actually acknowledged "I had no view

 5   whatsoever as to what was happening with Dr. Kovach's

 6   hands," right?

 7   A    I think that's reasonable.

 8   Q    And we know that Mark Cook was up at the front of

 9   the bed or top of the bed near Jennifer's head, he was

10   not able to see what Dr. Kovach was doing with her

11   hands either, right?

12   A    That's reasonable.

13   Q    And Jennifer was obviously not able to

14   visualize what was going on with Dr. Kovach's hands?

15   A    I agree.

16   Q    And Jennifer's mother also agreed that Dr. Kovach

17   remained at the perineum, in other words, in between

18   Jennifer's legs as the baby's head was being delivered,

19   and that she never left that area, and that her feet

20   never left the ground, right?

21   A    That seems to be my recollection.

22   Q    That is a pretty big difference in distinction

23   between family member recollections, isn't not?

24   A    I think it is a very chaotic situation, and,

25   again, that's what they documented in their
```

126

1    depositions.

2    Q    Now, you indicated that you authored a report in

3    this case, right?

4    A    Yes, ma'am.

5    Q    You understand from doing your work, your expert

6    work, what the purpose of an expert report is, I

7    assume?

8    A    Yes, ma'am.

9    Q    And you understood at the time that you authored

10   this report back in November of 2013, that at some

11   point this might be put up on a screen in a courtroom?

12   A    Always.

13   Q    And you understood that the lawyers involved in

14   this case were going to be relying on this report,

15   right?

16   A    Yes.

17   Q    Relying on the opinions that you give in this

18   report as a complete and total sum of the opinions that

19   you have in this case, right?

20   A    At least at the time of the records I have

21   reviewed, of course.

22   Q    Sure.  In the ensuing years since November of

23   2013, you did receive additional records?

24   A    Yes.

25   Q    You did not provide a supplemental report at

1    anytime, did you?

2    A    I did not.

3    Q    And so this is the report that you wanted

4    everybody to rely on for purposes of this trial, right?

5    A    Yes.

6    Q    The first time, Dr. Borow, that you indicate that

7    Dr. Kovach breached the standard of care in this case

8    was at what time?

9    A    I believe that was at 18:12.

10   Q    All right.  So according to your report at least,

11   the first criticism in terms of a breach of the

12   standard of care -- because there can be criticisms

13   that don't rise to the level of a breach in the

14   standard of care, true?

15   A    Yes.

16   Q    In other words, you as an obstetrician or

17   gynecologist might say, "Look, given a certain set of

18   facts in front of me, I would handle the patient

19   scenario like this, but one of my colleagues may do it

20   differently."  That would be a difference in

21   management, but not necessarily a breach in the

22   standard of care, true?

23   A    Potentially, right.

24   Q    So you've identified a lot of factual information

25   in your report, but the first time that you say Dr.

128

1    Kovach breached the standard of care was at 18:12,

2    right?

3    A    I believe so, yes.

4    Q    And you expected all of us to rely on that being

5    the first time you thought she breached the standard of

6    care, because you put it in your report?

7    A    Well, I did, of course, make a note in the

8    paragraph before, starting Pitocin without an

9    examination by the doctor, assessing estimated fetal

10   weight, or evaluating the pelvis.

11   Q    Right.

12   A    Now, I did put that in as well.

13   Q    You listed a whole set of facts of what occurred

14   at that time?

15   A    Right.

16   Q    And then on Page 2, this was the first paragraph

17   in your report where you actually articulate a standard

18   of care criticism, right?

19   A    It is.

20   Q    And in that paragraph, it starts "9:00 o'clock

21   with Pitocin running at 18 mU," and you can continue to

22   read on as much as you feel that you need to answer my

23   question, Doctor.  But towards the end is where -- or

24   the second part that's highlighted, "at 18:12, with

25   Pitocin running at 24 mU, Mrs. Cook was having

```
 1    repetitive variable decels."  And then you go on about

 2    Dr. Kovach being at home, receiving the report, and

 3    directing the nurses to continue increasing Pitocin.

 4    "Dr. Kovach did not direct the nurses to decrease or

 5    discontinue the Pitocin, or to do any intrauterine

 6    resuscitative measures at this time.  This was a breach

 7    in the standard of care in my opinion," right?

 8    A     Correct.

 9    Q     That is the first time you articulate that in your

10    report?

11    A     It is.

12    Q     Despite having gone through the facts of what

13    happened earlier in the day and her admission and all

14    of those other things?

15    A     It is.

16    Q     All right.  The only other place in this report

17    where you give standard of care opinions is on Page 3

18    starting at the bottom.  Do you agree?

19    A     Starting with "Dr. Kovach"?

20    Q     Correct.  Starting, it looks like, the paragraph

21    before that is when you are giving standard of care

22    criticisms relative to the nursing staff.

23    A     Yes, ma'am.

24    Q     And then the last paragraph relates to Dr. Kovach,

25    right?
```

```
 1   A     Yes.

 2   Q     Can you show me -- Doctor, you have a copy of your

 3   report up there?

 4   A     Yes.

 5   Q     Can you point out for me in your report where you

 6   indicate that the standard of care required Dr. Kovach

 7   to take Jennifer Cook to the OR and perform a cesarean

 8   section delivery?

 9   A     Yes.

10   Q     Show me where, please.

11   A     Bear with me for a second.  It's in the previous

12   paragraph.  It says, starting about the middle,

13   "Certainly by 21:07, when Mrs. Cook had prolonged

14   deceleration at plus 1 and plus 2 station, RN Krumwiede

15   needed to discontinue the Pitocin, immediately summon

16   Dr. Kovach to labor and delivery, and initiate plans

17   for cesarean section for fetal benefit."

18   Q     Right.  So that's the paragraph that you are

19   talking about your standard of care criticisms of the

20   nursing staff, right?

21   A     Well, it's a team effort, as far as I'm concerned.

22   Q     I understand that.  But if you read your report,

23   it says "the nursing staff," and then the rest of that

24   paragraph relates to the nursing staff, right?

25   A     As I read it -- I don't read it that way at all,
```

```
 1   and that's not how I wrote it.  I was asked this

 2   question before and I gave the answer.  My answer is I

 3   would have been in the hospital, the nurses would have

 4   called me, notified me of what was happening.  I would

 5   have gone, examined the patient, evaluated the fetal

 6   monitor strip, done the exam, realized mom,

 7   unfortunately, was far from delivery at that point, and

 8   I would initiated the movements and the steps to have

 9   the C-section initiated.  That's exactly what I wrote.

10   Q    With respect, Doctor, number one, you wouldn't

11   have done that, because you don't have privileges to

12   deliver babies.

