## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETHANY DITZLER, | : | CIVIL ACTION NO. 1:21-CV-1852 |
| | : | |
| Plaintiff | : | (Judge Neary) |
| | : | |
| v. | : | |
| | : | |
| UPMC PINNACLE HOSPITALS, | : | |
| BEVERLY A. HALL NDLOUVU, | : | |
| and LEE BLECHER | : | |
| | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

When resolving a motion for summary judgment, a court's job is simply to determine whether the non-moving party has established that a dispute of material fact persists in a given case. The court should not weigh the evidence or make findings of credibility; those tasks are reserved for the factfinder.

Here, Plaintiff Bethany Ditzler brought suit against UPMC Pinnacle Hospitals, Dr. Beverly A. Hall Ndlovu, and Dr. Lee Blecher for alleged negligence as to the delivery of her baby girl on August 16, 2001. All defendants have moved for summary judgment. Drs. Blecher and Ndlovu additionally moved to preclude certain testimony from some of Ditzler's expert witnesses. The defendants have shown, sometimes with Ditzler's agreement, there are some areas where no dispute of material fact exists. Additionally, there are some limits to the testimony given by Ditzler's expert witnesses. As for her core claims, however, Ditzler has shown there are material disputes of fact only a jury can resolve. Therefore, defendants' motions

*in limine* and motions for summary judgment shall be granted in part and denied in part.

## I.  <u>**Factual Background & Procedural History**</u>[1]

This case begins over twenty years ago when Cami Furjanic went to UPMC Pinnacle Hospitals[2] in preparation of giving birth to her daughter, plaintiff Bethany Ditzler. (Doc. 93 ¶ 3). When she arrived, Dr. Lee Blecher, then a family practice physician in an OB/GYN fellowship, documented Furjanic's history and conducted a physical. (<u>Id.</u> ¶ 4). At that time, Dr. Beverly A. Hall Ndlovu was working at the hospital as an outside obstetrician contracted to provide moonlight coverage. (Doc. 84 ¶ 13). Dr. Ndlovu was one of many attendings Dr. Blecher worked with during his fellowship. (<u>Id.</u> ¶ 15).

At this point, there is a gap in the documentary evidence as the labor and delivery records for Ditzler's birth are unavailable. (<u>Id.</u> ¶ 19). Instead, Ditzler turns

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. <u>Id.</u> Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (<u>See</u> Docs. 79, 84, 91 Ex. A, 93, 98, 123, 125, 127). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] The parties have agreed by stipulation the hospital where Ms. Ditzler's birth took place is UPMC Pinnacle Hospitals and it is owned by parent corporation UPMC Pinnacle. (Doc. 5). All references in this opinion to "the hospital" are to UPMC Pinnacle Hospitals.

to her mother and aunt, Joy Watkins, to prove her case. Watkins was present during the delivery, and both she and Furjanic recounted certain aspects of the delivery in deposition testimony. (See generally Doc. 84-9 (Deposition of Cami Furjanic, hereinafter "Furjanic Dep."); 84-13 (Deposition of Joy Watkins, hereinafter "Watkins Dep.")). Neither doctor remembers the specific events of Ditzler's birth or if they were even involved. (Doc. 93 ¶¶ 5, 7; Doc. 84-11, deposition of Dr. Beverly A. Hall Ndlovu, hereinafter "Ndlovu Dep." at 35:3-6).

The uncontroverted record indicates there were complications with Ditzler's birth. When Furjanic was giving birth to Ditzler, the former was 240 pounds and five feet tall. (Doc. 93-2 at 8). This means Furjanic had a BMI of 47, making her morbidly obese. (Doc. 93-6 at 2). Furjanic identified Dr. Blecher as the one who was in the room overseeing the delivery. (Furjanic Dep. at 83:7-86:3). During labor, Furjanic pushed for over two hours, but progressed only far enough to have Ditzler's head poking out of the birth canal. (Furjanic Dep. at 91:5-8; 118:2-119:13). At some point, her mother and aunt claim Dr. Blecher grabbed on to Ditzler's head, bracing his foot on the hospital bed, and attempted to pull Ditzler free. (Furjanic Dep. at 194:9-195:3; Watkins Dep. at 47:5-12). When that did not work, Dr. Ndlovu was summoned to assist. (Doc. 84 ¶¶ 25, 35-39). Within moments of Dr. Ndlouv's arrival, Ditzler was finally fully delivered. (Id. ¶ 23-24).