13           MS. PANTAGES:  Objection.

14           THE COURT:  Overruled.

15   Q    Right?

16   A    Under the circumstances of this situation, if I

17   was the attending physician instead of Dr. Kovach, the

18   answer is I would have moved to a cesarean section

19   delivery at that time.

20   Q    And I appreciate that.  And what you might have

21   done -- and that kind of goes to the question --

22   A    Sure.

23   Q    -- I asked a couple minutes ago, isn't necessarily

24   what the standard of care requires.

25   A    But in my --
```

1   Q    And so in this paragraph, you and I can agree, at

2   least the way it is written, that you are talking about

3   the nursing staff's obligation to start in motion plans

4   for a potential C-section, so that if, when Dr. Kovach

5   arrives, she feels that the patient needs to go to the

6   OR, it's ready.  Isn't that what you were saying in

7   this report?

8   A    No.

9   Q    Let's read the section again here that you read

10  about the plans for a cesarean delivery.  At that

11  point -- down here -- RN Krumwiede needed to

12  discontinue the Pitocin, immediately summon Dr. Kovach

13  to labor and delivery, and initiate plans for cesarean

14  section delivery for fetal benefit, right?

15  A    Just what I wrote.  Doctor has to do that.  That's

16  a doctor action, not a nurse.  Nurse cannot call a

17  cesarean section.  The doctor should have been there,

18  the doctor should have been ready to review the strip,

19  and the doctor should have been ready to get the

20  section going.

21  Q    All right.

22  A    That's what I meant, that's how I wrote it, that's

23  what I meant it to read.

24  Q    So do you recall in your deposition, Dr. Borow,

25  there being a number of occasions -- and I'm not, in

1    the interest of time and the jury's patience, we're not

2    going to do every piece of this.  Do you recall -- when

3    was the last time you read your deposition?

4    A    Within the past 24 hours.

5    Q    All right.  Recently?

6    A    Yes.

7    Q    So the exchange is relatively clear in your mind?

8    A    Yes.

9    Q    You recall there being multiple different

10   timeframes referenced where you said, "I think that

11   somebody should have been in looking at this patient's

12   strips, in at the bedside of the patient," and then

13   were you asked the question, "Well, I appreciate that.

14   Let's play that through for a minute.  Let's assume Dr.

15   Kovach arrived at noon and stopped the Pitocin, watched

16   the strips, monitored the patient.  Can we agree that

17   it would have been reasonable to allow her to continue

18   to labor?"

19        And you would have said, "At that point, sure,"

20   right?

21   A    Yes.

22   Q    I think you said the same thing about 3:00 o'clock

23   in the afternoon, 5:00 o'clock in the afternoon, all

24   the way up to 7:00, 8:00 o'clock in the afternoon,

25   didn't you?

1    A    Right.  Well, predicated on the fact that the

2    patient has been examined and evaluated and assessed by

3    the physician, the obstetrician attending, and that

4    there's a plan of care in place, correct.

5    Q    And when you say "correct," I just want to make

6    sure the jury is clear what you mean by that.  And I

7    understand, Dr. Borow, that you have opinions that Dr.

8    Kovach should have been at the hospital earlier.  But

9    if you assume that she arrived and did the assessments

10   and everything that you said she should have, you and I

11   can agree, based on what you see in these strips, one

12   reasonable option would have been allowed to continue

13   with a vaginal delivery, true?

14   A    Discontinue the Pitocin, let the patient and the

15   baby recover, start the Pitocin at a lower rate, which

16   is what I've discussed in my deposition, and then see

17   how the baby tolerates it and mom progresses.  If she

18   progresses, that's fine.  Work towards a vaginal

19   delivery.  If she doesn't progress, fine.  No emergency

20   C-sections.  Get a good baby for a good mom.

21   Q    And there's nothing about these strips at anytime

22   that required an emergency C-section, can we agree on

23   that?

24   A    Emergency C-section?

25   Q    Yes.

```
 1    A    I'll agree with that.  With the premise being that

 2    at 21:07 there is a late -- a prolonged deceleration,

 3    and it required the Pitocin being turned off, and that

 4    the baby recovers, and that we then can start over

 5    again.

 6    Q    In terms of the fetal heart monitor strips,

 7    Dr. Borow, we can agree that accelerations are good

 8    things?

 9    A    Yes.

10    Q    They are present throughout this strip, true?

11    A    I believe there are multiple areas where there are

12    not accelerations.

13    Q    That's not at all unusual in a laboring patient,

14    is it?

15    A    Well, there may not be.  That's exactly right.

16    But I don't think there are accelerations the entire

17    time, no.

18    Q    There are accelerations at certain periods of time

19    throughout the entire strips?

20    A    Earlier in the strips.  As the strips get further

21    with variable and late decelerations, there's less and

22    then absent accelerations.

23    Q    Is it your testimony, in the last hour of these

24    strips, that there are no accelerations, Dr. Borow?