There are existing medical records detailing Ditzler's condition post-birth and they are uncontested. When Ditzler was finally delivered, she had Apgar

scores[3] of seven at one minute and nine at five minutes. (Doc. 93-2 at 9). She had some bruises on the right side of her face. (Id. at 12). Additionally, Ditzler had a birth weight of 9 lbs. 8 oz., with a head circumference of 35 cm, and a chest circumference of 36 cm. (Id. at 9). The day Ditzler was born, she was assessed as having Erb's palsy.[4] (Id.).

Per Ditzler, she suffered a brachial plexus injury from a shoulder dystocia event at her birth. (Doc. 1 ¶ 27). While these are complex medical terms, Judge Mark A. Kearney of the Eastern District of Pennsylvania recently dealt with a similar case and provided a succinct, clear explanation of what these terms mean.

> The brachial plexus is "the network of nerves that send signals from the spinal cord to the shoulder, arm and hand. A brachial plexus injury occurs when these nerves are stretched, compressed, or in the most serious cases, ripped apart or torn away from the spinal cord." Brachial plexus injuries may occur in many ways, including during the birthing process. Injuries can range from numbness and weakness in the arm to complete lack of movement and feeling in the arm, including the shoulder and hand. [The court is] concerned here with a neonatal brachial plexus injury or "palsy" presenting in a newborn "as a weak or paralyzed upper extremity, with the passive range of motion greater than the active." There are various risk factors associated with neonatal brachial plexus injury, including shoulder dystocia.
> Shoulder dystocia is defined as "a delivery that requires additional obstetric maneuvers following failure of gentle downward traction on the fetal head to effect delivery of the shoulders." Shoulder

---

[3] An Apgar score is an "evaluation of a newborn infant's physical status by assigning numerical values (0 to 2) to each of 5 criteria: heart rate, respiratory effort, muscle tone, response stimulation, and skin color; a score of 8–10 indicates the best possible condition." Apgar score, Steadman's Medical Dictionary (27th ed. 2000).

[4] Erb's palsy is "a type of obstetric palsy in which there is paralysis of the muscles of the upper arm and shoulder girdle (e.g., deltoid, biceps, brachialis, and brachioradialis, and sometimes the infraspinati nad [sic] serratus anterior muscles) caused by a lesion of the upper trunk of the brachial plexus or of the roots of the fifth and sixth cervical roots." Erb Palsy, Steadman's Medical Dictionary (27th ed. 2000).

dystocia is diagnosed upon delivery of the baby's head but the baby's shoulders fail to deliver because a shoulder is impacted—or in layman's terms "stuck"—behind the mother's pelvic bones as the fetus moves in the course of labor and delivery. There is a difference between shoulder dystocia resulting from the impaction of the baby's anterior shoulder ("anterior" meaning "situated in front of or in the forward part of an organ") behind the mother's pubic bone and dystocia resulting from impaction of the posterior shoulder ("posterior" meaning "situated in the back of, or in the back part of, a structure") at the level of the mother's "sacral promontory" at the bottom of the spine. Dystocia from impaction of the anterior shoulder is evident on delivery of the baby's head while dystocia from impaction of the posterior shoulder occurs before delivery of the baby's head and is not clinically apparent at the time of its occurrence.

[The court is] concerned with an anterior shoulder dystocia. When a baby's anterior shoulder is stuck behind the mother's pubic bone, the obstruction of the affected shoulder widens the angle between the baby's neck and impacted shoulder and stretches the brachial plexus nerve. Brachial plexus stretch can be increased by traction applied by the clinician "typically described as a downward lateral traction, with bending of the fetus' neck away from the anterior shoulder," but "in the presence of shoulder dystocia, even properly applied axial traction will necessarily increase stretch of the brachial plexus."

A brachial plexus injury can be either temporary or "persistent." A persistent brachial plexus injury is defined as residual neurologic dysfunction twelve or more months after birth. . . .

There are two major components to the forces of labor and the delivery process: (1) compression; and (2) traction. Compression is the pushing force of the labor process, that is, the maternal forces of labor. In the mechanics of delivery, uterine contractions and maternal pushing produce pressure or force within the uterus moving the fetus into and through the birth canal. Traction is a pulling force applied by the clinician to the baby's head and spine in a downward motion but without bending the baby's neck laterally toward the floor or ceiling. The application of gentle traction in both an uncomplicated delivery and resolution of shoulder dystocia is consistent with the standard of care.