25    A    I think they're being overread by the nurses.  My
```

1    recollection is there are not accelerations.

2    Q    And "acceleration," just so that we get your

3    definition down for the record here, is what?

4    A    Acceleration is a positive sign.  It means usually

5    the baby has good oxygenation.  It's an increase in the

6    baby's heart rate, 15 beats above the baseline, lasting

7    15 seconds or more, twice in a 10 or 20-minute period,

8    10-minute period.  But the relevant fact is that it's

9    only during a baseline time, not during a contraction

10   or recovery from a contraction.  So during the last

11   hour, mom was in such active labor and pushing, it was

12   difficult to see any accelerations that would meet that

13   test.

14   Q    And so in that scenario that you have just

15   described, you would almost never see the kind of

16   accelerations that you would need to meet the

17   definition when a patient is pushing?

18   A    In my opinion in that case it would be difficult

19   to see accelerations.  But you asked me if they were

20   present, and they weren't.

21   Q    Sure.  Did you say they were or were not?

22   A    Were not.

23   Q    This baby's heart rate remained within a normal

24   range for a baseline heart rate throughout this entire

25   strip, true?

1  A    No, I pointed out several times where the baby's

2  heart rate was 180 beats per minute, but it wasn't

3  persistent.  So the baby's heart rate did go above the

4  normal 160 beats per minute, but it was not for 10

5  minutes or longer, so there wasn't a reset in the

6  baseline.

7  Q    What pages of the strips are you referring to

8  there?

9  A    I don't have the strips in my hand.

10  Q    All right.

11  A    But I did point some of them out when we showed

12  the half a dozen or eight different strips where the

13  fetal heart tones had reached 180 on several occasions,

14  transiently.

15  Q    Sure.

16  A    Not over a 10-minute period.

17  Q    So not over a 10-minute period?

18  A    Right.  So it wasn't a reset of the baseline to a

19  tachycardic rate.

20  Q    So the baby was never tachycardic.  Maybe that's

21  where it was.

22  A    By official definition, right, I agree with that.

23  But the heart rate did go up to 180.

24  Q    Sure.  And periods of that are normal.  That's why

25  the definition of tachycardia requires it to be

1  persistent for 10 minutes or longer, right?

2  A    Right.

3  Q    So normal fetal heart rate tracing in terms of the

4  baseline throughout, true?

5  A    Pretty much.  Other than the presence, of course,

6  of variable and late decelerations.

7  Q    Moderate variability throughout the strip, we can

8  agree on that?

9  A    Mostly, right.

10 Q    At no time was this ever a Category 3 strip, true?

11 A    I can agree with that.

12 Q    And a Category 3 strip is a strip that would be of

13 concern and require an immediate intervention by an

14 obstetrician?

15 A    It would be.  But they didn't use that in this

16 hospital at that time.  So I appreciate the fact you

17 have introduced Category 1, 2, 3, which the jury

18 doesn't know about, never heard of, but they weren't

19 even using it.  They were using descriptors, which is

20 what I tried to do throughout this case.

21 Q    When you indicate in your report -- one of the

22 things that you have an obligation to do, Doctor, is to

23 try and be accurate when you're reviewing a case,

24 right?

25 A    Yes.

1    Q    And do you recall there being an exchange where

2    you have listed in quotes in your report, that Dr.

3    Kovach called this a, quote, "significant shoulder

4    dystocia" or a "difficult shoulder dystocia"?

5    A    I do, and I corrected that, I think, in my

6    deposition.

7    Q    But in your report you put them in quotes,

8    attributing those statements to Dr. Kovach, right?

9    A    One of them was mine, and one of them came from

10   the prenatal -- from the nursery records.  And I did

11   correct that in the deposition.

12   Q    As I understand -- well, strike that.  I'm going

13   to try to cut some stuff out here, Doctor.

14        In terms of encountering a shoulder dystocia, we

15   can agree that there are accepted maneuvers that are

16   widely used by obstetricians to try to manage and

17   resolve a shoulder dystocia, true?

18   A    Yes.

19   Q    We talked about Dr. Kovach timely recognizing a

20   shoulder dystocia in this case, and you agree to that?

21   A    I did agree.

22   Q    She was obviously aware of the appropriate

23   maneuvers to try to resolve it?

24   A    At least of the maneuvers she used, those would be

25   sort of standard maneuvers, sure.

```
 1   Q     The first two maneuvers typically are McRoberts
 2   position?
 3   A     The first maneuver usually is to announce a
 4   shoulder dystocia.  The second one is to tell mom to
 5   stop pushing.  And then to start getting your staff
 6   together so you can do the maneuvers with adequate
 7   help.  Those are the normal first three steps.
 8   Q     So the first maneuver would be to put the patient
 9   in McRoberts position, right?
10   A     Yes.
11   Q     And the second typical maneuver would be the
12   suprapubic pressure that we talked about, right?
13   A     We usually do those together.
14   Q     Okay.  And those are often successful in resolving
15   a shoulder dystocia?
16   A     About 60 to 70 percent.
17   Q     And they were effective in this circumstance?
18   A     In the presence of a torticollis, a neck injury, a
19   broken clavicle, and a brachial plexus injury, the
20   answer is, sure, they were effective.
21   Q     We can agree that there is strain and stretching
22   of the brachial plexus nerves during a normal vaginal
23   delivery without a shoulder dystocia, true?
24   A     Enough that the vast majority of babies are not
25   born with a brachial plexus injury, sure.
```

1    Q    Sure.  There is increased strain and stretching

2    when there is a shoulder dystocia, right?

3    A    No, I do not agree with that.

4    Q    You don't?

5    A    I do not agree with that statement.  Right.

6    Q    In terms of Dr. Kovach's response to the supra --

7    to the shoulder dystocia, calling for the suprapubic

8    pressure, what is your impression, Dr. Borow, of who

9    was responsible at that point of holding Jennifer's

10   legs into proper position?

11   A    Well, I read the deposition of Nurse Krumwiede,

12   and she said she held the left leg and did suprapubic

13   pressure at the same time.

14   Q    Who held the right leg?

15   A    I don't know.  We know it wasn't Nurse Aker.  She

16   doesn't remember doing that.  So we don't know.  One of

17   the grand moms?  We're not sure.

18   Q    Do you remember Mark and Jennifer testifying that

19   each grandmother had one leg?

20   A    Initially.

21   Q    Initially?

22   A    Yes.

23   Q    After Dr. Kovach arrived in the room?

24   A    As far as I remember, yes.

25   Q    Do you remember Patricia testifying she never

1    touched Jennifer after Dr. Kovach arrived into the

2    room?

3    A    Vaguely, I do.

4    Q    Do you know how many nurses were in the delivery

5    room?

6    A    It's a real question.  We know Nurse Akers was

7    there.  We know that Nurse Krumwiede was -- probably

8    was there.  I don't have any other nurses that were

9    identified.  I don't see a nursery nurse or anyone

10   else.

11   Q    Is it assumption, Dr. Borow, just based upon

12   common sense and the way that labor and delivery floors

13   worked across this country, that there was likely a

14   baby nurse in there was well?

15   A    No.

16   Q    Who did they hand the baby off to after the baby

17   was delivered?

18   A    Well, Nurse Aker said she was there to be the baby

19   nurse, so that would sort of be the answer to the

20   question.

21   Q    Which means Nurse Aker was there?

22   A    Right.  And I already conceded she was there.

23   Q    And Nurse Krumwiede was there as well?

24   A    Yes.  And I don't -- I can't identify any other

25   nurses that were called in or they came in to help with

143

```
 1    the shoulder dystocia relief.
 2    Q    Even though memories have faded, and these nurses
 3    did not recall their specific roles in this specific
 4    case when they were deposed multiple years later, you
 5    and I can agree that if there were two nurses
 6    available, more likely than not, the nurses were being
 7    utilized in some fashion to help resolve this
 8    obstetrical emergency, that would be common sense to
 9    you, wouldn't it?
10    A    It would, but it doesn't seem to be the case that
11    happens in most labor and delivery rooms.  Anybody from
12    the nursery usually does not get near the baby --
13    sorry -- near the mom at all during shoulder dystocia
14    relief, so I don't agree with your statement.
15    Q    When we were talking about features on the strip
16    that would be reassuring or look good to you, when you
17    talk about variable decelerations, we can agree those
18    are not unusual with a laboring patient, are they?
19    A    They're common, and they may be significant or
20    insignificant, depending upon the depth, the
21    repetition, and how frequently they occur.
22    Q    We can agree that there are significant
23    substantial morbidity and mortality risks associated
24    with a brachial plexus or with a shoulder dystocia,
25    true?
```