<u>M.D.R. by Rivera v. Temple Univ. Hosp.</u>, No. CV 22-621, 2022 WL 15173903 *2-3 (E.D. Pa. Oct. 26, 2022) (internal citations omitted).[5]

Ditzler retained several experts to help substantiate her claims. This opinion concerns two of them: Dr. Lawrence D. Borow and Dr. Joshua M. Abzug. Dr. Borow is a Board-Certified Obstetrician and Gynecologist in continuous active practice for over 45 years, and someone who has trained over 200 residents in obstetrics and gynecology as well as numerous family practice physicians in labor and delivery. (Doc. 93-5 at ECF 2). In his expert report, Dr. Borow finds Ditzler's birth was at high risk for a shoulder dystocia event because of maternal morbid obesity and suspected large for gestational age fetus. (<u>Id.</u> at ECF 5; doc. 93-6 at 2-3).

He additionally opines Ditzler did in fact suffer a shoulder dystocia event and that the event was cause by "excessive rotation on the fetal head or excessive traction [that] was applied in an off-axial manner." (Doc. 93-5 at ECF 3). Dr. Borow bases this conclusion on Furjanic's and Joy Watkins' testimony describing Dr. Blecher bracing his foot on the hospital bed and pulling on Ditzler's head, along with other descriptions from that day. (<u>Id.</u> at ECF 4). In Dr. Borow's opinion, Dr. Blecher, Dr. Ndlovu, and UPMC Pinnacle Hospitals breached the standard of care owed to patients in the course of Ditzler's delivery due to the manner in which she was delivered. (Doc. 93-5 at ECF 6).

---

[5] The court acknowledges that some of the descriptions from Judge Kearney were based on the specific testimony in that case. See <u>M.D.R.</u>, 2022 WL 15173903 at *2-3. Ditzler has not raised any objections to the <u>M.D.R.</u> courts medical framing and this court is only using this portion of that opinion to help clarify and explain the medical issues involved.

As for Dr. Abzug, he is a certified pediatric orthopedist who is currently an associate professor at the University of Maryland School of Medicine and works at the University of Maryland Hospital. (Doc. 93-7 at ECF 11-12). He also concludes that Ditzler suffered a shoulder dystocia event, a brachial plexus injury, and that her injury was caused by Dr. Blecher. (Id. at ECF 7). Similar to Dr. Borow, Dr. Abzug bases his opinion on the deposition testimony of Furjanic and Watkins. (Id. at ECF 7-8). Unlike Dr. Borow, however, Dr. Abzug does not give an opinion on the standard of care, (Doc. 93-8 at 6-7); rather, he only identifies when and how he believes Ditzler suffered her brachial plexus injury. Further, because the birthing records from Ditzler's birth are missing, the deposition testimony of Furjanic and Watkins are effectively the only account of Ditzler's birth available for review. (Doc. 93-6 at 6; Doc. 93-8 at 4).

The defendants have filed various motions for partial summary judgment and Ditzler has filed responses thereto. This matter is now fully briefed and ripe for disposition.

## II.    <u>Legal Standards</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is material if resolution of it "might affect the outcome of the suit under the governing law" and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Mall Chevrolet, Inc. v. General Motors LLC</u>, 99 F.4th 622, 631 (3d Cir. 2024) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When considering a

motion for summary judgment, a court must view the evidence in the light most

favorable to the non-moving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (citing

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The court's duty is not "to

weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial." Anderson, 477 U.S. at 242-43.

There are "two closely related methods for a movant to succeed at summary

judgment." Mall Chevrolet, 99 F.4th at 630. "First, under the standard approach, the

moving party may produce material facts, established as genuinely undisputed, that

entitle it to judgment as a matter of law." Id. (citing FED. R. CIV. P. 56(a)). "Second,

under the Celotex approach, a moving party may instead demonstrate that the

nonmoving party has not made 'a showing sufficient to establish the existence of an

element essential to that party's case *on which that party will bear the burden of

proof at trial.*'" Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

The nonmoving party can defeat a motion for summary judgment by

producing evidence to establish a genuine issue of material fact. Anderson, 477 U.S.