```
1    A    Your question's so broad, I really want to answer
2    it, I do.  Your question's so broad, I really don't
3    feel I can answer.  Would you re-ask it?
4    Q    Fair.  I would be happy to do that for you.
5         We can agree that there is a substantial risk of
6    harm to the fetal brain in the context of a shoulder
7    dystocia, true?
8    A    I'm really glad I asked to you ask that over,
9    because I definitely didn't understand.  So the answer
10   is, in rare cases it is a risk, and it's something that
11   obstetricians have to be aware of and work their way
12   through in a systematic, organized way, paying
13   attention to the health of the baby over the time
14   period.  And that's why you do shoulder dystocia
15   drills.  And that's why there's a timekeeper who is
16   supposed to keep track of what time the baby's head
17   delivers and what time your events are going on, and
18   when the body delivers.  The answer is, ostensibly,
19   yes.
20   Q    Do you remember --
21   A    You can cause harm if you wait too long.
22   Q    And we can agree in this case harm to ▊▊▊▊
23   Cook's brain was totally avoided or averted, true?
24   A    This baby had good Apgar scores, and she did not
25   have brain damage, I agree.
```

1    Q    Do you remember one of the grandmother's, I

2    believe Jennifer's mom, testifying that this shoulder

3    dystocia lasted for approximately 10 minutes?

4    A    I did read that.

5    Q    You don't believe that that's likely accurate, do

6    you?

7    A    I think it was a one to two-minute event.

8    Q    We can agree that patients that are first time

9    moms and that have an epidural sometime have --

10   sometimes have a longer phase of pushing, true?

11   A    Second stage, the answer is yes.

12   Q    And I use the term "phase of pushing" just to make

13   sure that the jury is on the same page as me at 4:30 in

14   the afternoon.

15        So while a mom's pushing, first time mom who has

16   an epidural -- that's Jennifer, right?

17   A    Usually slows them down for about an hour.  So

18   where you might have wanted to get delivered in an hour

19   or so, you're up to two hours.  With an epidural it

20   could be a little longer than that.  So three hours

21   with progress and a non -- a fetal monitor strip

22   without concern, you can go three hours before you

23   really need to reassess where you're headed.

24   Q    This patient was delivered within three hours of

25   starting to push and delivery, true?

1   A    Yes.

2   Q    I think I heard you testify on direct examination

3   that there's evidence in this case that there are three

4   nerves that were torn.  Are you aware that Dr. Mehlman,

5   ███████ Cook's treating physician, has identified this

6   as a two-nerve injury?

7   A    My recollection was that there was an EMG done,

8   which -- an electromyogram, it's a nerve stimulation

9   study.  And I thought that there were three nerves

10  involved, not just two.

11  Q    At this stage you agree --

12  A    Oh, the EMG I believe is -- I think two now, but I

13  think it was three before.

14  Q    We can agree that the nurses were in Mrs. Cook's

15  labor room regularly?

16  A    I agree with that.

17  Q    They were regularly assessing her?

18  A    Yes.

19  Q    They were regularly documenting their assessments?

20  A    Yes.

21  Q    They were in regular communications with Dr.

22  Kovach?

23  A    Actually, I counted at least eight times that they

24  called her, over the time from admission, until the

25  time she was called at 21:49, half an hour before

1   delivery, to come in.

2   Q     So either where --

3   A     So at least eight phone calls back and forth.

4   Q     Where either Dr. Kovach called in for a report or

5   the nurses called her, regular communication?

6   A     Right.  At least eight times.

7   Q     You haven't read a deposition or saw anywhere in

8   the record where anybody claims to have been looking

9   for Dr. Kovach and not being able to reach her at any

10   point, true?

11   A     No.

12   Q     Anytime where anybody said, "Boy, we really needed

13   her here, and she just didn't show up," that never

14   happened, right?

15   A     I've talked about that in communications, breaches

16   of standard of care from the nurses in terms of

17   communication, but I agree with you, it's not in the

18   record.

19   Q     Now, with respect to this house doctor concept,

20   let me just make sure that I understand your opinions

21   here.  You understand that Dr. Fernando is a board

22   certified obstetrician, right?

23   A     Yes.

24   Q     And Dr. Fernando is literally at the hospital

25   within minutes, if needed, from this patient's labor

```
1    room, right?

2    A    I assume that -- yeah, I assume that he's

3    physically in the hospital, number one.

4    Q    Okay.

5    A    Number two, I also assume that no one at anytime

6    ascertained where he was, and if he could come and even

7    help with a cesarean section, that he wasn't in

8    surgery, he wasn't in the emergency room.  We didn't

9    know where he was.  There was no contact with him,

10   according to the record, after 9:30 in the morning when

11   he was asked to come in and put in the scalp electrode

12   and the IUPC catheter for contractions.

13   Q    You understand that he was available to laboring

14   patients in the hospital if needed, true?

15   A    I assume that he was available if needed in an

16   emergency.

17   Q    Well, we know, for example, it was not an

18   emergency at 9:00 o'clock in the morning where he came

19   and evaluated Mrs. Cook, right?

20   A    I also know that the nurses can't put an IUPC in

21   or an internal scalp electrode.  That's in the hospital

22   policy.

23   Q    Doctor, listen --

24   A    So they had to get a doctor to come in and do it.

25   Q    Doctor, with respect, you're not answering my
```

```
 1   questions.

 2        We know that it was not --

 3             MS. PANTAGES:  Objection.

 4             THE COURT:  Overruled.  He was not

 5   responsive.

 6             Try to answer the question, Doctor.

 7             THE WITNESS:  Yes, sir.

 8   Q    We know that at 9:00 o'clock in the morning when

 9   Dr. Fernando presents to Jennifer Cook's bedside, it

10   was not an emergency?

11   A    I agree with that.

12   Q    He was responding because somebody asked him to do

13   something for this laboring patient because he was at

14   the hospital, right?

15   A    I believe it was his job to do that --

16   Q    Yes.

17   A    -- with the attending not being there, yes.

18   Q    And we know that he did his own assessment and

19   evaluation of Jennifer Cook at that time?

20   A    He did an exam.  He recorded an examination or

21   nurses recorded his exam, yes.

22             MS. MULLIN:  All right.  I don't have any

23   other questions.  Thank you.