at 256. The nonmoving party "may not rest upon mere allegation or denials of his

pleading, but must set forth specific facts showing that there is a genuine issue for

trial." Id. The party "must do more than simply show that there is some

metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." Anderson, 477

U.S. at 252. Moreover, if the nonmovant's version of disputed facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

Federal Rule of Civil Procedure 56(c) requires movants and nonmovants alike to support factual assertions by "citing to particular parts of materials in the record" or otherwise "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c). Rule 56(e) allows the court to deem undisputed any fact not properly countered by record evidence. See FED. R. CIV. P. 56(e)(2). Local Rule of Court 56.1 undergirds these principles by requiring Rule 56 motions to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. Local Rule 56.1 further requires the nonmovant to file a responsive statement identifying genuine issues to be tried and mandates that both parties' submissions "include reference to the parts of the record that support the statements." Id.

This court has wide discretion to sanction noncompliance with local rules, including Local Rule 56.1, which serves the important purpose of organizing the summary judgment record and facilitating efficient disposition of Rule 56 motions. See Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 613-14 (3d Cir. 2018). Permissible sanctions for failure to strictly comply with Local Rule 56.1 include striking nonresponsive statements of fact or deeming a moving party's statement to be unopposed when not properly controverted. See id.; see also FED. R. CIV. P. 56(e);

M.D. PA. L.R. 56.1. In resolving the instant motion, the court has reviewed the parties' statements and has independently considered the entire record.

The Supreme Court, through Federal Rule of Evidence 702, provides the standard for the admission of expert testimony: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . : (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The district court serves "as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)). As gatekeeper, the court has three duties: "(1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993)).

### III.   **Discussion**

Dr. Ndlovu and Dr. Blecher ("the defendant Doctors") each filed motions *in limine* seeking to preclude the expert testimony of Dr. Borow and Dr. Abzug on the

basis that they are speculative and lack foundation. All defendants have moved for summary judgment. As the motions *in limine* effectively serve as motions for summary judgment, see Toogood v. Owen J. Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003), they shall be addressed first.

### A. Doctors' motions for *in limine*

The Third Circuit describes Federal Rule of Evidence Rule 702 as a "trilogy of restrictions on expert testimony: qualification, reliability[,] and fit." Calhoun v. Yamaha Motor Corp., USA, 350 F.3d 316, 321 (3d Cir. 2003) (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)). "The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'" Id. (citing FED. R. EVID. 702). While a court has discretion in applying Rule 702's restrictions, it does not have discretion to abandon the gatekeeping function or to perform the function inadequately. Id. (quoting Kumho Tire v. Carmichael, 526 U.S. 137, 158–59 (1999) (Scalia, J., concurring)).

The reliability threshold requires an expert's opinion to be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." Id. (quoting Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 80–81 (3d Cir. 2017)). While "Rule 702 has a 'liberal policy of admissibility,'" United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting Kannankeril, 128 F.3d at 806)), an expert's testimony must still be "supported by 'good grounds,'" UGI Sunbury, 949 F.3d at 834. This is not intended to be a high standard or applied in a way requiring a plaintiff "to prove [her] case twice"; a plaintiff need only demonstrate by a preponderance of the evidence her expert's opinions are reliable. Oddi v. Ford

Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting In re Paoli R.R.Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)).

Of Rule 702's trilogy of restrictions on expert testimony, the defendant Doctors only focus on one basis: the plaintiff's expert witnesses are not reliable. (Doc. 85 at 11-12; Doc. 94 at 5 (stating Dr. Borrow has "no scientific or medical facts to support his opinion.")). "[The] reliability threshold requires expert testimony to be 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" UGI Sunbury, 949 F.3d at 833-34 (quoting Karlo, 849 F.3d at 80–81). "[A]dmissibility is not based on whether an expert's 'opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.' Rather, 'the court looks to whether the expert's testimony is supported by "good grounds."'" Id. at 834 (quoting Karlo, 849 F.3d at 81).

The defendant Doctors' first attack on the reliability of Ditzler's witnesses is that the experts effectively opine that because she suffered a brachial plexus injury, it had to be the result of negligence on the part of the delivering physicians. (Doc. 85 at 10-12, 19-23 (quoting largely from M.D.R., 2022 WL 15173903); Doc. 94 at 12-15). This theory of *res ipsa loquitur* causation with respect to shoulder dystocia injuries was thoroughly discredited by Judge Kearney. See M.D.R., 2022 WL 15173903 at *11-14. For her part, Ditzler does not argue the logic on M.D.R. was wrong, rather she argues her case is distinguishable. (Doc. 126 at 33-36). She is correct.