24             THE COURT:  Thank you.

25             One more round, Doctor.
```

```
 1              THE WITNESS:  Thank you, sir.
 2              THE COURT:  We'll hear from Attorney Murphy
 3   on behalf of the hospital as soon as we get set up.
 4              Members of the jury, are you doing all right?
 5              MR. MURPHY:  I'll be quick.
 6              THE COURT:  Good.
 7              MR. MURPHY:  I promise.
 8              THE COURT:  Famous last words.
 9              PROSPECTIVE JUROR:  Right.
10              MR. MURPHY:  I've been good so far.
11                           *  *  *
12       CROSS-EXAMINATION OF LAWRENCE S. BOROW, M.D.
13   BY MR. MURPHY:
14   Q    Good afternoon, Doctor.
15   A    Nice to see.
16   Q    All right.  So you gave a deposition in this case,
17   right?
18   A    I did.
19   Q    And I'm assuming you want to testify today
20   consistent with what you said at deposition, correct?
21   A    Yes.
22   Q    I want to talk about the nursing care in this
23   case, from the time that mom came in up until
24   6:12 p.m., so that 15-hour period of time.  As I
25   understand it, during that timeframe you believe the
```

1    EMH nurses met the standard of care?

2    A     In terms of the baby not being at risk for

3    significant hypoxia, the answer is yes.

4    Q     All right.  So I want to run through this just

5    very quickly.

6    A     Okay.

7    Q     At 4:05 a.m., it was appropriate and within the

8    standard of care for the nurses to update Dr. Kovach,

9    correct?

10   A     Yes.

11   Q     8:44 a.m., it was appropriate and within the

12   standard of care for the nurses to update Dr. Kovach

13   again, correct?

14   A     Yes.

15   Q     Same question, 12:25 p.m., it was appropriate and

16   within the standard of care for the nurses to update

17   Dr. Kovach, correct?

18   A     Yes.

19   Q     3:00 p.m., it was appropriate and within the

20   standard of care for the nurses to get an order from

21   Dr. Kovach to increase the Pitocin to above 20,

22   correct?

23   A     Yes.

24   Q     All right.  And as I understand it as well, you

25   testified at deposition that this fetal monitor strip