Dr. Borow argues Ditzler was at increased risk of shoulder dystocia due to *specific* characteristics such as her mother's weight, her gestational size, and her measured head size. (Doc. 93-5 at ECF 5). While defense expert Dr. Robert

12

Gherman,[6] calls these "purported risk factors," (Doc. 93-9 at ECF 6), he does not further dispute or otherwise discredit Dr. Borow's claim on this point. Next, both Dr. Borow and Dr. Abzug also focus on the deposition testimony from Furjanic and Watkins in coming to their medical opinions. (Id. at ECF 4, 6; Doc. 93-7 at 7). While the Doctors and their experts have other issues with using deposition testimony, it is quite clear plaintiff's experts' opinions are not grounded on *res ipsa loquitur* logic. Rather, Dr. Borow and Dr. Abzug place significant weight on the *specific* manner of Ditzler's delivery as described by Furjanic's and Watkins' deposition. Thus, the analysis from M.D.R. is not persuasive on this point.[7]

Concerning the use of the deposition testimony of Furjanic and Watkins by Ditzler's experts, the Doctors claim that use of lay witness testimony is disqualifying in the medical context. (Doc. 85 at 15-17; Doc. 94 at 7-8, 12). Yet Rule 703 allows an expert to base an opinion "on facts or data in the case that the expert has been made aware of or personally observed." FED. R. EVID. 703. This includes the deposition testimony of Ms. Fujanic and Watkins. The commentary on the Federal Rules explicitly references the sources of information doctors use in coming to a decision: "[A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, *including statements by patients and relatives*." FED. R. EVID. 703 cmt. 1972. Neither of the defendant Doctors cites to any

---

[6] Dr. Gherman is a board-certified physician in Maternal/Fetal Medicine and Obstetrics/Gynecology. (Doc. 93-9 at ECF 2). He has served as the chairman of the American College of OB/BYN Tas Force on Neonatal Brachial Plexus Palsy. (Id.).

[7] This also addresses Dr. Blecher's argument that Dr. Borow's testimony was too speculative and lacking a basis in the record. (See Doc. 94 at 6-8).

caselaw or other support for the proposition that a medical doctor can *never* rely on testimony or descriptions from non-medical persons.

Simply put, it does not matter that Furjanic and her sister are not medical experts; doctors often take the accounts of untrained patients and make medical judgments reflecting on what they have been told. That is what happened here. To the extent the Doctors wish to bring up the passage of time between Ditzler's birth and the present, that goes to the weight and credibility of the evidence— which is within the undisputed province of the factfinder. Drs. Borrow and Azbug base their opinions on the accounts of Furjanic and Watkins. If the jury finds that account credible, they may also rely on Drs. Borrow and Azbug assertion that malpractice took place.

The last critique from the defendant Doctors is that Ditzler's experts must be unreliable because the deposition testimony they reviewed is about an event that took place two decades ago. (Doc. 85 at 15-17; Doc. 94 at 9-10). The Supreme Court, however, has made clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrell Dow Pharm, Inc., 509 U.S. 579, 596 (1993). "In most cases, the lack of factual support for an expert opinion affects its weight rather than its admissibility." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 420 (3d Cir. 2002) (Sloviter, J., dissenting). It is only when there is "no factual support" that a potential expert's testimony must be excluded. Id.

14

Here, there is a factual basis for the expert opinions proffered by Drs. Borow and Abzug. Furjanic has stated Ditzler's "shoulder was hung up and being dislocated by my [(Furjanic's)] pelvic bones." (Furjanic Dep. at 25:11-13). She also stated that she could feel through the bed frame Dr. Blecher using his foot to brace himself as he pulled on Ditzler. (Id. at 194:9-19). Watkins corroborated this testimony, saying she saw the doctor "put their foot on the table almost to brace themselves and pulled at the same time." (Watkins Dep. at 36:12-15). To the extent the Doctors wish to discredit this testimony, they are free to do so—to the factfinder.