```
 1   was never non-reassuring before 6:12 p.m., correct?
 2   A    To the extent that I would have had significant
 3   concern for fetal hypoxia, the answer is yes.
 4   Q    All right.  So fair to say as of 1:45 p.m., the
 5   nurses were acting within the standard of care,
 6   correct?
 7   A    As of 1 --
 8   Q    And the strip -- I'm sorry -- and the strip was
 9   reassuring, or at least not non-reassuring?
10   A    Again, by my definition, I'm concerned about
11   evidence of or concern of progressive non-correctable
12   fetal hypoxia, baby not getting enough oxygen, blood
13   supply.  So to those extents, I'm seeing variable
14   decelerations, other changes, but I didn't feel that
15   the baby at that point was at risk of brain damage.
16   The answer is, yes, I agree with you.
17   Q    All right.  So, again, at 4:15 p.m., in your mind
18   the strip was reassuring or not non-reassuring, and
19   nurses were acting within the standard of care?
20   A    Again, with the same provisos that I just offered.
21   Q    And same question at 6:05 p.m., just before 6:12,
22   but at 6:05 p.m. the strip was not non-reassuring and
23   the nurses were acting within the standard of care?
24   A    The strip was showing and had been showing
25   variable decelerations, occasional late decelerations,
```

1    things that would be of concern, but I don't believe

2    that the baby was at risk of brain damage at that

3    point.

4    Q    Nurses were acting within the standard of care at

5    this time, fair?

6    A    Exclusive of calling the doctor at numerous other

7    times when there were prolonged decelerations lasting

8    two minutes, three minutes, four minutes, five minutes,

9    we talked about some of those a little earlier.

10   Excluding those, the answer would be yes, under the

11   standard of care.

12   Q    Well, I want to understand your testimony, though.

13   A    Okay.

14   Q    Are you referring to a timeframe after 6:12 p.m.?

15   A    No.

16   Q    All right.  Well, I just want to be clear for the

17   record, because you're not disputing that you said at

18   deposition the nurses in everything they did met the

19   standard of care up to 6:12 p.m.  I thought we

20   established that.

21   A    I think we did do that, based upon my definition

22   of what was reassuring and lack of brain -- potential

23   brain damage because of hypoxia to the baby.

24   Q    All right.  So, hypothetically, if Nurse Daniels

25   testifies by way of videotape trial deposition that at

1    1:45, 4:15, and 6:05 the nurses were not acting within

2    the standard of care, you disagree with that?

3    A    Because I'm familiar with the times that you just

4    gave me, I would agree with Nurse Daniels that there

5    were areas of concern that should have been discussed

6    with the doctor.  But do I believe that ultimately they

7    caused harm to the baby?  No.  The doctors can't tell

8    what the baby will be like tomorrow when you're sitting

9    here today.  So there should have been areas of concern

10   that should have been discussed with the doctor --

11             THE COURT:  Doctor.

12   A    -- which isn't what you asked me.

13             THE COURT:  Doctor, that's not the question

14   that was asked.  And it's getting late, and I'm -- the

15   question was asked relative to the standard of care and

16   your opinion with the nurse.

17             Reask the question.  And please try to answer

18   the question that's put to you.

19             THE WITNESS:  Sure.

20             MR. MURPHY:  Thanks, Your Honor.

21   Q    So I think we've established that up to 6:12 p.m.,

22   you believe that the EMH nurses met the standard of

23   care, right?

24   A    Yes.

25   Q    Okay.  Hypothetically, if Nurse Daniels testifies

1    the nurses didn't meet the standard of care 1:45, 4:15,

2    6:05, you disagree with that, right?

3    A    I don't disagree with her, because I have read her

4    depositions and I have read her report, and I

5    understand what she's saying.  And she had concerns as

6    a nurse, and those concerns should have been shared

7    with the doctor.  That's it.

8    Q    All right.  But the standard of care didn't

9    require sharing those concerns from your perspective

10   and your testimony?

11   A    Not from my testimony.

12   Q    Okay.  All right.  Now, as I understand it, at

13   6:12 p.m. Nurse Lopez calls Dr. Kovach for an update.

14   At least that was appropriate, correct?

15   A    Yes.

16   Q    9:50 -- I'm sorry, 7:54 p.m., one of the nurses

17   calls Dr. Kovach, says, "Listen, mom's ready to push,"

18   gives Dr. Kovach an update.  At least that was

19   appropriate to tell Dr. Kovach?

20   A    Of course.

21   Q    Okay.  All right.  Now, very quickly, I want to

22   talk about the notion of interpretation of fetal

23   monitor strips.  As I understand it, there is a certain

24   degree of subjectivity in the interpretation of a fetal

25   monitor strip; is that fair?

1  A    There is.

2  Q    In other words, sometimes very good obstetric

3  nurses can disagree over what a strip shows, right?

4  A    That's possible.

5  Q    From time to time, very good qualified, competent

6  obstetricians can disagree over what a fetal monitor

7  strip shows, correct?

8  A    Possible.  Not probable, but possible.

9  Q    Okay.  Well, in this case I want you to assume

10  that Dr. Ouzounian from USC will testify that this

11  strip was never non-reassuring.  If that's his

12  testimony, you disagree?

13  A    I disagree.

14  Q    I want you to assume that Joanna McGrath, from

15  Philadelphia, and a professor of nursing at Villanova,

16  will testify that this strip was never non-reassuring.

17  You disagree with her?

18  A    I do.

19  Q    I want you to assume that Dr. Kovach and the EMH

20  nurses will testify at no time was the strip ever

21  non-reassuring.  If that's true and that's what they

22  say, you disagree with them, true?

23  A    Yeah, I do disagree.

24  Q    So there seems to be a little difference of

25  opinion as to what this strip shows, correct?

1    A    I think there is a difference of opinion.

2    Q    And, by the way, in the event Dr. Ouzounian and

3    the EMH nurses and Dr. Kovach and Dr. -- or, I'm

4    sorry -- Nurse McGrath all testify, in the last hour

5    leading up to delivery, there were accelerations on the

6    strip, you disagree with them in that regard?

7    A    I do.

8    Q    Okay.  All right.  Variable decelerations.  You

9    indicated that they are commonly seen on the fetal

10   monitoring strips?

11   A    Yes.

12   Q    The presence of variable decelerations is not

13   always an ominous sight, correct?

14   A    Correct.

15   Q    The presence of variable decels do not, in and of

16   themselves, make the strip non-reassuring?

17   A    Well, it depends on if they're persistent and how

18   deep they are and how long they last.

19   Q    Okay.

20   A    So the repetitive nature becomes part of the

21   variable, and then the depth and the duration.

22   Q    All right.  So their presence doesn't always mean

23   the strip is non-reassuring?

24   A    Right.  It means it has to be evaluated.

25   Q    It's fair that many healthy babies are born even

1    though variable decels are seen on the strip, right?

2    A    That's a true statement.

3    Q    And that's true that many healthy babies are born

4    even with light decelerations seen on the strip?

5    A    That's also true.

6    Q    In fact, the concern with variables and lates is

7    the potential for brain injury.  We know █████████

8    didn't have a brain injury, correct?

9    A    Fortunately.

10   Q    And the presence of variable decels does not

11   always mean that the nurses have to stop the Pitocin

12   and get the doctor bedside?

13   A    If they're repetitive, then that would have to

14   happen.  If they were getting late and longer, that

15   would have to happen.  And the nurses normally, in the

16   presence of that, do position change, IV fluids, and

17   then have to cut back or discontinue the Pitocin.

18   That's what the hospital protocol is.

19   Q    Sure.  But the point is, if the variable decels

20   are not severe and prolonged and persistent, in that

21   scenario the standard of care doesn't necessarily

22   require the nurses to stop and get the doctor bedside.

23   Fair statement?

24   A    That would be an individual situation to examine,

25   right.

1    Q     Okay.  All right.  Before I get to the issue of

2    causation, I wanted to ask you this:  We can at least

3    agree that nowhere in this labor and delivery chart do

4    the nurses ever document anything about having a

5    C-section done?

6    A     Correct.

7    Q     All right.  Let's talk about your causation

8    opinions against EMH in this case.  You did review Dr.

9    Kovach's deposition, correct?

10   A     I did.

11   Q     And you saw that when she did arrive at the

12   hospital at 10:22 p.m., identified the shoulder

13   dystocia, delivered ███████, obviously she did not do

14   a C-section, correct?

15   A     Correct.

16   Q     You read from Dr. Kovach's deposition that if she

17   was in the hospital at 21:07, she would not have done a

18   C-section then, correct?

19   A     I read that.

20   Q     Dr. Kovach never gave testimony at deposition

21   that, if she was in the hospital five hours earlier or

22   four hours earlier, that she ever would have done a

23   C-section; fair statement?

24   A     That's what she said in her deposition, yes.

25   Q     Now, you cautioned the jury that experts that take

1    the stand should not Monday morning quarterback

2    anything, correct?

3    A    Correct.

4    Q    Isn't that precisely what you're doing with

5    respect to what you're telling the jury you think Dr.

6    Kovach would have done if she was in the hospital

7    earlier?

8    A    No, I don't believe so, because I think my

9    testimony reflects what a reasonable obstetrician under

10   same or similar circumstances would have done with this

11   fact pattern, with this patient, with this exam, and

12   with the fetal monitor strips.  So the answer is I

13   don't think that in any way is quarterback -- Monday

14   morning quarterbacking.  I think this is prospectively

15   looking at the facts of the case and what should have

16   been done and what the reasonable practitioner would

17   have done.

18   Q    I'm not asking you "should."  I'm asking you

19   "would."  My question to you is, isn't it true that

20   it's absolute complete speculation for you to tell this

21   jury what Dr. Kovach would have done, if she was in the

22   hospital sooner?  You have no way of knowing that.

23   A    No, I --

24   Q    You have no way of knowing that, do you?

25   A    I cannot say what she would have done.  I can only

1    say what she should have done to comply with the

2    standard of care.

3    Q    Oh, did you review the depositions of Mr. and

4    Mrs. Cook?

5    A    Yes.

6    Q    Did you read in their depositions that they

7    described the nurses as caring and compassionate and

8    professional and responsive?

9    A    I read that.

10   Q    You have no reason to disagree with them?

11   A    In terms of their interaction --

12   Q    That's right.

13   A    -- socially with them?  In folks who are not of

14   medical background, the answer would be, I think,

15   socially they thought the nurses were fine.

16            MR. MURPHY:  Thank you.  That's all I have.

17            THE WITNESS:  Thank you.

18            THE COURT:  Any redirect?

19            MS. PANTAGES:  Just briefly, Your Honor.

20   Just a couple.

21            THE COURT:  Okay.

22                         * * *

23      **REDIRECT EXAMINATION OF LAWRENCE S. BOROW, M.D.**

24   **BY MS. PANTAGES:**

25   Q    Doctor, do you still have a laser pointer?

1    A    I have it.

2    Q    Okay.  Let's revisit your report, please.  Do you

3    have your report in front of you?

4    A    Yes, ma'am.

5    Q    So this report was drafted January -- I'm sorry,

6    November 19th, 2013?  Thank you.  Correct?

7    A    Yes, ma'am.

8         MS. PANTAGES:  Jennifer, if you could go to

9    Page 3, please.  And could you pop that paragraph out,

10   please?  Great.  Thank you.

11   Q    Okay.  So you were asked some questions about some

12   individual sentences and phrases in this paragraph.

13   But let's look at the paragraph in its totality, and I

14   would like you as the author to tell us what you meant

15   by this.  So let's start with, "It is my opinion that

16   Dr. Kovach and the EMH Regional Medical Center breached

17   the standard of care and caused permanent harm to

18   ███████  Cook."  Did you start out with that -- at that

19   paragraph addressing standard of care violations by

20   both Dr. Kovach and the EMH nurses?

21   A    Yes.

22   Q    Okay.  And then the last sentence in the paragraph

23   is, "Had this been accomplished a timely manner, Baby

24   ███████  would not have suffered both a fractured right

25   clavicle and a permanent right brachial plexus injury."

1    Did I read that correctly?

2    A     You did.

3    Q     So you start the paragraph with identifying who

4    was -- who fell below the standard of care, and you

5    ended the paragraph with what the result would have

6    been if these individuals had met the standard of care,

7    right?

8    A     Exactly.

9    Q     Okay.  Can you tell us --

10              THE COURT:  Counsel, hold on.  Hold on with

11   the next thought.

12              (Discussion held off the record.)

13              THE COURT:  Does any counsel have a large --

14   how big -- case sitting outside marked "Pelican" that

15   is causing us to have a potential security concern?  If

16   that can't be identified, we may need to take some

17   other steps.  Does anybody --

18              MS. PANTAGES:  Is it a bag or a box or what

19   is it?

20              THE DEPUTY:  There's a bag with some cords in

21   it, and there's a box that's marked "Pelican."  Does it

22   belong to somebody?

23              A MAN:  It's not ours.

24              THE COURT:  All right.  One moment.

25              We're going to take a recess for a moment.