Dr. Ndlovu also challenges the Ditzler's experts regarding alleged supervisory negligence. (See Doc. 85 at 14-17). However, she does not fairly characterize Ditzler's allegations. Ditzler primarily alleges Dr. Ndlovu was negligent by *failing* to supervise Dr. Blecher. (Doc. 126 at 30-32). There is plenty of evidence to support this idea. First, Dr. Blecher testified there were circumstances where he should not have been alone in a delivery room.[8] (Doc. 84-2, Deposition of Dr. Lee Blecher, at 25:5-12, 41:9-13). Next, Dr. Borow gave his opinion for why a doctor like Dr. Blecher should not have handled a delivery by himself. (Doc. 93-5 at ECF 5-6; Doc. 93-6 at 4-6, 8). To the extent Dr. Ndlovu disagrees with that conclusion, she must make such an argument to a jury, not the court.

---

[8] Dr. Ndlovu asks this court to disregard this comment by Dr. Blecher. (Doc. 85 at 15 n.12). She provides no legal support for this request, and this court will not grant it.

It is of no moment that the evidence marshalled by Ditzler does not establish whether Dr. Ndlovu knew what was transpiring; indeed, the point is that Dr. Ndlovu was unaware of what was going on. Further, for the reasons given above, Drs. Borow and Abzug are allowed to rely on the testimony of Furjanic and Watkins. Ditzler has demonstrated a dispute of material fact exists regarding her supervisory negligence claim against Dr. Ndlovu.

With all that said, there are some justified restrictions on Ditzler's experts. Dr. Ndlovu seeks to be freed from claims of direct negligence. (See Doc. 85 at 17-18). Ditzler counters that Dr. Borow offers an "alternate opinion" establishing the direct negligence of Dr. Ndlovu, as opposed to supervisory negligence. (Doc. 126 at 22). Yet, even Ditzler concedes that "an expert may offer an opinion based on hypothetical facts *reasonable consistent* with the evidence." (Doc. 126 at 21 (quoting In re DVI, Inc. Sec. Litig., No. CIV.A. 03-5336, 2014 WL 4634301, *19 (E.D.Pa. Sept. 16, 2014)) (emphasis added). In this case, it is undisputed that Dr. Ndlovu's involvement in the delivery "was limited to the performance of an episiotomy" and that there is "no evidence that Dr. Ndlovu applied any degree of traction relative to her late and limited involvement in the delivery of [Ditzler]." (Doc. 84 at ¶¶ 39, 41). Therefore, there is no evidence tying Dr. Ndlovu to direct negligence regarding the delivery of Ditzler. Dr. Borow's unsubstantiated testimony on this point is precluded and summary judgment is granted to Dr. Ndlovu as it pertains to claims of direct negligence.

Additionally, Dr. Abzug himself disclaims offering any testimony about the standard of care in this case. (Doc. 93-8 at 6-7). The defendant Doctors disagree,

with one saying this is "form over substance." (Doc. 85 at 9 n.5; <u>see also</u> Doc. 94 at 11-12). The court reads Dr. Abzug's testimony as identifying when the shoulder dystocia event occurred, but not going beyond that. In other words, though Dr. Abzug opines when he believes Ditzler was injured, he does not say the Doctors negligently caused her injury. Identifying when Ditzler's injury occurred is within Dr. Abzug's expertise and it shall be confined to such.[9] Dr. Ndlovu further wishes to strike the parts of Dr. Borow's testimony regarding the need for a discussion about a cesarean section. (Doc. 85 at 18-19). Ditzler does not address this argument in her briefing. As she does not plead a claim for failure to obtain informed consent, any attempt to use Dr. Borow's testimony for that purpose would be improper.

### B. Joint Motion

All defendants jointly filed a partial motion for summary judgment concerning allegations of negligence, injuries, and damages. Defendants collectively moved for summary judgement on claims from paragraphs 38 (f), (i), (n), (o), (q), (t), (u), (v), and (w) and 40 (b), (d), and (g) of the complaint[10] for not being supported by

---

[9] Dr. Abzug also has no grounds to guess about whether the words "shoulder dystocia" were about to be written on a document and so that part of his testimony is excluded.

[10] These claims were that the Doctors failed to exercise the judgment of a reasonable physician by:
   (f) Failing to adequately record plaintiff's symptoms and the treatment provided by defendants;
   (i) Holding out expertise which induced plaintiff's mother to believe that adequate and proper care would be provided when, in fact, adequate, proper and reasonable care was not provided when treating and delivering plaintiff;
   (n) Failing to refer plaintiff for appropriate treatment;
   (o) Failing to refer plaintiff to the appropriate specialist;

expert testimony. (Doc. 81 at 6). Ditzler filed a response opposing summary

judgement with respects to paragraphs 38(i) and 40(b) and (d). (Doc. 105 at 3). Given

the implicit non-opposition to granting summary judgment on paragraphs 38 (f), (n),

(o), (q), (t), (u), (v), and (w) and 40(g), defendants' motion as to those paragraphs will

be granted.