```
 1   I'm going to have -- I'm not going to order any of the
 2   attorneys or folks to go anywhere, but I'm going to
 3   make -- I'm going take the jury back to the jury room.
 4   The sheriff's deputies are beginning protocol to -- go
 5   ahead.  Do you want to tell me something?
 6            MS. PANTAGES:  I was just going to say, under
 7   these circumstances I can stop.  If we're --
 8            THE COURT:  Well, it may be nothing at all,
 9   and they're going to find out shortly.
10            MS. PANTAGES:  Okay.
11            THE COURT:  So I just want to get this jury
12   back into the jury room.  And I'll give counsel -- we
13   have three our jury rooms for the parties to come back,
14   and bring everybody if you want.  I'm not going to make
15   you go anywhere.  But once we get the jury back, if the
16   attorneys and your particular sides want to come back
17   to use the jury room -- I'm probably making a molehill
18   out of nothing, but I would much rather be cautious,
19   given the nature of things that have been occurring in
20   our country.  Again, probably being overly cautious,
21   but I would rather do that.  So we're going to recess.
22            Doctor, you can go with the Plaintiffs'
23   group, but please do not discuss your testimony.  Let's
24   get the jury out, and then we'll go from there.
25            THE BAILIFF:  All rise.
```

```
 1              (Recess from 4:46 p.m. to 5:03 p.m.)

 2              THE COURT:  The record will reflect that the

 3   jury has been returned to the courtroom, and the Court

 4   was apprized by the sheriff's deputies that an

 5   unidentified, discarded, suitcase-like plastic

 6   container with a second small bag had been abandoned,

 7   which causes the sheriff's deputies no small amount of

 8   concern, as well as this Court, for the safety of our

 9   jury and our attorneys, the public, and everybody else.

10   Certain security measures were taken by the sheriff's

11   department.  There does not appear to be any threat.

12   The bag has been removed.

13              And I want the jurors to know that that bag

14   was not part of any of the lawyers in this firm or any

15   of the parties or the doctor.  It was abandoned by

16   probably just an oversight from somebody.  But make

17   sure that you, for purposes of this trial, that that

18   has no impact on this trial or the parties or the

19   lawyers.

20              So I apologize for the inconvenience, but I

21   would much rather be -- err on the side of safety.  So

22   let's proceed with redirect, and we'll discuss our

23   plans for the next two days.

24              MS. PANTAGES:  Thank you, Your Honor.  Thank

25   you very much.
```

**BY MS. PANTAGES:**

Q    All right.  Dr. Borow, so let's pick up where we were.  The first sentence in this paragraph, on Page 3 of your four-page, single-spaced report, starts with your opinions about Dr. Kovach and the EMH nurses, correct?

A    Correct.

Q    All right.  So the second sentence in that paragraph, could you just tell us what the second sentence is?

A    Second sentence says the nursing staff, particularly RN Jamie Krumwiede, failed to recognize a nonrecurrent non-reassuring electronic fetal monitor pattern that had developed, and that developed shortly after Mrs. Cook began to push at 20:00.

Q    And when you say "failed," is that synonymous with a deviation from standards of care?

A    Yes.

Q    And did you discuss that in detail here in the courtroom today?

A    We did.

Q    Okay.  Third sentence.

A    "She failed to report this pattern to Dr. Kovach, and requested her presence only for delivery."

Q    Is that a deviation from the standards of care?

1   A     It is, and we did discuss it.

2   Q     Next sentence?

3   A     "Additionally, she failed to decrease or

4   discontinue the Pitocin infusion and initiate

5   intrauterine resuscitation.  Oxygen had been placed on

6   as of 20:37, as was required to meet the standard of

7   care."

8   Q     Aside about the oxygen, is there, in your

9   discussion with defense counsel about Dr. Ouzounian,

10   Nurse McGrath don't think this was ever a

11   non-reassuring tracing, would there be any other reason

12   for a nurse to place oxygen, other than for the fact it

13   was a non-reassuring tracing with late decelerations?

14   A     No.  Or to do any other intrauterine

15   resuscitation.

16   Q     All right.  "Certainly by 21:07," could you read

17   that sentence?

18   A     "Certainly by 21:07 when Mrs. Cook had prolonged

19   deceleration at plus 1/plus 2 station, Nurse Krumwiede

20   needed to discontinue the Pitocin, immediately summon

21   Dr. Kovach to labor and delivery, and initiate plans

22   for cesarean section delivery for fetal benefit."

23   Q     All right.  And in this sentence, are you critical

24   of both Nurse Krumwiede and Dr. Kovach for the -- for

25   failing to do the cesarean delivery for fetal benefit?

1    A    In a timely fashion at that time, yes.

2    Q    All right.  And the last sentence in this

3    paragraph we already read.

4         MS. PANTAGES:  Jen, could you go to the next

5    paragraph, please?

6    Q    This is the last paragraph on Page 3.  Is this a

7    continuation of your standard of care violations that

8    we were just talking about in the previous paragraph?

9    A    Yes.

10   Q    Okay.  Paragraph 1 -- I'm sorry, sentence one,

11   could you read that, please?

12   A    "Dr. Kovach was not present for over 19 hours that

13   Mrs. Cook was in labor and delivery."

14   Q    All right.  Are you critical of Dr. Kovach for not

15   being present for 19 hours in this delivery?

16   A    I am.

17   Q    All right.  Did you talk about that earlier this

18   afternoon?

19   A    I have.

20   Q    Okay.  Second sentence.

21   A    "She only arrived six minutes before what she

22   described in ████████'s records as a, quote, difficult

23   shoulder dystocia and a significant shoulder dystocia

24   event."

25   Q    Are you critical of Dr. Kovach for arriving six

```
 1   months before delivery here?