Moving to the disputed paragraphs starting with paragraph 38(i), it alleges

the defendant Doctors "failed to exercise the judgment of a reasonable physician

under the circumstances [by] . . . [h]olding out expertise which induced plaintiff's

mother to believe that adequate and proper care would be provided when, in fact,

adequate, proper and reasonable care was not provided when treating and

delivering plaintiff." (Doc. 1 ¶ 38(i)). It is undisputed that Dr. Ndlovu and Dr.

Blecher were practicing physicians. (Doc. 84 ¶¶ 2-3). Additionally, it would be fair

for a jury to find that physicians, by virtue of their positions, hold out expertise to

induce patients to rely on them, especially regarding a matter squarely within their

specialty area. Next, as already discussed, Dr. Borow has given an admissible,

---

(q) Failing to discover and diagnose conditions within plaintiff's body;
(t) Failing to investigate plaintiff's symptoms and conditions;
(u) Failing to properly assess plaintiff's symptoms and obtain
    appropriate diagnostic studies;
(v) Failing to properly examine plaintiff and refer her to the
    appropriate specialist; and
(w) Failing to properly document plaintiff's symptoms;
(Doc. 1 ¶ 38) (cleaned up). The other claims were that Ditzler suffered:
(b) Hospitalization;
(d) Large and unnecessary medical bills incurred and that will be incurred in
    the future; and
(g) Past and future unreimbursed wage loss, permanent disability and
    impairment of her earning power and capacity.
(Id. ¶ 40) (cleaned up).

legitimate opinion that proper care was not given in this case. (Doc. 93-5 at ECF 6-7; Doc. 93-6 at 6-9). Accordingly, there is a dispute of material fact as to paragraph 38(i).

Turning to paragraph 40, Ditzler complains she suffered hospitalization and other medical bills, past and present. (Doc. 1 ¶ 40(b), (d)). In defense of these paragraphs, Ditzler points to the life-care plan recommended to her by her expert. (Doc. 124 at 6). This plan is for future medical interventions. (See id.). Defendants' main argument for summary judgment on these paragraphs is that this plan is only "for future care needs, but does not address incurred medical bills." (Doc. 81 at 6; see also Doc. 115 at 5 (arguing again the evidence cited by Ditzler is only on future care). Ditzler has provided no evidence of the costs of past hospitalization or past medical care, and summary judgment will be granted to defendants to the extent paragraphs 40(b) and (d) were seeking relief for care already rendered. There is, however, a material dispute of fact about potential future care. The life-plan submitted by Ditzler is enough for her claims regarding future medical to survive summary judgment.

### C.  Corporate Negligence

Last, UPMC Pinnacle Hospitals argues plaintiff has not raised a genuine dispute of material fact concerning its liability for corporate negligence. In Pennsylvania, corporate liability for hospitals in medical malpractice actions is governed under the Pennsylvania Supreme Court case Thompson v. Nason Hospital, 591 A.2d 703 (Pa. 1991). That Court has explained "[c]orporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper

standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." Id. at 707.

At the same time, "it is necessary to show that the hospital had actual or constructive knowledge of the defect or procedures which created the harm." Id. at 708. Actual or constructive knowledge is crucial because "[a] hospital is not directly liable under Thompson just because one of its employees or agents makes a mistake which constitutes malpractice. . . . Thompson contemplates a kind of systemic negligence." Corey v. Wilkes-Barre Hosp. Co., LLC, 307 A.3d 701, 710 (2023), appeal denied, 326 A.3d 399 (Pa. 2024) (quoting Edwards v. Brandywine Hosp., 652 A.2d 1382, 1386-87 (Pa. Super. Ct. 1995)). "[I]ndividual decisions and actions of a doctor" are an insufficient basis to form a corporate negligence claim against a hospital. Id. at 712.