 2   A    Yes.

 3   Q    Or before the shoulder dystocia?

 4   A    Six minutes before the delivery, after 19 hours of

 5   nonattendance, yes.

 6   Q    Was it a deviation from standards of care for Dr.

 7   Kovach to arrive six minutes before a difficult vaginal

 8   delivery?

 9   A    Before any delivery in this case.

10   Q    All right.  Next sentence.

11   A    "Dr. Kovach did not present to labor and delivery

12   despite slow descent of the fetal head in the second

13   stage of labor, and --" goes onto the next page "--

14   persistently --"

15   Q    Hold on.  We're getting there.  Let Jen get there.

16   A    I'm sorry.

17   Q    Okay.

18   A    "-- persistently non-reassuring fetal heart

19   pattern."

20   Q    Did we already discuss earlier in your testimony

21   today, Dr. Borow, that you were critical of Dr. Kovach

22   for not being at the bedside with the protracted labor

23   pattern and the persistently non-reassuring fetal heart

24   pattern?

25   A    I believe we did.
```

1   Q    Okay.  Then if you could continue your report,

2   please.  Delivery?

3   A    "Delivery only -- delivery occurred only minutes

4   after she arrived and was complicated by a shoulder

5   dystocia event.  It is my opinion she rushed through

6   multiple maneuvers, and Mrs. Cook pushing through these

7   maneuvers, which only makes them more likely to fail

8   and increase the risk of harm to the fetus, and

9   employed excessive downward traction to pull the

10  anterior right shoulder below the symphysis pubis."

11  Q    All right.  Keep going.

12  A    "These actions by Dr. Kovach caused the fractured

13  right clavicle and permanent brachial plexus injury to

14  Baby ████████.  She had ample time --" meaning Dr.

15  Kovach had ample time "-- to slowly and carefully work

16  her way through the maneuvers, the numerous maneuvers

17  available to relieve the shoulder dystocia, without

18  trauma to this child."

19  Q    Dr. Borow, you've been here for a couple of hours.

20  Are the opinions that you offered in this courtroom

21  today consistent with those areas of criticism that you

22  identified in your report in 2013?

23  A    Yes.

24  Q    Great.  Thank you.

25       You were asked questions -- you were asked a lot

1  of questions about Dr. Fernando and where was he and

2  what did he do.  Whose job was it on October 24th,

3  2009, to manage Mrs. Cook's delivery?

4  A     The attending obstetrician, that's Dr. Kovach.

5  Q     All right.  Last two questions I promise.  You

6  were asked questions about whether or not in a shoulder

7  dystocia there is a substantial risk of brain injury

8  and risk of permanent brachial plexus injury.  In 6,000

9  deliveries and the hundreds of shoulder dystocias that

10 you've encountered over your career, have you ever

11 managed a shoulder dystocia that led to a baby with

12 brain damage?

13 A     No.

14 Q     What is the incidence, if you could please tell

15 the jury, because they haven't heard the static yet.

16 What is the incidence of permanent brachial plexus

17 injuries in newborn babies?

18 A     Most recent statistics are 1 in 10,000 deliveries

19 that result in permanent brachial plexus injuries.

20 Q     And, Dr. Borow, of those 10,000 babies, is that

21 allcomers?  Is that preemies?  Is that sick babies?  Is

22 that malformed babies?  Is that deformed babies?  Is

23 that all babies?

24 A     All babies.

25 Q     What are the odds, Dr. Borow, of a permanent

 1    brachial plexus injury in a perfectly healthy,

 2    perfectly developed, perfectly formed, term baby like

 3    ███████ Cook?  What are the odds?

 4    A    Under normal circumstances, no more than 1 in

 5    10,000.  And avoidable in the presence of a C-section.

 6    Q    And do you believe, had Dr. Kovach done her job on

 7    October 24th, been present at the hospital, been at the

 8    bedside, watched Mrs. Cook's labor, been aware of the

 9    protracted descent, been aware of the estimated fetal

10    weight, the size of her pelvis, the changes on the

11    fetal monitor tracing, the extreme uses of Pitocin,

12    recognized the shoulder dystocia without having walked

13    in the room only four minutes before, gowned, gloved,

14    and was immediately confronted by an obstetric

15    emergency, if she had adequately prepared, do you

16    believe -- and not used force to break the collar born

17    and tear the brachial plexus, that all of that could

18    have been avoided if Dr. Kovach met the standard of

19    care?

20    A    I do believe that.

21              MS. PANTAGES:  Thank you.  That's all I have.

22              THE COURT:  Any follow-up, Attorney Mullin?

23              MS. MULLIN:  Thank you, Your Honor.  Very

24    briefly.

25                         *  *  *

**RECROSS-EXAMINATION OF LAWRENCE S. BOROW, M.D.**

**BY MS. MULLIN:**

Q    Dr. Borow, turn to the last page of your report where you just read to the jury, where you indicate that it is your opinion that Dr. Kovach rushed through multiple maneuvers, and had Mrs. Cook pushing through these maneuvers, where it only makes it more likely to fail.  Do you see that part?

A    Yes.

Q    You read Dr. Kovach's testimony about how she managed the shoulder dystocia, right?

A    Her deposition and her testimony?

Q    Yes.

A    Yes.

Q    And you recall reading specifically her indicating that she glances at the clock, takes a deep breath, has the nurses get on the stool for good leverage for the suprapubic pressure, quote, tells the patient to stop pushing.  Do you remember reading that?

A    I did.

Q    And so you have absolutely no basis to conclude that she rushed through maneuvers and had this patient push through maneuvers, do you?

A    My recollection was I believe Nurse Krumwiede talked about pushing with shoulder dystocia.

```
1   Q     That's your recollection?

2   A     Yes.

3               MS. MULLIN:  Thank you.

4               THE WITNESS:  Yes, ma'am.

5               MR. MURPHY:  No questions.

6               THE COURT:  All right.  Thank you, Doctor.

7   You're excused.

8                       (Witness Excused.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2    THE STATE OF OHIO,      )
                             )   SS:
3    COUNTY OF LORAIN.       )

4

5        I, Michelle M. Lewis, Official Court Reporter of

6    the Court of Common Pleas, Lorain County, Ohio, duly

7    appointed therein, do hereby certify that this is a

8    correct transcript of the proceedings in this case.

9        I further certify that this is a complete

10   transcript of the testimony.

11       IN WITNESS WHEREOF, I have subscribed my name this

12   __2nd__ day of ____June_____, 2018.

13

14

15

16

17                        _____

18                        Michelle M. Lewis, RPR
                          Official Court Reporter
                          Court of Common Pleas
19                        Lorain County Justice Center
                          Elyria, Ohio  44035
20                        (440) 329-5424

21

22

23

24

25       My Commission expires on January 12, 2019.