Plaintiff's expert Dr. Borow states UPMC Pinnacle Hospitals "breached the standard of care by failing to oversee the defendant Doctors patient care and they breached the standard of care by failing to formulate, adopt and enforce rules and policies to ensure quality care." Doc. 93-5 at ECF 6. He explains the specific failure was "allow[ing] a family practice resident to attempt delivery without supervision." (Doc. 93-6 at 9).

The basis for Dr. Borow's finding comes from Dr. Ndlovu's deposition in which she states, "Any provider who is in labor and delivery can deliver a baby on their own without the physician, provided that they are on the unit, and if the patient needs assistance in delivering, any physician, whether it's a resident or any

other practitioner, can provide delivery for that patient."[11] (Ndlovu Dep. at 64:14-21). In this answer, she was describing what she understood the policy of the hospital to be. (Id.).

As a physician allowed to operate within the hospital's walls, Dr. Ndlovu was in a position to give a legitimate description of what the policy of the hospital was at the time of Ditzler's birth. Taking the evidence in light most favorable to Ditzler, either the official hospital policy was to allow resident fellows to conduct delivery by themselves, or the hospital was failing to adequately supervise Dr. Ndlovu in allowing resident fellows to conduct deliveries by themselves. This means UPMC Pinnacle Hospitals was on notice of the negligent policy under Thompson. See Rauch v. Mike-Mayer, 783 A.2d 815, 828 (Pa. Super. 2001) ("[C]onstructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. We interpret 'failure to enforce adequate rules and policies' as an analog to 'failure to provide adequate supervision.'") (internal citations omitted). It is true the hospital can dispute whether Dr. Ndlovu is giving an accurate representation of the hospital's policy, but resolving such a dispute is for the factfinder, not a court.

---

[11] There were two objections to form before Dr. Ndlovu gave this answer. (Ndlovu Dep. at 64:8-11). While there was not any further elaboration, the court finds no issue with the question asked, which was "As a fellow in 2001 at Harrisburg Hospital, was he [Dr. Blecher] permitted, if you know, to deliver a baby on his own?" (Id. at 64:5-7). The court construes this question as asking Dr. Ndlovu what her sense of the policy of the hospital was—a legitimate question. Therefore, the court overrules the objections to form.

The other argument from UPMC Pinnacle Hospitals is that Dr. Borow is unqualified to opine on "the development and enforcement of hospital policies and procedures nor the role of the hospital in the supervision of resident physicians." (Doc. 78 at 8). This is because Dr. Borow has only been a physician with no supervisor or management experience. (Id. at 8-9). UPMC Pinnacle Hospitals also criticizes Dr. Borow for not giving a clear methodology for his conclusions or tie his experience to his opinions. (Id. at 9). Dr. Borow is a board-certified obstetrician and gynecologist who reports having trained "over 200 residents in obstetrics and gynecology as well as numerous family practice physicians." (Doc. 93-5 at ECF 2). Given his role as an attending physician and as a teacher to new physicians, Dr. Borow is qualified to opine on the standards hospitals should set for its physicians to follow. As correctly pointed out by Ditzler, a doctor may, by virtue of his training and appointments, offer expert testimony regarding corporate negligence. See Whittington v. Episcopal Hosp., 768 A.2d 1144, 1155-56 (Pa. Super. 2001).[12] Dr. Ndlovu's statement about what he believed the policy of the hospital to be, along with Dr. Borow's expert opinion, are sufficient to create a dispute of material fact concerning the UPMC Pinnacle Hospitals' corporate negligence.

---

[12] It is true that Pennsylvania uses a different standard for expert opinions, namely it continues to follow the Frye standard rather than the Daubert standard adopted by federal courts. Grady v. Frito-Lay, Inc., 839 A.2d 1038, 1044 (Pa. 2003). Yet, Daubert allows for "a somewhat broader range of scientific testimony than would have been admissible under Frye." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997). As such, if expert testimony would be allowed in a Pennsylvania court on corporate negligence for a hospital, it follows that such testimony would also be allowed in a federal court.

## IV.    <u>Conclusion</u>

For the reasons given above, the court will not preclude the testimony of Drs. Borow and Abzug except as noted. Their testimony creates a dispute of material facts regarding whether Drs. Ndlovu and Blecher, as well as UPMC Pinnacle Hospitals, breached the standard of care in treating Ditzler. Where disputed, the court also denies defendants' joint partial motion for summary judgment. Finally, Ditzler has presented a triable claim of corporate negligence with respect to UPMC Pinnacle Hospitals. An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    September 17th, 2025